**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**RECEIVED**

MAY 0 9 2007

ANGEL RUIZ RIVERA

Petitioner

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

v.                                                    07-0019 (EGS)(RBW)

ALBERTO R. GONSALES, et al.,

Respondents

---

**MEMORANDUM IN SUPPORT OF PETITIONER'S MOTION IN RESPONSE TO**
**RESPONDENTS' MOTION TO DISMISS**

TO THE HONORABLE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
(HUSDCDC):

        Comes now the Petitioner, Angel Ruiz Rivera (ARR), appearing here Pro Se Ipso, and

respectfully states, alleges and prays as follows:

**I. INTRODUCTION**

        The Respondents claim in their Memorandum, that Petitioner, ARR: "filed this petition

for writ of mandamus seeking to have the Court compel the Respondents to concede that they

neglected to properly investigate Petitioner's complaint in which he had alleged that certain

Assistant United States Attorney (AUSA's) in Puerto Rico, while handling litigation on behalf of

the United States Department of Education (USDE), against Instituto de Educacion Universal

(IEU) had engaged in misconduct". The above is a very accommodating and subjective

interpretation of the reasons justifying the Mandamus. The instant Petition, on its prayer at p.18,

clearly seeks from this HUSDCDC to have the Respondents "compelled to take the disciplinary

measures that the circumstances and the ethics dictate against the USAO Attorneys...".

1

The reasons for the instant Mandamus Petition are simple. With the quantity and quality of the overwhelming smoking gun and beyond doubt evidence that the Petitioner here, complainant there, submitted together with his Complaint for Misconduct (CFM) against the USAO Attorneys, it is improbable that the CFM could be neglected the way it was, except only if it was as a result of a cover up of same misconduct. On their clearly unripe to say the least, Motion To Dismiss (MTD) and Memorandum of Points and Authorities in Support of Motion To Dismiss (MPASMD), the Respondents do not even deny these serious allegations, nor could they, since the hard evidence flies on their face. The facts of the instant controversy are also simple. The USAO Attorneys evidently lend themselves to act as mere rubber stamps or limited their act to play second fiddle to plainly incompetent USDE legal counsels who knowingly violated the law. As the Court taught us in Burns v. Reed, 500 U.S. 478,494-495:

> As the qualified immunity defense [500 U.S. 478, 495] has evolved, **it provides ample support to all but the plainly incompetent or those who knowingly violate the law.**" Malley, supra, at 341; see also Mitchell, 472 U.S., at 524 . **Although the absence of absolute immunity for the act of giving legal advice may cause prosecutors to consider their advice more carefully, "`[w]here an official could be expected to know that his conduct would violate statutory or constitutional rights, he should be made to hesitate.**"' Ibid. (quoting Harlow, 457 U.S., at 819 ). Indeed, it is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice. Cf. Butz, 438 U.S., at 505 -506. Ironically, it would mean that the police, who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not.

In their legal and ethical obligation to provide legal advice to their client-agency legal counsels, as the U.S. Attorney Manual mandates, the USAO Attorneys were derelict in their duties by not properly sifting the evidence and providing the adequate legal assistance that the facts, the applicable law and the extraordinary and exceptional circumstances of the controversy dictated.

When the Petitioner, timely filed his CFM, it was neglected or covered up. It is this simple. That neglect or cover up, continues to cause damages to the Petitioner who has not been able to have his violated constitutional rights vindicated due to the perpetuation of the evident misconduct by all the heretofore intervening USAO Attorneys, to whose long list, the presently appearing ones are the newcomers who insist in pretending to cover up, the cover up of the cover up.

At p.1. ¶ 1, foot note 1, of their MPASMD the appearing U.S. Attorneys raise that they cannot fathom why the Petitioner included the U. S. Department of Justice (USDJ), Office of the Inspector General (OIG), as a Respondent, in the instant controversy. In the published USDJ, OPR, Policies and Procedures, at p.1, ¶2, first sentence, it states that:

> **OPR has jurisdiction to investigate the allegations of misconduct involving Department attorneys that relate to the exercise of their authority to investigate**, litigate **or provide legal advice**, as well as allegations of misconduct ...when they are related to allegations of misconduct within the jurisdiction of OPR.

On p.1, ¶2, second sentence it states that:

> Other allegations of misconduct by the Department attorneys that do not fall within the jurisdiction of OPR **are investigated by the Office of the Inspector General**....

Very respectfully, Petitioner does not know nor has a viable way to know, at least at this early stage of these proceedings, whether the CFM he filed against some of the U.S. Attorney's Office (USAO), Attorneys, was investigated by the OPR officers, the OIG officers, or both. That is, if it was investigated at all. Until the Petitioner is informed by the Respondents or discovers through the vehicles that are available to him, and which this HUSDCDC may allow, who was in charge of the investigation of the CFM, if anyone actually ever took the care of investigating it, both the OPR and OIG, shall remain as Respondents.

The appearing U.S. Attorneys, however, certainly know or reasonably should had

known,[1] if the CFM in question was investigated at all, and if so, if it was by the OPR, the OIG, or both. Ergo, instead of raising the question, if they were litigating in good faith, and with the candor they owe this process as officers of the court, they should had instead illustrated this HUSDCDC and simultaneously informed the adverse party about; when, how, where, and who investigated the CFM in question, in case it ever was, and produced at least a scintilla of evidence so demonstrating, especially since they are prematurely moving for the dismissal of this Petition.

Due to the lack of production of any evidence whatsoever in support of their Motion To Dismiss, relative to the investigation of the CFM, same Motion should fail. Due to the lack of candor and/or evidence by the appearing U.S. Attorneys in this vein, Petitioner remains in no position to know whether OIG should remain a party to the Petition or not, until de minimis modicum of discovery that the circumstances dictate is allowed and complied with. Without it, Petitioner does not have a viable way to know if the OIG intervened in the investigation of the CFM that was covered up or neglected by the USDJ's OPR and/or OIG. With regards to this issue, the Court in its seminal, applicable and controlling case, <u>Crawford-El v. Britton</u>, 523 U.S. 574,  taught us that: **"If the plaintiff's action survives these initial hurdles and is otherwise viable, the plaintiff ordinarily will be entitled to some discovery."**

As to the Respondents claim at p.2, ¶2, that the instant Petition is an attempt to

---

[1] Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official **"knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury . . . ."** Ibid. (emphasis added). <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 815 (1982) .

4

"relitigate" issues that have been already litigated in various federal courts, we must respond by stating that on p.3, ¶ 7, of the instant Mandamus Petition, we were the first one to inform the HUSDCDC that:

> Since 1995, ARR and IEU have been immersed in a complex, long and protracted litigation against the USDE. Specifically since 1998, they have been active pursuing the judicial review of the final USDE action mentioned above. On April 12, 2000, they won their first appeal (99-1628), before the USCA1C. <u>Instituto de Educacion Universal Corp. v. United States Department of Education, 209 F.3d 18 (1st Cir. 04/12/2000).</u> Presently, the issues that originated that related controversy are still there sub judice for the third time. The first time it was docketed as 98-1242. Presently, appeal 06-1562, is pending the filing of the USDE appellate brief and subsequent procedures.

Having clarified this, the fact remains that this Mandamus Petition is related not to the issues in the sub judice litigation mentioned above nor any other related one, as the appearing U.S. Attorneys want to give the false impression of, but rather, with the neglect and/or cover up by the USDJ- OPR and/or OIG  Attorneys, in view of the facts, legal issues and the overwhelming beyond doubt and clear and convincing evidence produced in the CFM filed against the U.S. Attorneys for their in turn neglect to prevent the conspiracy of their client-agency legal counsels from the USDE, through the latter's egregious malicious prosecution, reckless abuse of the legal process, unethical intimidation of witnesses, wanton occlusion of exonerating evidence, deliberate obstruction of justice, and reiterated fraud upon the courts.

May we respectfully add, that the Respondents have filed their MTD and MPASMTD evidently based on the Petitioner's prayer in the alternative, that the filing could end being considered by the HUSDCDC as a Complaint and not as a Mandamus Petition. This necessarily and obligatorily entails that the Respondents have based their legal strategy in what they hope that the Petition may be converted into, and not as to what it is-a Mandamus Petition.

## II. BACKGROUND

Most ironically, the background that the appearing U.S. Attorneys include in their MPASMTD, hereby respectfully responded to, is based on the litigation sub judice before the U.S. Court of Appeals for the First Circuit (HUSCA1C) and not the instant one. From that background, what is pertinent to the instant one is the following.

The USDE legal counsels illegally and ultra vires upheld three (3) pseudo-audits findings against Instituto de Educacion Universal (IEU) and Angel Ruiz Rivera (ARR), as its President, fiduciary agent, signatory of the Program Participation Agreement (PPA) with the USDE on behalf of IEU and its person responsible for its taxes according to the Internal Revenue Service (IRS).[2] Two (2) of these pseudo-audits findings were issued by the USDE's OIG, namely the clock hour "finding" and the excess cash "finding". They were raised by an insubordinate, Certified Public Accountant (C.P.A.) and lawyer, Rafael Nater, who acted as the Auditor In Charge (AIC) and who was expelled after the audit from the USDE. The remaining third "finding" was the unpaid refunds issue raised by a corrupt auditor from the USDE's Institutional Review Branch (IRB), who later resigned from the USDE to work for IEU's main competitor. The illegal upholding of the above pseudo-audits "findings" was what prompted the Petitioner's CFM against various U.S. Attorneys who neglected to prevent the conspiracy of their client-agency legal counsels (the USDE) and provided inadequate legal advice to them, ergo, aiding and abetting in the conspiracy to violate the constitutional and civil rights of the Petitioner. The Background of the Instant Petition is the following:

---

[2] In addition ARR faces disbarment de jure by the USDE since he has already suffered disbarment de facto due to the stigma that the USDE abuses over his person have caused.

1. Petitioner originally in 1996 complained personally to the then Acting U.S. Attorney for the District of P.R., Guillermo Gil-Bonar, Esq., that ARR was being object of a malicious prosecution by USDE officers provoked in part; for their invidious discrimination against Puerto Ricans,[3] and in part; for his denunciation of this discrimination personally to then President William Jefferson (Bill) Clinton, in a $50,000.00 a seat fund-raising dinner at the Washington, D.C. Ritz Carlton held on September 22, 1995, which provoked the ire and wrath of various USDE officers against ARR personally. Gil and ARR were classmates since the eighth to the twelfth grade at the Jesuit American Colegio San Ignacio (CSI) High School in P.R..

2. Soon after, Assistant U.S. Attorney (AUSA), Isabel Munoz Acosta, Esq., together with AUSA, Edna Rosario, Esq. called ARR for a meeting where he was accompanied by his barristers at the time, namely, Waleska Marrero Melecio, Esq. and Charles Candelaria Farulla, Esq.. The results of that meeting are summarized in an Affidavit that was included before and repeated here as Exhibit 1. The most relevant point emerging from that meeting is that at that early juncture, the USDE legal counsels already were violating Petitioner's; First, Fifth And Sixth Amendment constitutional rights, not necessarily in that order nor exhaustively.

3. The USDE first violated the Petitioner's Fifth Amendment due process rights by unilaterally switching IEU in breach of the contract he had signed on behalf of IEU, into the reimbursement method of payment without even an informal hearing, much less a full blown hearing and even before the pseudo-audits were final. Not being final, the punitive action was taken before Petitioner could respond to the "findings", ergo, the lack of due process.

---

[3] Based on their preconceived bias and prejudice that Puerto Ricans, according to their ill-conception, bilked the USDE since Puerto Rico was the fourth largest recipient of Higher Education Act (HEA), Title IV, Student Financial Aid Programs (SFAP's) funds

4. Second, they violated the Petitioner's Sixth Amendment right to representation by counsel of his choice by deliberately delaying via all sort of imaginable and unimaginable dilatory tactics the payments owed to IEU/ARR. With this taking without due process of funds owed them, the USDE legal counsels made sure that Petitioner did not receive the financial resources to be able to continue paying his legal counsels he had to retain to litigate the Bivens Complaint 96-1893(JAF) against the same USDE officers who deliberately delayed the payments first, and second, unconstitutionally preconfiscated all of them (over $2.263 million dollars).

5. Third, they violated the Petitioner's First Amendment Rights by taking reprisals against him in retaliation for having exerted his Constitutional right to ask for the redress of grievances against the USDE and various of its officers in the Bivens Complaint already made reference to. In addition, they, retaliated against Petitioner for having exerted his free speech constitutional rights when he raised their discrimination against Petitioner and the class of all Puerto Rican Higher Education institutions similarly situated, before then President William (Bill) Jefferson Clinton, already mentioned above.

6. Petitioner timely forewarned his ex-classmate and ex-friend Gil-Bonar, that a terrible mistake and grave injustice was being committed not only against Petitioner and his family, but against the over 5,000 students who had entrusted their investment in the future and the over 500 employees who were making good that investment, all at IEU, trusting the full faith and credit that the USDE's eligibility granted to IEU represented.

7. That although initially, Gil-Bonar did kindly receive ARR at this offices and interceded for the meeting mentioned above, instead of ethically sifting the evidence that his client-agency produced against Petitioner vis a vis the one ARR produced, which consequently and necessarily

8

obliged the elimination of the pseudo-audits findings, Gil-Bonar neglected to prevent the conspiracy by the USDE legal counsels for purely personal vendetta reasons.

8. Due to his desperation for having lost everything, ARR filed various complaints for judicial misconduct against JAF, the judge who railroaded the Injunctive Relief Petition (IRP) and Bivens Complaint and in one of them ARR mentioned the contrast between the overdose of due process that JAF gave Gil-Bonar's sister in the Gil de Rebollo v. Miami Heat Associations, Inc., 137 F.3d 56 (1st.Cir. 3/5/1998), controversy vis a vis the lack of any in the IEU v. USDE 96-1893 (JAF) one. According to Frank Inserni, Esq., an ex-legal counsel of ARR and IEU, and also ex-classmate of both Gil and ARR at CSI, that reference initiated the hostility of Gil-Bonar towards ARR. Petitioner then followed with a Petition for Certiorari before the Court regarding the interim tenure of Gil. Eventually, ARR sued CSI for issues that related back to the time ARR and Gil-Bonar were classmates.[4] The above facts are relevant to the instant Petition in view of what the Court taught us in Crawford-El v. Britton, supra.

> Thus, although **evidence of improper motive** is irrelevant on the issue of qualified immunity, it **may be an essential component of the plaintiff's affirmative case. Our holding in Harlow, which related only to the scope of an affirmative defense, provides no support for making any change in the nature of the plaintiff's burden of**

---

[4] While both attended CSI, ARR had to spent all his leisure time working at his father's small businesses every day and during the weekends, inasmuch Gil-Bonar entertained himself riding horses and stealing federal property. Gil-Bonar, the son of a serious and prestigious P.R. State Judge was caught in the act but his case was "amapuchado" by then Federal Bureau of Investigations (FBI) agent, Pedro Toledo, Esq., today's P.R. Police Superintendent, and then AUSA, Ignacio Rivera, Esq., both of whom were Gil-Bonar's father friends or acquaintances. As a result, "Rufo" (Gil Bonar's nickname at CSI) was not expelled from CSI as its rules mandated. Other peers with lesser offenses suffered a disparate treatment. ARR filed this suit as a matter of principle in defense of those who were discriminated against for not having friends in the federal bar, an scenario, that as the facts of the instant controversy corroborate, repeats itself transgenerationally.

9

**proving a constitutional violation.**

...

...That unfairness may be present even when the official conduct is motivated, in part, by **hostility to the plaintiff.**

[67] **This last rationale of fairness does not provide any justification for the imposition of special burdens on plaintiffs who allege misconduct that was plainly unlawful when it occurred** -- While there is obvious unfairness in imposing liability -- indeed, even in compelling the defendant to bear the burdens of discovery and trial -- for engaging in conduct that was objectively reasonable when it occurred, **no such unfairness can be attributed to holding one accountable for actions that she knew, or should have known, violated the constitutional rights of the plaintiff.** Harlow itself said as much: **"If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."** Id., at 818-819; see also Butz, 438 U. S., at 506 ("[I]t is not **unfair to hold liable the official who knows or should know he is acting outside the law ... .").**

Putting the subjective elements aside, Gil-Bonar objectively knew that the First, Fifth and Sixth Amendment Constitutional Rights of Petitioner were being viciously violated by his client-agency (the USDE) legal counsels. Gil-Bonar also knew, or reasonably should had known that the clock hour pseudo-audit "finding" was illegally upheld for the years 1991-93 by his client-agency legal counsels and slanderously reported to the U.S. Congress when they did not have even a pretext to uphold that "finding" for those two years. As for those years, the evidence proves without any doubt that this "finding" was: against the own USDE's Office of the General Counsel(OGC) legal opinion; the own USDE's IRB Chief Auditor Policy Memo against it ordering the USDE auditors "not to cite a finding nor take any action" in scenarios such as IEU's and against the own USDE's ALJ decision in In The Matter of Denver Paralegal Institute, 92-86-SP, 92-87-SA and in the Matter of MBTI, supra.

As for the year 1993-94, for which his client-agency counsels had at least the pretext, albeit false, of the amendment to the July 23, 1993 regulations and the purported clarification by

the Secretary in their corresponding published Federal Register Preamble, Gil-Bonar knew or reasonably should had known that same pretext had been specifically, explicitly and expressly rejected by the USDE administrative Law Judge (ALJ) in In The Matter of MBTI., 93-147-SA.

8. After the above events, Petitioner found about the fact that USDE-OIG-AIC Nater had been expelled from the USDE-OIG in part for his flaws in IEU's audit. ARR learned of this through Nater's own legal counsel, Anibal Escanellas, Esq., who informed ARR that to his surprise issues regarding IEU's audit had played a prominent part of Nater's v. USDE proceedings at the U.S. Merit System Protection Board (USMSPB) and as such ARR had a right to request that record. ARR then followed to request it from the USDE legal counsels, who in one of its many instances of obstruction of justice, responded by writing that if the record existed it would not release it to ARR.

9. After being somehow able to get a copy of the USMSPB record, Petitioner found additional evidence that proved beyond doubt, this time not only that the pseudo-audit findings had been fabricated, flawed and/or grossly exaggerated, but that in effect there had been a conspiracy to violate his Constitutional and civil rights by the USDE officers he had sued in the Bivens Complaint with the support of some of the USDE-OGC legal counsels. The evidence found also confirmed that the pseudo-audits "findings", had been upheld by the USDE legal counsels through, suborn perjury, perjury, occlusion of exonerating evidence, intimidation of witnesses, obstruction of justice and fraud upon the courts. That evidence was then submitted to Humberto Garcia, Esq., the U.S. Attorney for the District of P.R. who succeeded Gil-Bonar.

10. Petitioner later found additional overwhelming smoking gun evidence of the payment of the "unpaid refunds" and was timely submitted to Garcia.

11

11. All of the above evidence was submitted to the USDJ OPR as part of the CFM neglected. That hard evidence includes: the names, social security numbers, the amounts refunded, the dates, the batch numbers where each one was refunded, and a cross reference to the Student Payment Summary, the final roster of all recipients. In brief, everything that may be needed and more, for any reasonable person to find that the unpaid refunds "finding" was and remains totally and absolutely vicious.

12. Later, Petitioner himself found that the HEA itself, explicitly, expressly and specifically proscribed the application of the July 23, 1993 regulations to IEU and Petitioner timely denounced this to the U.S. Attorneys. Most certainly, all the heretofore appearing USAO Attorneys knew or reasonable should had known that the USDE legal counsels were acting against the existing law, including Gil-Bonar and Munoz Acosta, the AUSA for civil affairs. See HEA, as amended, 20 U.S.C. 2070, et seq., applicable at the time of the events, on section 482, "Master Calendar", at (c):

"The Effective Date of Late Publications":

"Any regulatory changes initiated by the Secretary affecting the programs pursuant to this title that have not been published in final form by December 1, prior to the start of the award year **shall not become effective until the beginning of the second award year after such December 1 date**."

In view of the above, which is pretty obvious, Gil-Bonar and Munoz Acosta did not have any discretion but to provide the adequate legal advice to their client -agency that the facts, the law and the circumstances dictated, which was to instruct them to eliminate or drop the clock hour "finding".

For this reason only, without more, all the defenses raised by the appearing USAO

12

Attorneys must fail. Actually, it is not accidental nor coincidental that they do not even mention, much less react to the merits of our just and true claims and instead limit themselves to address legal technicalities far from the merits. Why do not they react to the above excerpt of the law itself which unmasks their farce? Have they have ran out of any other false pretexts left in their arsenal to continue reiterating their fraud upon all the intervening forums, including this one?

As we have stated elsewhere, the appearing USAO Attorneys evident omission to any reference to the merits of our claims or what we call eloquent silence on their part, speaks more than a million words. At this point we must add, another excerpt of the Crawford-El, decision, supra, of strict application here is particularly pertinent, significant and enlightening:

> **The reasoning in Harlow, like its specific holding, does not justify a rule that places a thumb on the defendant's side of the scales when the merits of a claim that the defendant knowingly violated the law are being resolved.**

Not only do the previous appearing USAO Attorneys knew or reasonably should had known about the above proscription in the law with regards to the pretext abused of, pretending to have the "finding" upheld in obvious fraud to all the intervening courts, but the presently appearing ones insist in emulating their predecessors, thereby perpetuating the fraud in a temerarious, recalcitrant and contumacious fashion defeating on its way all the candor, decorum and respect they owe to the courts of which they are officers and to themselves and their reason for being as U.S. Attorneys. With these acts they are also prolonging the damages caused to this date, thereby by their own acts defeating any statute of limitations defense(s).

### III. LEGAL STANDARDS OF REVIEW FOR A MOTION TO DISMISS

#### A. Subject Matter Jurisdiction

The instant Mandamus Petition was respectfully filed pursuant to the authority mandated

in the All Writs Act, 28 U.S.C. 1651. It is also based on the First, Fifth, and Sixth Amendments

of the U.S. Constitution; the Civil Rights Act of 1964 as amended; particularly, 42 U.S.C. 1983,

1985 and 1986; and the authority of <u>Bivens v. Six Unknown Federal Narcotic Agents</u>, 403 U.S.

388 (1971) and its progeny. It is also based on the mandates of the Federal Torts Claim Act, 28

U.S.C. 1346 (b).

    Notwithstanding the above, the U.S. Supreme Court in <u>Burnett Et al v. Grattan Et al</u>, 468

U.S. 42, 50, taught us that:

> **In the Civil Rights Acts, Congress established causes of action arising out of rights and duties under the Constitution and federal statutes. These causes of action exist independent of any other legal or administrative relief that may be available as a matter of federal or state law. They are judicially enforceable in the first instance. The statutes are characterized by broadly inclusive language. They do not limit who may bring suit, do not limit the cause of action to a circumscribed set of facts, nor do they preclude money damages or injunctive relief.** An appropriate limitations period must be responsive to these characteristics of litigation under the federal statutes. **A state law is not "appropriate" if it fails to take into account practicalities that are involved in litigating federal civil rights claims and policies that are analogous to the goals of the Civil Rights Acts.**
>
> ...
>
> **That policy, keyed to a classification of plaintiffs, cannot pre-empt the broadly remedial purposes of the Civil Rights Acts, which make no distinction among person who may look to the court to vindicate their federal constitutional rights.**
>
> **That policy is manifestly inconsistent with the central objective of the Reconstruction-Era civil rights statutes, which is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief.** See Mitchum v. Foster, 407 U.S. 225, 239 (1972); Griffin v. Breckenridge, 403 U.S. 88, 97 (1971); McNeese v. Board of Education, 373 U.S. 668, 671 -672 (1963); Monroe v. Pape, 365 U.S. 167, 173 (1961).

Petitioner respectfully avers that nothing in the above controlling authority remotely suggests that

the Civil Rights Act may not be applicable to federal officials, officers, agents or however you

may call them. The reference to the phoneme or word "state", in the language in the

Reconstruction or Civil Rights Statute, does not necessarily and obligatorily imply that "state" excluded the United States as the collective "state" its Union represents. Furthermore, it would be more than an oxymoron, but an incongruent contradiction to conclude that federal officers may be exempted from the mandates of the Civil Rights Act.

In any event, with regards to the Respondents' claims regarding Federal Rule of Civil Procedure (FRCP) 12 (b)(1), this is what the Honorable U.S. Circuit Court for the District of Columbia (HUSCADC), taught us in Equal Employment Opportunity v. St. Francis Xavier Parochial School and St. Francis Xavier Church, 96-5239, (D.C. Cir. 7/18/1997):

> **Because the claim arises under the laws of the United States and is neither "immaterial and made solely for the purpose of obtaining jurisdiction" nor "wholly insubstantial and frivolous," Bell v. Hood, 327 U.S. 678, 682-83 (1946), the district court has federal question jurisdiction** pursuant to 28 U.S.C. Section(s) 1331...

As already corroborated, the instant Mandamus Petition claims arise under the Constitution, laws of the United States (Civil Rights and the HEA), and the U.S. Attorney's Manual mandates. Consequently it was not made solely for the purpose of obtaining jurisdiction, a claim that not even the Respondents have dared to make. Since the claims are not insubstantial and /or frivolous, but quite to the contrary; meritorious and fully supported by the hard evidence produced, the HUSDCDC definitely has jurisdiction and have no reasons whatsoever, at least at this stage, to grant the Respondents', clearly unripe to say the least, Motion To Dismiss.

## B. Failure to State a Claim

With regards to the Respondents' claims regarding the FRCP 12 (b)(6), in the same case just cited above, the HUSCADC admonished us that:

> To prevail on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the ...

15

must show **"beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."** Conley v. Gibson, 355 U.S. 41, 45-46 (1957). **In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents** either attached to or incorporated in the complaint **and matters of which we may take judicial notice.**\*fn3 See Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1017-18 (5th Cir. 1996). Moreover, **we must accept** the EEOC's **factual allegations as true,** see Albright v. Oliver, 510 U.S. 266, 268 (1994), **and draw all inferences in** the EEOC's **favor.** See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

The Respondents have certainly **not** shown "beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief." Not only have they **not** shown

that, but they have also **not** shown anything to even controvert the well supported allegations

accompanied with the overwhelming smoking gun and beyond doubt evidence produced by the

Petitioner that show that the Complaint against the USAO Attorneys was neglected and

consequently their misconduct covered up, by whomever was in charge of its investigation, if

there was any.

## IV. ARGUMENT

## A. ALL MONETARY CLAIMS AGAINST RESPONDENTS IN THEIR INDIVIDUAL CAPACITIES SHOULD BE DISMISSED

### 1. This Court lacks Personal Jurisdiction Over Respondents In Their Individual Capacities.

Since the statute of limitations to serve summons on these officers in their individual

capacities have not expired, and since the Petitioner does not know nor should know who they

are until he is  provided with the most elementary information by the Respondents, such as their

names and addresses, this extreme of the MPASMD is not only unavailable but unripe, to say the

least. Once the Respondents comply with the modicum of discovery owed to the Petitioner, such

as the names and addresses of the officers who investigated the Complaint, again if such

16

investigation ever took place, then the Petitioner will be in a position to serve them their summons forms adequately and if not, then the Respondent will be able to raise this issue ripely and properly.

Ironically, precisely because the Respondents in their individual capacities have not been served, this HUSDCDC, does not have in personam jurisdiction over them, ergo, it cannot legally dismiss nor take any action over them personally. In addition, same officers, not yet been a party to the case personally, have not filed for the U.S. to represent them, additional reason why, this extreme of the Respondents' MPASMD is also unripe. In the absence of a timely filed notice of substitution and certificate by the United States Attorney alleging that the individual defendants were acting within the scope of their federal employment in connection with the events that led to the Petition, the purported representation by the USAO's Attorneys of the federal officers in their individual capacities is clearly unripe, to say the least. Ironically, if and once the U.S. Attorneys file the above, their sovereign immunity defense fails as a result. [That notice was supposed to inform the district court that the United States was substituted for the USDE federal officers in their individual or personal capacity pursuant to the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("the Westfall Act"), Pub. L. No. 100-694, 102 Stat. 4564 (1988).]

**2. The Complaint Fails To State A Claim Upon Which Relief Can Be Granted Against Respondents In Their Individual Capacities.**

For the reasons stated immediately above, the presently appearing USAO Attorneys, do not have the legal authority to purport to represent Respondents in their individual capacities, even more when they know that they have not been served summons personally, at least as of yet.

17

For this reason only, without more, the above defense, objection, or claim must legally fail.

**a. Title 42, United States Code, Section 1983 is inapplicable to Respondents.**

Respondents insist that the federal officers are for some unexplained reason exempted

from the application of the Civil Rights Act mandates. For that proposition they cite in support a

relatively old case from another Honorable Circuit Court, namely, Resident Council of Allen

Parkway Village v. U.S. Department of Housing and Urban Development, 980 F. 2d 1043 (5th.Cir.

1993). That authority is not controlling over this HUSCADC and it is strange to say the least, that

the appearing U.S. Attorneys could not come up with any other authority in support. On the other

hand we have found the following in City of Rancho Palos Verdes, California v. Abrams, 544

U.S. 113 (U.S. 03/22/2005).

> [37] Title 42 U. S. C. §1983 provides:
> [38] **"Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen
> of the United States** or other person within the jurisdiction thereof **to the deprivation of
> any rights, privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress."**
> [39] In Maine v. Thiboutot, 448 U. S. 1 (1980), we held that **this section "means what it
> says" and authorizes suits to enforce individual rights under federal statutes as well
> as the Constitution.** Id., at 4.

Petitioner reiterates that federal officials should not be exempted from the Civil Rights Act

mandates, regardless of the windows opened by the Bivens Doctrine and its progeny effects. We

cannot underemphasize that since the Bivens option is a byproduct or creature of jurisprudence,

if same were to be overturned, for whatever reasons, such an scenario would leave federal

officials totally exempted from any claim against them for acting ultra vires under the color of

authority, that is if this HUSDCDC or any court for that matter, were to be persuaded of the

18

Respondents' claim in this vein here. That improbable but possible scenario would result into

being an anathema to the Constitutional precepts that govern this Nation.

Regarding this issue, Petitioner has been able to find other precedents where federal

officers were sued under sections 1983 and 1985 of 42 U.S.C. See Clinton v. Jones, No. 95-1853

(U.S. 05/27/1997), where the Defendant was non other than the President himself, while he was

in Office, from where we cite:

> The first charges that petitioner, acting under color of state law, deprived her of rights
> protected by the Constitution, in violation of Rev. Stat. Section(s) 1979, 42 U. S. C.
> Section(s) 1983. The second charges that petitioner and Ferguson engaged in a conspiracy
> to violate her federal rights, also actionable under federal law. See Rev. Stat. Section(s)
> 1980, 42 U. S. C. Section(s) 1985.

Since the events that gave way to that action transpired before Clinton was President, this case

serves to illustrate perhaps in a dramatic way, that the gist of the issue here is the nature of the

function performed at the time the events took place and not the title of the functionary,

consonant to what the Court has taught regarding this issue.

Furthermore, the Court made clear that when constitutional rights are violated under the

color of authority by federal officials, they are not exempted from having to respond personally.

See Bivens v. Six Unknown Named Agents Federal Bureau Narcotics, 403 U.S. 388 (U.S.

06/21/1971), from where we cite the following pertinent and relevant quote:

> In Bell v. Hood, 327 U.S. 678 (1946), **we reserved the question whether violation of**
> **that command by a federal agent acting under color of his authority gives rise to a**
> **cause of action for damages consequent upon his unconstitutional conduct. Today**
> **we hold that it does.**

The Court also has clearly established and reiterated that Pro Se writings should be liberally

construed and if there is a nominal legal error on the part of this layperson in the instant

Mandamus Petition, as to whether Bivens is the applicable authority instead of 42 U.S.C., 1983,

19

to the set of circumstances in the instant controversy, let this HUSDCDC correct me or so I stand

corrected. [5] The own Honorable U.S. Circuit Court of Appeals for the D.C. Circuit

(HUSCADCC) has recognized this in <u>Warren v. District of Columbia</u>, 353 F.3d 36 (D.C.Cir.

1/2/2004). In the alternative, I Pray that I am allowed to amend the Mandamus Petition or the

pleadings in the alternative, in order to correct them for the record.

In any event, the following excerpt from Crawford-EL, supra, should serve to dissipate

any doubts that this HUSDCDC may have regarding this issue or rather, non-issue, and

consequently should be persuaded that the defenses raised by the Respondents in this vein, at

least up to the heretofore stage of these proceedings, are unavailable and untenable.

> **Neither the text of Section 1983 or any other federal statute, nor the Federal Rules of Civil Procedure, provides any support for imposing the clear and convincing burden of proof on plaintiffs either at the summary judgment stage or in the trial itself. The same might be said of the qualified immunity defense;...**

If the Court has clearly ruled that nothing supports the proposition; **"for imposing the clear and**

**convincing burden of proof on plaintiffs either at the summary judgment stage or in the**

**trial itself. The same might be said of the qualified immunity defense",** then much less can

the Respondents pretend to prevail at this Motion to Dismiss, FRCP 12 (b) threshold, with the

poor pretexts that they have been able to come up with, all non-related to the merits and the hard

evidence that proves without the doubt that the CFM and more importantly, the misconduct per

se, was, and worse, that it is still being neglected by the U.S. Attorneys in overt violation of their

---

[5] See United States v. Palmer, 296 F.3d 1135, 1143 (D.C. Cir. 2002) ("[A]llegations of pro se motioner, 'however inartfully pleaded,' are subject to 'less stringent standards than formal pleadings drafted by lawyers.'") (summarizing and quoting Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam)). Fletcher v. Reilly, 433 F.3d 867 (D.C.Cir. 01/06/2006)

statutory, regulatory and ethical standards.

Although we mentioned above that the only case cited in support by the Respondents

regarding this issue was from another Honorable Circuit Court (HCC), and as such, not

necessarily binding, if this HUSDCDC does considers it, we respectfully pray that it also

considers the following dissident opinion from one Honorable Judge of the same HCC, of strict

application to the instant Petition's controversy issues.

> **A conviction obtained through use of false evidence, known to be such by
> representatives of the government, must fall** under the Fourteenth Amendment. Napue
> v. Illinois, 360 U.S. 264, 269 (1959) (citing Mooney v. Holohan, 294 U.S. 103 (1935)).
> See Miller v. Pate, 386 U.S. 1 (1967)(false "blood" on shorts). **"'[T]he same result
> obtains when the State, although not soliciting false evidence, allows it to go
> uncorrected when it appears.'"** Giglio v. United States, 405 U.S. 150, 154 (1972)
> (quoting Napue, 360 U.S. at 279); United States v. Agurs, 427 U.S. 97, 103 (1976). "'It is
> of no consequence that the falsehood bore on the witness' credibility rather than directly
> upon defendant's guilt. **A lie is a lie, no matter what its subject, and, if it is in anyway
> relevant to the case, the district attorney has the responsibility and the duty to
> correct what he knows to be false and elicit the truth. * * * That the district
> attorney's silence was not the result of guile or a desire to prejudice matters little,
> for its impact was the same, preventing, as it did, a trial that could in any real sense
> be termed fair.**" Napue, 360 U.S. at 269-70 (quoting People v. Savvides, 136 N.E.2d
> 853, 854-55 (1956)).
>
> [65] A new trial is required if the false testimony could in any reasonable likelihood have
> affected the judgment of the jury. United States v. Bagley, 473 US 667, 678-79 (1985);
> Giglio v. United States, 405 U.S. 150, 154 (1972) (quoting Napue, 360 U.S. at 271);
> Kirkpatrick v. Whitley, 992 F.2d 491 (5th Cir. 1993). The fact that the jury was apprised
> of other grounds for believing that the government witness may have had an interest in
> testifying against the defendant does not turn what was otherwise a tainted trial into a fair
> one. Napue, 360 U.S. at 270.
> ...
>
> Applying the constitutional principles set forth by the Supreme Court in the cases cited
> above, it is clear that defendants' appeal raises a substantial question whether their
> **convictions and sentences must fall** under the Fourteenth Amendment **because (1) they
> were obtained through the use of perjured testimony and false evidence, known to
> be such by representatives of the government,** Napue v. Illinois, 360 U.S. at 269;
> Miller v. Pate, 386 U.S. 1, 7 (1967); Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir.), cert.

denied, 117 S. Ct. 487 (1996) ; Pyles v. Johnson, 136 F.3d 986, 996 (5th Cir. 1998); (2) **although the government may not have directly solicited the perjury or false evidence, it was responsible for the creation of the false statement, knew or should have known that the jury would be exposed to the false statement** wrongfully indicating that O'Keefe participated in altering the BCI minutes, **and knowingly allowed it to go uncorrected when it appeared before the jury**, Giglio v. United States, 405 U.S. at 154; Napue, 360 U.S. at 279; United States v. Agurs, 427 U.S. 97 (1976); Faulder v. Johnson, 81 F.3d at 519; Pyles v. Johnson, 136 F.3d at 996; and (3) **the perjury and false evidence could in any reasonable likelihood have affected the judgment of the jury.** United States v. Bagley, 473 U.S. at 678-79; Giglio, 405 U.S. at 154; Napue, 360 U.S. at 271; Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993). See 2 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure §19.5, at 534 (1984) ("**This obligation [of the prosecutor to disclose] requires that it not suborn perjury, not use evidence known to be false, and not allow known false testimony of its witnesses to stand uncorrected.**").

May we respectfully add the following, also of application here. See <u>United States v. Gillespie,</u>

974 F. 2d 796 (7th. Cir. 8/20/1992), from where we extract the following pertinent quote:

> One protection to which a target remains entitled is the conscientious and dutiful conduct by **the prosecutor, who "is an administrator of Justice, an advocate, and an officer of the court."** Id. (quoting American Bar Ass'n Standards Relating to the Admin. of Crim. J.). **We emphasize that "the duty of the prosecutor is to seek Justice, not merely to convict."** Id. (quoting same). In failing to adhere to internal policy, and in representing to the district court that advising witnesses of their rights is not necessarily "good policy," **the prosecutor in this case—even if inadvertently—undermined the Department of Justice's commitment to fairness.**

The CFM explained ad nauseam how the pseudo-audit "findings" were upheld by the USDE

legal counsels by way of:

> 1. Occluding the exonerating evidence contained in the Quality Assurance Review (QAR) Team Report (TR) of the expelled USDE-OIG-AIC Nater's flaws in his audit.

> 2. Occluding that Nater had been expelled from the USDE-OIG, reason why they suborned the perjury of Chief Auditor Rios when they sat him to testify for Nater.

> 3. Suborning the perjury of corrupt auditor IRB Lugo who lied about the "unpaid refunds" even in a stupid manner. Lugo later resigned to work for Petitioner's main competitor. When the President of that institution was indicted by the U.S. Attorney for embezzlement of federal funds, the USDE officers sued by Petitioner in his Bivens

22

Complaint did not take any action against him nor the institution as the law and the regulations demanded in a clear disparate treatment.

4. The clock hour "finding" was against all the legal precedents at the own agency.

5. The excess cash "finding" was so grossly inflated that it did not make mathematical sense. The own QAR TR described it as one where the "logic is faulty" and "not supported by the working papers."

For all the above reasons, the appearing U.S. Attorneys have had and have more than enough

evidence that proves without a doubt that their predecessors in turn had more than the necessary

evidence needed to give the appropriate under the circumnstances legal advice to their client -

agency counsels (the USDE) and that was to order them to eliminate or drop the pseudo-audits

findings. In <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259 (1993) we find the following excerpt, also of

strict application here: "

> **We further decided, however, that prosecutors are not entitled to absolute immunity for their actions in giving legal advice** to the police. **We were unable to identify any historical or common law support for absolute immunity in the performance of this function**. 500 U.S., at 492 -493....**In sum, we held that providing legal advice to the police was not a function "closely associated with the judicial process."** Id., at 495.
> ...
> **On the other hand, as the function test of Imbler recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor. Qualified immunity "`represents the norm'" for executive officers,** Malley v. Briggs, 475 U.S., at 340 , quoting Harlow v. Fitzgerald, 457 U.S., at 807 , **so when a prosecutor "functions as an administrator, rather than as an officer of the court," he is entitled only to qualified immunity.** Imbler, 424 U.S., at 431 , n. 33...

In view of the above, if the instant Mandamus Petition were to be taken as a Bivens Complaint

against the U.S. Attorneys, it would be up to this HUSDCDC to decide if the role played by the

U.S. Attorneys when providing legal advice to their client-agency, not their one as prosecutors, is

administrative or judicial in nature. We respectfully claim that it is administrative to the point

where they have the authority and duty to order their client-agency to eliminate the "findings"

just as they have the authority and the duty to order the police to drop whatever charges may be in the making.

Having said the above, this Mandamus Petition is not the Bivens Complaint that the appearing U.S. Attorneys have purported it to be, it is a Petition to the HUSDCDC to order the USDJ-OPR to rule upon the merits of a CFM filed before the previously appearing U.S. Attorneys in related proceedings, since the evidence submitted with same CFM was of such nature quantitatively and qualitatively that the USDJ-OPR could not possibly had neglected it the way it did and if so, same conduct being tantamount to a cover up of the U.S. Attorneys misconduct, a clearly illegal act for which the Petitioner is owed a duty by the government, reason why the Petition should issue.

## b. Petitioner fails to state a claim under 42 U.S.C. 1985.

Among the evidence submitted in support of the CFM, there is a confession by the own USDE legal counsel extracted from the record of the administrative proceedings that prove without any doubt whatsoever, that he conspired with his co-counsel to make ex parte communications to intimidate the witnesses that Petitioner had announced to the USDE-ALJ, when he was appearing Pro Se and in representation of IEU. The confession goes like this:

> Yes. In fact the functionary that counsel [Petitioner's] is referring to is **my co-counsel who specifically did knowingly, in my presence properly (sic) contact two independent public accountants who appeared on a witness list that Respondent presented to both the Department and this Tribunal.**

> It would had been improper for the Department not to contact these individuals (sic) who are to appear before this Tribunal as witnesses, and request opportunity to speak with them.

> Clearly the Department did not contact the school, the school officials, anybody that counsel would be representing. We would not contact respondent.

24

Similarly, we would not allow them to contact someone that we purported as our client, for purposes he described to us.

But an independent public accountant has a duty to talk to the Department, as our regulations specifically say. It's the duty to present its work papers for our evaluation. And certainly, not only was it not improper, but it was necessary that the Department contact these two individuals. [Transcript of October 22, 1996 administrative hearings at p.9-11, Exhibit 2 here.]

As anyone can corroborate, when the USDE-OGC legal counsel admitted for the record that his

co-counsel, **knowingly and in his presence** contacted in an ex-parte fashion two witnesses that

Petitioner had announced, he was confessing about the commission of the elements in a

conspiracy to interfere with civil rights proscribed in 42 U.S.C. 1985 (2). [6] This incredible

confession confirms Petitioner's claim that qualified immunity should not be granted to the U.S.

Attorneys respondents here since accord, Burns v. Reed, 500 U.S. 478,494-495, "As the qualified

immunity defense [500 U.S. 478, 495] has evolved, **it provides ample support to all but the**

**plainly incompetent or those who knowingly violate the law**." Malley, supra, at 341; see also

Mitchell, 472 U.S., at 524."

The above confession is not only significant for what it openly concedes but also for the

_____

[6] **Section 1985. Conspiracy to interfere with civil rights**

(2) Obstructing justice; intimidating party, witness, or juror **If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully**, ....

..... in any case of conspiracy set forth in this section, **if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.**

25

arrogant way it was expressed, as if the U.S. Attorneys in question felt that they could violate the law with total impunity, which paradoxically is exactly what has happened. We cannot underemphasize that at the time these events transpired, Petitioner was without a lawyer due to the USDE having frozen the funds owed him. Consequently, Petitioner, a lay person not trained in the law, was appearing for IEU. At that juncture, the U.S. Attorneys did not object to that illegal representation for the corporation by ARR. Instead, they took unfair advantage of ARR's ignorance and exploited it to the maximum. That is why they contacted the witnesses that ARR had announced with the undisguised intention of intimidating them.

ARR's purported appearance for IEU, the corporation, against the well settled standard held for over 200 years that a lay person cannot represent a corporation, (see James Rowland v. California Men's Colony, 113 S. Ct. 716), was condoned or acquiesced to by all the intervening U.S. Attorneys. ARR did not know nor needed to know this since he is not a lawyer but the USDE legal counsels and the U.S. Attorneys most certainly did know or reasonably should had known about this and very accommodatingly did not object to it since they were litigating against a functional illiterate in legal matters, to their obvious unfair advantage. According to Grace v. Bank Leumi Trust Co. Of New York, No. 04-5824 (2d.Cir.4/4/2006), this is enough reason by itself alone to rule the decisions against IEU/ARR void.

Besides the above, Petitioner produced with his CFM hard evidence that proves without any doubt that the USDE legal counsels in addition to having knowingly violated the law as shown before, they occluded exonerating evidence against the OIG pseudo-audit "findings" published by the own USDE-OIG Quality Assurance Review(QAR) Team Report (TR). They occluded from the ALJ and the adverse party the genuine issue of material fact that OIG-AIC

Nater had been expelled from the USDE in part for his flaws in IEU's audit. They also suborned

the perjury of Chief Auditor Rios, who was sat to testify for expelled OIG-AIC Nater. They also

suborned the perjury of corrupt IRB auditor, Felix Lugo.  All these illegal acts, which violated

the Petitioner's Constitutional and civil rights were proven to the U.S. Attorneys who neglected

to prevent and still pretend to continue neglecting to prevent all of the above conspiracies. With

this neglect, the initially appearing U.S. Attorneys condoned, acquiesced to and/or aided and

abetted their client-agency counterparts. The neglect of the CFM which motivates the instant

Petition by the succeeding U.S. Attorneys, is a reconfirmation of that neglect.

> Our precedents establish that in order to prove a private conspiracy in violation of the first
> clause of section 1985(3),*fn1 a plaintiff must show, inter alia, (1) that **"some racial, or
> perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the
> conspirators' action,"** Griffin v. Breckenridge, 403 U.S. 88, 102, 29 L. Ed. 2d 338, 91 S.
> Ct. 1790 (1971), and (2) **that the conspiracy "aimed at interfering with rights" that
> are "protected against private, as well as official, encroachment,"** Carpenters v. Scott,
> 463 U.S. 825, 833, 77 L. Ed. 2d 1049, 103 S. Ct. 3352 (1983). Jayne Bray v. Alexandria
> Women's Health Clinic Et Al., 113 S. Ct. 753 (U.S. 01/13/1993)

**c. Any claims pursuant to 42 U.S.C. 1986 are barred by a one-year statute of limitations**

Since the damages resulting from the denounced neglect persist to this date, this defense fails.

**d. The Petition fails to state a claim for violation of constitutional rights.**

This issue has already been responded to. By neglecting to prevent the conspiracies by

their client-agency USDE legal counsels, the U.S. Attorneys in the resulting negligence from

their omissions, became accomplices of the violation of the constitutional rights of the Petitioner.

The neglect and/or cover up of the USDJ OPR and/or OIG U.S. Attorneys of the CFM, have as

its most proximate and logical effect, the making of the previous actors conspiracies, their own.

27

**e. Respondents are entitled to qualified immunity for claims asserted against them in their individual capacities.**

We respectfully insist that the presently appearing U.S. Attorneys cannot legally raise

defenses on behalf of the federal officers in their individual capacities because of the reasons

explicated above. First, that this HUSDCDC does not have in personam jurisdiction over same,

which is more than enough. Second, that the U.S. Attorneys have not informed the HUSDCDC

that the United States was substituted for the federal officers in their individual capacity pursuant

to the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("the Westfall

Act").

Nevertheless, in case this HUSDCDC may be persuade otherwise, in the opinion of a

controversy that resembles more the instant one, where the U.S. Attorney General was a

defendant, the Court determined in Mitchell v. Forsyth, 472 U.S. 511, (1985) that:

> Although rejecting Mitchell's claim of absolute immunity, **the court found that Mitchell was entitled to assert a qualified immunity from suit and could prevail if he proved that he acted in good faith.** (Mitchell, p. 515)...
>
> At the same time, the court reconsidered its ruling on qualified immunity in light of Harlow v. Fitzgerald, 457 U.S. 800 (1982), in which this Court purged qualified immunity doctrine of its subjective components and held that **"government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."** Id., at 818. (Mitchell, p.517)
>
> We emphasize that the denial of absolute immunity will not leave the Attorney General at the mercy of litigants with frivolous and vexatious complaints. Under the standard of qualified immunity articulated in Harlow v. Fitzgerald, **the Attorney General will be entitled to immunity so long as his actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."** 457 U.S., at 818 . This standard will not allow the Attorney General to carry out his national security functions wholly free from concern for his personal liability; **he may on occasion have to pause to consider whether a proposed course of action can be**

28

**squared with the Constitution and laws of the United States. But this is precisely the point of the Harlow standard: "Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he should be made to hesitate . . . ." Id., at 819 (emphasis added). This is as true in matters of national security as in other fields of governmental action. We do not believe that the security of the Republic will be threatened if its Attorney General is given incentives to abide by clearly established law.**

As corroborated above, the Attorney General and his inferiors, all, violated clearly established constitutional and civil rights of which they knew or reasonably should had known. For this reason only, without more, they cannot expect this HUSDCDC to grant them qualified immunity, just for asking it without more, especially since they have not produced an iota of evidence demonstrating that they complied with their ministerial duties by properly investigating and adequately and justly adjudicating the CFM filed by Petitioner. As also mentioned earlier, their filings are devoid of any evidence whatsoever of having conducted any investigation, and more importantly, they have not even averred, claimed or stated that they did ever. With such a poor showing, the Respondents cannot expect this HUSDCDC or any for that matter, grant them what they evidently have not earned, neither in law, reason, order, equity, much less in "Justice".

## B. THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AGAINST RESPONDENTS IN THEIR OFFICIAL CAPACITIES

The main objective of the instant Mandamus Petition is to have the U.S. Attorney General have his inferiors, comply with their ministerial duties, and amend their error in neglecting the CFM that Petitioner filed against various U.S. Attorneys, that is in case they did not cover up the U.S. Attorneys misconduct. More importantly, Petitioner pursue that as an effect of properly investigating and justly adjudicating the CFM accord the overwhelming hard evidence produced, the U.S. Attorney General may amend its USAO's Attorneys error in providing inadequate legal

advice to their client-agency USDE legal counsels.

Petitioner is not seeking damages for the alleged and proven ad nauseam constitutional

torts against Respondents in their official capacities, as the Respondents' suggest. As to the

raising by the Respondents of the opinion in Brandon v. Holt, 469 U.S. 464,471 (1985) as

support for the above argument, which happens to be an attorney's fees controversy, what we

found that is pertinent here is that:

> In at least three recent cases arising under 1983, **we have plainly implied that a
> judgment against a public servant "in his official capacity" imposes liability on the
> entity that he represents provided,** of course, the public entity received [469 U.S. 464,
> 472] notice and an opportunity to respond. 20 **We now make that point explicit.**

Nowhere in this opinion do we find anything whatsoever that may support the Respondents

argument in this vein.

Regarding this issue, we respectfully refer the HUSDCDC to the own case raised by the

Respondent, FDIC v. Meyer, 510 U.S. 471, (1994), from where we cite the following excerpt of

application here:

> **Section 1346(b) grants the federal district courts jurisdiction over a certain category
> of claims for which the United States has waived its sovereign immunity and
> "rendered" itself liable.** Richards v. United States, 369 U.S. 1, 6 (1962). This category
> includes claims that are:
>
> [23] "[1] against the United States, [2] for money damages, . . . [3] for injury or loss of
> property, or personal injury or death [4] **caused by the negligent or wrongful act or
> omission of any employee of the Government** [5] **while acting within the scope of his
> office or employment,** [6] under circumstances where the United States, if a private
> person, would be liable to the claimant in accordance with the law of the place where the
> act or omission occurred." 28 U.S.C. ? 1346(b).

Ergo, the United States is not immune under the above conditions, which are applicable to the set

of facts of the instant Mandamus Petition, much less if the United States decides as it has

advanced here, that it intends to substitute the federal officers involved here as a party. What the

Court ruled in Meyer, supra, was that: **"An extension of Bivens to agencies of the Federal**

**Government is not supported by the logic of Bivens itself"**. Or, in other words, that it was not

ready to extend the effects of the Bivens doctrine to a federal agency vis a vis a federal officer.

Finally in terms of <u>Kentucky v. Graham</u>, 473 U.S. 159, 167 (1985), another attorney's

fees case, what we found pertinent is the following:

> **Proper application of this principle in damages actions against public officials requires careful adherence to the distinction between personal- and official-capacity suits. Because this distinction apparently continues to confuse lawyers and confound lower courts, we attempt to define it more clearly through concrete examples of the practical and doctrinal differences between personal- and official-capacity actions.**

> **Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.** See, e. g., Scheuer v. Rhodes, 416 U.S. 232, 237 -238 (1974). **Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent."** Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690 , n. 55 [473 U.S. 159, 166] (1978). **As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. Brandon, 469 U.S., at 471 -472. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.**

> **On the merits, to establish personal liability in a 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.** See, e. g., Monroe v. Pape, 365 U.S. 167 (1961). **More is required in an official-capacity action, however, for a governmental entity is liable under 1983 only when the entity itself is a "'moving force'" behind the deprivation,** Polk County v. Dodson, 454 U.S. 312, 326 (1981) (quoting Monell, supra, at 694); **thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law.** Monell, supra; Oklahoma City v. Tuttle, 471 U.S. 808, 817 -818 (1985); id., at 827-828 (BRENNAN, J., concurring in judgment). 12 **When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such** [473 U.S. 159, 167] **as objectively**

31

**reasonable reliance on existing law**. See Imbler v. Pachtman, 424 U.S. 409 (1976) (absolute immunity); Pierson v. Ray, 386 U.S. 547 (1967) (same); Harlow v. Fitzgerald, 457 U.S. 800 (1982) (qualified immunity); Wood v. Strickland, 420 U.S. 308 (1975) (same). **In an official-capacity action, these defenses are unavailable.** Owen v. City of Independence, 445 U.S. 622 (1980); see also Brandon v. Holt, 469 U.S. 464 (1985). 13 **The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment**. While not exhaustive, this list illustrates the basic distinction between personal- and official-capacity actions. 14

As we all know, the Eleventh Amendment sovereign immunity protects the states of the union

and not the United States of America, ergo, this defense raised by the Respondents is clearly

unavailable to them.

As to the last case that the Respondents raised in support of their position regarding this

issue, ironically it also helps Petitioner more than it harms. From <u>Clark v. Library of Congress</u>,

750 F.2d 89 (D.C. Cir. 1984), we import the following excerpt of strict application to the instant

Mandamus Petition.

**The Supreme Court, in Larson v. Domestic and Foreign Corp.**, 337 U.S. 682, 689-91, 93L. Ed. 1628, 69 S. Ct. 1457 (1949), **stated that sovereign immunity does not bar suits against government officials where the challenged actions of the officials are unconstitutional or beyond the official's statutory authority**...

...The Supreme Court prefaced its discussion of these two exceptions by stating: **"There may be, of course, suits for specific relief against officers of the sovereign. . . ."** Larson, 337 U.S. at 689 (emphasis added). The Court explicitly noted: "Of course, a suit may fail, . . . even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, **if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.**" Id. at 691, n. 11. These exceptions have been applied only in suits for specific relief. See, e.g., Dugan v. Rank, 372 U.S. 609, 622, 10 L. Ed. 2d 15, 83 S. Ct. 999 (1963) **(In cases of ultra vires or unconstitutional actions "the officer's action 'can be made the basis of a suit for specific relief against the officer. . . .'")** (quoting Malone v. Bowdoin, 369 U.S. 643, 647, 8 L. Ed. 2d 168, 82 S. Ct. 980 (1962)); Unimex, Inc. v. Department of Housing and Urban Development, 594 F.2d 1060, 1061-62 (5th Cir. 1979) (Even if officials' actions were ultra vires "that claim would entitle the plaintiff to specific relief only, and not to monetary damages.")32

32

Since the instant Mandamus Petition relief sought is everything except monetary in nature, the

defenses raised by the Respondents in this vein must fail, as the authority they raised in support

themselves proves ad nauseam. Let it suffice to mention that the precedent recognized by the

Court in Larson, supra, in terms of the sovereign immunity of the United States not being an

impediment to find relief for the violation of constitutional rights, has been reiterated in the

following important cases of pertinence here: Joint Anti Fascist Refugee Committee v. Mc Grath,

Attorney General, Et al, 341 U.S. 123 (1951) [First Amendment] and Davis v. Passman, 442 U.S.

228 (1979)[Fifth Amendment].

Finally, we must call the attention of this HUSDCDC to another pertinent and significant

teaching emerging from the Larson case, supra, which is the following:

> **A second type of case is that in which the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional.** Actions for habeas corpus against a warden and injunctions against the threatened enforcement of unconstitutional statutes are familiar examples of this type. Here, too, the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign. The only difference is that in this case the power has been conferred in form but the grant is lacking in substance because of its constitutional invalidity.
>
> **These two types have frequently been recognized by this Court as the only ones in which a restraint may be obtained against the conduct of Government officials.** The rule was stated by Mr. Justice Hughes in Philadelphia Co. v. Stimson, 1912, 223 U.S. 605, 620 , 344, where he said: '* * * in case of an injury threatened by his illegal action, the officer cannot claim immunity from injunction process. The principle has frequently been [337 U.S. 682 , 691] applied with respect to state officers seeking to enforce unconstitutional enactments. (Citing cases.) **And it is equally applicable to a Federal officer acting in excess of his authority or under an authority not validly conferred.**' 11
>
> ...
>
> **There are limits, of course. Under our constitutional system, certain rights are protected against governmental action and, if such rights are infringed by the actions of officers of the Government, it is proper that the courts have the power to grant relief against those actions...**

33

Finally, with regards to this issue, the instant Mandamus Petition is not asking for the redress of damages or compensation, but for the officers of the U.S. Government to comply with their ministerial duties, ergo, all the Respondents defenses raised in this vein, must fail.

## C. PETITIONER DOES NOT HAVE STANDING

Of the myriads of lies that the U.S. Attorneys have gotten away with during the past years since the Petitioner's ordeal with them started, perhaps no one is more flagrant than what this defense claimed here by the appearing U.S. Attorneys pretends, to have this HUSDCDC decide that the Petitioner allegedly does not have standing to make the claims he has made and rightly justified, accord, the Constitution, the applicable laws, the U.S. Attorney's Manual and the rules of ethics that govern the conduct of all lawyers, USAO Attorneys definitely not excluded.

Since most if not all of the defenses that the Respondents raised in this vein are not only legally untenable or invalid, but even unbecoming of U.S. Attorneys that have sworn to obey and to make sure that everyone else obeys the laws on this otherwise Great Nation, we will not take more of this HUSDCDC valuable time with a point by point response. Rather, we will limit ourselves to illustrate this forum about why there is no one in this world with more standing to file this Mandamus Petition than us. First, any U.S. citizen ( and paradoxically even non-citizens) has the inalienable right to recur to its courts to defend his/her Constitutional, Civil, statutory, equity or whatever rights. This is so, even in the case of second or third class citizens born and raised in a vulgar colony of the U.S. of A., where he/she cannot vote for the President that appoints, nor the Senators and Representatives that consent the appointments of the Honorable Judges that rule over these matters. Second, in the case of this Petitioner, U.S. of A. Government officers, most saliently the U.S. Attorneys, have unconstitutionally, illegally and in an ultra vires

34

fashion moved for over twelve (12) years now, without reason nor logic of any kind, to confiscate the rights of the Petitioner even to defend himself from the above. It is time for this shameful, temerarious, egregious, contumacious and vicious misconduct to come to an end. Not only for the sake of the Petitioner and the thousands he indirectly represents, but for the sake of those similarly situated in the future and the own U.S. Attorneys themselves and the institution they represent or are supposed to represent-"Justice".

The Respondents in their MPASMTD at p.12, make their latest desperate efforts to have this time this HUSDCDC rule that Petitioner cannot even defend himself from their years of abuses, misconduct, fraud upon the courts and cover up's. Petitioner has already shown how his First, Fifth and Sixth Amendment Constitutional Rights were violated since the outset of his ordeal with the USDE legal counsels. But the plot thickened ever since, mainly as a result of the U.S. Attorneys having not only neglected to prevent the conspiracy of the former, but by so doing, aiding and abetting in that conspiracy, which to this date they obstinately and stubbornly linger to without shame, much less remorse.

Petitioner is hereby including hard evidence, all emerging from official U.S. agencies government on how he has been persecuted for having dared to exert his First Amendment Constitutional Rights. Enclosed this HUDCDC will find the following:

1. Copy of the Internal Revenue Service (IRS) imputation of the Trust-Fund Liabilities against ARR personally for the taxes owed by IEU, the corporation, since he was found to be the person "responsible" for the taxes owed by that corporation.

2. The collection notices sent to Petitioner collecting from him over $29,000,000 million dollars that same corporation allegedly owed the USDE.

35

3. The collection notice by the IRS of the Trust Fund Liabilities again in 2005.

4. The communication that the U.S. Attorney, Mr. Anthony Yang, Esq., representing the U.S., in the appeals of case 98-2225(RLA) before the Honorable U.S. Court of Appeals for the First Circuit (HUSCA1C) spontaneoulsy made to Petitioner, regarding his concern about Petitioner's personal and his family's exposure.

All of the above, should be more than enough not only to defeat the Respondents defenses in this vein, but to persuade this HUSDCDC and/or any court of law for that matter, that Petitioner has more than standing, but a duty to defend himself and his family from the abuses of the U.S. Attorneys that provoked the instant Mandamus Petition.

Petitioner also must clarify that the above issues were not part of those in controversy 99-1012 (CCC)(SEC)(JAG), which evolved into appeal 03-1083, Ruiz Rivera v. I.R.S., 226 F. Supp.2d. 345 (D.P.R. 2002). That controversy was related to illegal disclosures by IRS agents to third parties which resulted in ARR losing a lease contract and its consequential damages. In terms of In re Ruiz Rivera, 04-1397 (D.C. Cir.). A perfunctory reading of that controversy will confirm that the main issue there was the non-compliance by the IRS of a timely filed Notice of Lien over the funds owed to IEU/ARR, that ARR requested the courts to order the IRS to enforce.

In terms of the fastidiously rehashed argument that ARR is purporting to appear for IEU, same is untenable since IEU is not a party to the instant Mandamus Petition.

## D. PETITIONER HAS FAILED TO MEET HIS BURDEN FOR A WRIT OF MANDAMUS

As this HUSDCDC must have corroborated, the Respondents have not raised a single

reason why the writ should not issue. They did not even cared to allege that the OPR had indeed conducted an investigation of the CFM in question here. They have not produced , who, when, and how the investigation was conducted or any report issued as a result of the investigation whatsoever. They have not explained why in view of the smoking gun evidence regarding the unpaid refunds "finding", the investigator(s) of the CFM could had ruled that the intervening U.S. Attorneys did not incurred into misconduct. They have not explained why in view of the beyond doubt evidence cited above, that the HEA proscribed the use of the July 23, 1993 amended regulations against IEU/ARR, the investigator(s) of the CFM could had ruled that the intervening U.S. Attorneys did not incur into misconduct. They have not explained why in view of the clear and convincing evidence cited above, that the own QARTR exonerated IEU/ARR from the excess cash "finding" and it was a mathematical impossibility, the investigator(s) of the CFM could had ruled that the intervening U.S. Attorneys did not incur into misconduct. They have not explained how the U.S. Attorneys complained about could justify the USDE legal counsels confessed intimidation of Petitioner's announced witnesses before its ALJ. They have not explained how in view of all of the above, the U.S. Attorneys gave legal advice to their client-agency legal counsels contrary to what the hard evidence produced demanded and mere prudence dictated.

If the Respondents have not met even with their burden of production, how can they possibly expect to have met with their burden of persuasion, see <u>Director OWCP v. Greenwich Collieries</u>, 114 S.Ct. 2251, especially vis a vis the quantity and the quality of the evidence that the Petitioner produced which should be more that enough to convince a cold reviewer of the merits of the instant Mandamus Petition.

May we end with a quote from the seminal case, <u>Davis v. Passman</u>, supra, from where we extract the following.

> The Constitution, on the other hand, does not "partake of the prolixity of a legal code." McCulloch v. Maryland, 4 Wheat. 316, 407 (1819). It speaks instead with a majestic simplicity. One of "its important objects," ibid., is the designation of rights. **And in "its great outlines," ibid., the judiciary is clearly discernible as the primary means through which these rights may be enforced.** As James Madison stated when he presented the Bill of Rights to the Congress:
>
> > **"If [these rights] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they [442 U.S. 228, 242] will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights."** 1 Annals of Cong. 439 (1789).

At least in the absence of "a textually demonstrable constitutional commitment of [an] issue to a coordinate political department," Baker v. Carr, 369 U.S. 186, 217 (1962), **we presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights. "The very essence of civil liberty,"** wrote Mr. Chief Justice Marshall in Marbury v. Madison, 1 Cranch 137, 163 (1803), **"certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.**

## CONCLUSION

This is not the first and unfortunately will not be the last time where malicious prosecution degenerates into vindictive prosecution of the worst kind and same is covered up, consciously because of conflicts on interests or unconsciously because the presumption of righteousness owed to federal attorneys is converted into a disingenuous assumption of infallibility. For a sample of some other cases in recent years, see Exhibit 3.

38

For all the reasons above, we pray that this HUSDCDC, grants the instant Mandamus Petition, for reasons supported by the Amendments to the Constitution cited, in the laws cited, in the U.S. Attorney's Manual and the Office of Professional Responsibility Policies and Procedures, in Equity and more important and basic than all of the above, for reasons of "Justice". So we state, allege and pray, this 5th. of May of 2007.

Respectfully submitted,

Angel Ruiz Rivera
Pro Se Ipso
P.O. Box 191209
San Juan, P.R. 00919-1209.
787-435-3512
arruizrivera@aol.com

CERTIFICATE OF SERVICE

I, Angel Ruiz Rivera, appearing here Pro Se ipso, hereby certify that I have sent a copy of this writing by priority mail of the USPS to the appearing counsel for the Respondents, Ms. Judith A. Kidwell, AUSA, 555 Fourth St., NW.-Room E4905, Washington, D.C. 20530. (202) 514-7250.

EXHIBITS

1. AFFIDAVIT
2. TRANSCRIPT OF OCTOBER 22, 1996 HEARING.
3. IRS DOCUMENTS-COLLECTION NOTICES
4. ARTICLES ON PROSECUTORIAL AND JUDICIAL MISCONDUCT.

1. AFFIDAVIT

## AFFIDAVIT

1. THAT MY NAME IS ANGEL A. RUIZ RIVERA, OF LEGAL AGE, MARRIED AND RESIDENT OF CAROLINA, P.R. AND THAT I SWEAR THIS AFFIDAVIT VOLUNTARILY WITHOUT COERCION OF ANY SORT.

2. THAT GUILLERMO GIL, THE U.S. ATTORNEY HAPPENS TO BE AN EX-CLASSMATE.

3. THAT EVEN WHEN WE COULD NOT CONSIDER TO BE FRIENDS SINCE WE HAD SEEN EACH OTHER ONLY TWICE SINCE OUR 1971 GRADUATION FROM COLEGIO SAN IGNACIO (ONCE IN 1987 IN THE BALLPARK AT THE PAN-AMERICAN GAMES IN INDIANAPOLIS, INDIANA, WHERE HE WAS WITH EVERETT DE JESUS CHECKING OVER THE CUBAN EXILES BOTHERING THE CUBAN NATIONAL BASEBALL TEAM MEMBERS. THE OTHER IN 1991 AT A MEETING AT DR. ENRIQUE PEREZ SANTIAGO'S IN BAYAMON, P.R. AT A MEETING OF THE CLASS OF 1971 DURING THE SUMMER OF 1996 I SET AN APPOINTMENT WITH HIM AT HIS OFFICES).

4. DURING THAT MEETING I EXPLAINED TO HIM THAT I WAS AT ODDS WITH SOME RACISTS AT THE U.S. DEPARTMENT OF EDUCATION AND THAT I WAS ON THE VERGE OF SUING THEM. HE ADVISED ME THAT IF I DID THAT, HE WAS THE ATTORNEY FOR THE GOVERNMENT AND THAT I SHOULD KNOW.

5. I REPLIED THAT I KNEW AND THAT I WAS THERE FOR OTHER REASONS. I JUST WANTED TO START WITH THAT DISCLOSURE SO THAT IF I LATER DECIDED TO INDEED FILE, HE WOULD NOT THINK THAT I HAD NOT BEEN TOTALLY HONEST.

6. THEN I GOT INTO THE OBJECT OF THE MEETING WHICH WAS THAT I HAD BEEN TOLD BY SOMEONE I KNEW, NAMED PIPO RIVAS DOMINICCI, THAT HE HAD BEEN VISITED BY FEDERALS ASKING QUESTIONS ABOUT ME, A FEW WEEKS BACK IN THE SUMMER OF 1996. THAT HE UNDERSTOOD THEY WERE MAKING SOME SORT OF CRIMINAL INVESTIGATION OF MYSELF. THAT HE HAD TOLD AN ATTORNEY IN BAYAMON, NAMED EFRAIN LATONI, THINKING THAT LATONI WAS GOING TO RELAY THE INFORMATION TO ME.

7. SINCE IN ALL MY ORDEAL WITH THE U.S.D.E. THERE HAD NEVER BEEN ANY SIGNS OF ANYTHING CRIMINAL, I WAS VERY SURPRISED AND INDIGNANT AT THE MERE IDEA THAT I COULD BE THE SUBJECT OF A CRIMINAL INVESTIGATION.

8. SINCE THE ORDEAL WITH THE U.S.D.E HAD BEEN SO TRAUMATIC I FELT I DESERVED TO KNOW IF THEIR IRRATIONAL HATE FOR ME COULD REACH THIS SORT OF DIMENSION.

9. THAT SINCE I HAD ALWAYS BEEN AN HONORABLE PERSON, I PERHAPS NAIVELY, THOUGHT THAT MY EX-CLASSMATE WOULD SHARE WITH ME IF A WAS OBJECT OF AN INVESTIGATION OR NOT.

10. FOR THAT REASON I CALLED HIM AND ASKED FOR AN APPOINTMENT.

11. THAT HE AGREED THE MEETING AS MENTIONED ABOVE AT HIS OFFICES. THAT I INQUIRED IF I WAS OBJECT OF A CRIMINAL INVESTIGATION, SINCE NOTHING CRIMINAL HAD BEEN BROUGHT AGAINST ME OR IEU IN OUR ORDEAL WITH THE U.S.D.E., AND HE ANSWERED HE DID NOT KNOW. THAT WHEN HE ASKED ME ABOUT MY SOURCE AND I

TOLD HIM MY SOURCE WAS RELATED TO ATTORNEY EFRAIN LATONI, ESQ. FROM BAYAMON, P.R., HE TOLD ME THAT WHEN HE WAS GOVERNMENT LAWYER (FISCAL) IN HIS EARLY DAYS IN BAYAMON, SINCE THEN, ATTORNEY LATONI WAS KNOWN FOR HAVING FRIENDS SPREAD THE NEWS THAT SOME INVESTIGATION WAS TAKING PLACE RELATED TO X PERSON AND THE FRIEND WOULD RELAY TO X THAT LATONI KNEW ABOUT IT, SO THAT THE OBJECT OF THE ALLEGED INVESTIGATION WOULD FEEL NATURALLY COMPELLED TO SEE LATONI WHO THEN WOULD TRY TO SELL HIS SERVICES. IN OTHER WORDS, IT SOUNDED TO ME AS A PECULIAR CASE OF A REFLEXIVE AMBULANCE CHASING THROUGH A THIRD PARTY, OR TRIANGULAR IF YOU PREFER.

12. THAT HE THEN ASKED ME IF I WAS WILLING TO PAY THE DEPARTMENT MY DUES, AND I REPLIED I HAD EXPRESSED MY WILLINGNESS AND DISPOSITION TO DO THAT FROM THE ONSET BUT THAT THE IMPRESSION I HAD RECEIVED WAS THAT THE MEMBERS OF THE U.S.D.E. HATE TEAM, SICK WITH THEIR PREJUDICE AGAINST PUERTO RICANS, WANTED TO BEHEAD ME AND DESTROY THE INSTITUTION I HAD FOUNDED AND DEVELOPED TO BE ONE OF THE BEST IN P.R. IN ITS CATEGORY FOR NO APPARENT REASON EXCEPT THAT THEY RESENTED I HAD THE COURAGE OF HAVING CHALLENGED THEIR *MODUS OPERANDI*.

13. THEN HE PROCEEDED TO SHARE WITH ME THAT THERE WAS A MEMO BY JANET RENO PROMOTING THAT THE ALTERNATE DISPUTE RESOLUTION OPTION BE USED MORE FREQUENTLY INSTEAD OF ORTHODOX ADVERSARIAL LITIGATION AND THAT HE RECOMMENDED THAT I EXPLORED THAT ALTERNATIVE INSTEAD OF FILING SUIT. I THANKED HIM FOR HIS COMMENTS AND LEFT. HE WARNED ME THAT THIS CONVERSATION SHOULD BE KEPT OFF THE RECORD AND THAT I WAS NOT TO USE IT UNDER ANY CIRCUMSTANCE. HE ADDED THAT SINCE HE HAD SEEN ME ONLY THREE TIMES SINCE GRADUATION HE COULD NOT SPEAK ABOUT MY MORAL SOLVENCY ALTHOUGH HE DID NOT HAVE ANYTHING HE COULD HOLD AGAINST ME.

14. SOME SHORT TIME AFTER I TALKED TO HIM AGAIN AND I TOLD HIM THAT THE SITUATION WITH THE U.S.D.E. WAS UNBEARABLE SINCE THEY HAD STOPPED ALL PAYMENTS AND THAT I WAS VIRTUALLY BANKRUPT AND ABOUT TO FILE SUIT. THAT I WANTED TO KNOW IF THERE WAS ANYTHING HE COULD DO TO HELP ME SAVE THE INSTITUTION THAT HAD CLOSE TO 5,000 STUDENTS AND 500 EMPLOYEES AND AVOID A NASTY LITIGATION.

15. AFTER THIS CONVERSATION, MY LAWYERS AT THE TIME, MS. WALESKA MARRERO MELECIO, THE EX-DIRECTOR OF THE LEGAL DIVISION OF THE CORRECTIONS DEPARTMENT OF P.R., AND MR. CHARLES CANDELARIA FARULLA, CALLED ME TO A MEETING AT THE U.S. ATTORNEY'S OFFICE WITH ATTORNEY ISABEL MUNOZ ACOSTA. THAT A MEETING WAS HELD AT A CONFERENCE ROOM AT THE U.S. ATTORNEY'S OFFICE AND THE FIVE OF US PRESENT WERE: MUNOZ, MARRERO, CANDELARIA, MYSELF AND ANOTHER U.S. ATTORNEY; MS. EDNA ROSARIO. AFTER WE EXPLAINED TO THEM THE VICIOUS CHARACTER OF THE U.S.D.E'S EMPLOYEES ACTIONS THEY MADE A TELEPHONE CALL TO THE U.S.D.E. TO INQUIRE ABOUT THEIR POSITION REGARDING THE RELEASE OF FUNDS PENDING DISBURSEMENT AND THAT HAD BEEN ILLEGALLY AND UNREASONABLY WITHHELD.

16. THAT MS. MUNOZ LEFT THE ROOM TO MAKE THE CALL AND ATTORNEY ROSARIO REMAINED AT THE ROOM WITH MY LAWYERS AND MYSELF. IN THE MEANTIME I WAS ABLE TO HIGHLIGHT TO ATTORNEY ROSARIO THE ALJ DECISION IN THE MATTER OF MBTI

WHERE THE U.S.D.E'S PURPORTED INTERPRETATION OF THE CLOCK HOUR REGULATION HAD BEEN REJECTED. I ARGUED THAT IN VIEW OF THIS UNDENIABLE REALITY, THE U.S.D.E.'S ACTIONS AGAINST IEU WERE TOTALLY VICIOUS. SHE ACQUIESCED NON VERBALLY.

17. THAT SOME TIME AFTERWARDS, ATTORNEY MUNOZ RELAYED TO US THAT THE U.S.D.E. PERSONNEL HAD TOLD HER THAT THEY WERE EVALUATING OUR REQUESTS AND THAT EVENTUALLY WOULD LET US KNOW THEIR FINAL DECISION. I REACTED BY TELLING HER THAT SHE WAS GETTING FROM THEM EXACTLY THE SAME SORT OF STORY THAT WE ALWAYS GOT FROM THEM, WITH NO PRECISION, NO DETAILS, NO PROJECTION, NO NOTHING. THE MEETING WAS ADJOURNED WITH A FEELING OF IMPOTENCE IN EVERYONE'S FACES.

18. THAT WE NEVER ASKED WHY MUNOZ CALLED THAT MEETING BUT I ALWAYS WAS LEFT WITH THE IMPRESSION THAT IT WAS AS A RESULT OF AN INITIATIVE BY GIL. AT THE TIME I DID NOT KNOW THAT MUNOZ WAS THE WIFE OF A NEIGHBOR FROM BY TEENAGE DAYS AND ALSO LATER A CLASSMATE DURING THE SUMMER OF 1972 TOGETHER WITH HIS FIRST WIFE.

19. THAT AT THE SEPTEMBER 5, 1996 HEARING AT JUDGE FUSTE'S CHAMBERS I WAS SURPRISED TO SEE MUNOZ AND ROSARIO AT THE COURTROOM TOGETHER WITH THE U.S.D.E. LAWYERS SINCE I THOUGHT, PERHAPS NAIVELY, THAT THEY SHOULD NOT BE THE ATTORNEY'S REPRESENTING THE U.S. DEPARTMENT OF JUSTICE SINCE THEY HAD MET WITH US SOME DAYS BEFORE AND KNEW ABOUT OUR POSITION AGAINST THE U.S.D.E..

20. THAT AFTER THAT HEARING, MS. MUNOZ HAVE BEEN FOR ALMOST THREE YEARS THE ATTORNEY OF RECORD FOR THE U.S. DEPARTMENT OF JUSTICE IN REPRESENTATION OF THE U.S.D.E., AS SUCH IT IS DISHONEST ON HER PART TO STATE THAT :"IT IS COMPLETELY UNKNOWN TO WHICH RECORD, AND WHICH DECISION, AND WHICH APPEAL PLAINTIFFS REFER" DEFENDANT'S. MEMORANDUM AT 9.WHY SHE IS PRETENDING AND REPRESENTING TO THE COURT THAT SHE DOES NOT KNOW WHAT THIS CASE IS ALL ABOUT, IS A GOOD QUESTION TO ASK HER.

21. THAT I FILE THIS AFFIDAVIT, WITH THE CONSCIOUS BELIEF AND CONVICTION THAT I HAVE BEEN OBJECT OF THE MOST VEXATIOUS TREATMENT IMAGINABLE THROUGHOUT AN ORDEAL THAT HAS LASTED FOR ME, MORE THAN FOUR YEARS NOW AND THAT HAVE BEEN EXACERBATED BY THE TREATMENT THAT I HAVE RECEIVED FROM MANY OFFICERS OF THE GOVERNMENT IN THE FEDERAL DISTRICT COURT IN P.R., WHERE IN A TEXTBOOK EXAMPLE OF THE MOST FLAGRANT VIOLATION OF THE PRINCIPLE OF SEPARATION OF POWERS THE "JUDICIAL" POWER HAVE JOINED THE "EXECUTIVE" POWER IN THE LATTER'S EFFORT TO ANNIHILATE ME.

22. THAT AS QUIXOTICAL OR ALTRUISTIC (IN THE BEST JIBARO SENSE) AS MAY SOUND, I AM WILLING TO DIE FOR MY PRINCIPLES AND TRY EVERYTHING POSSIBLE TO CONVERT THIS PRECEDENT IN THE REASON FOR ACTIONS OF THIS SORT TO NEVER OCCUR AGAIN IN THE FUTURE IN PUERTO RICO AND IN THE U.S.A..

I, ANGEL RUIZ RIVERA, UNDER THE PENALTY OF PERJURY, HEREBY SWEAR THAT EVERYTHING IN THIS AFFIDAVIT IS TRUE .

4

SIGNED TODAY FEBRUARY 24, 1999, IN SAN JUAN, P.R.

ANGEL RUIZ RIVERA

2. TRANSCRIPT OF OCTOBER 22, 1996 HEARING.

96-28-ST

(17a)    1

UNITED STATES OF AMERICA

OFFICE OF THE DEPARTMENT OF EDUCATION

+ + + + +

HEARING

IN THE MATTER OF:

INSTITUTO DE EDUCACION
UNIVERSAL

Docket No. 96-20-ST
           96-93-ST
           96-103-SA

Tuesday, October 22, 1996

Room 1008
San Juan Judicial Center
Muñoz Rivera Avenue
Hato Rey, Puerto Rico

        The above-entitled matter was announced
to be heard at 9:30 a.m. at the aforementioned
location.

BEFORE:

        RICHARD O'HAIR, Administrative Law Judge
        Department of Education Office

OFFICE OF
HEARINGS AND APPEALS

001218  NOV 6  1996

RECEIVED

9

1          JUDGE O'HAIR:  Orally.

2          MR. CEREZO:  Orally.  Would that be now?

3          JUDGE O'HAIR:  Uh--

4          MR. CEREZO:  Or later?

5          JUDGE O'HAIR:  I think probably later is

6  probably as appropriate as anything.

7          MR. CEREZO:  Okay.  We have another, if we

8  may call it, administrative problem which we want to

9  bring to your attention.

10          We, even though the burden of proof, as

11  properly expressed by you, falls upon the Department

12  of Education, there are complex accounting matters

13  that are to be discussed in this hearing.

14          And we had intended to bring two

15  accountants before, and it's of common knowledge who

16  the two accountants are.  And they were ready to

17  appear until functionaries from the Department of

18  Education, in an ex parte manner, contacted these

19  witnesses and all of a sudden we are without

20  witnesses.

21          After that intimidating conversation,

22  whatever the nature was, whatever the reasons were,

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.

(202) 234-4433

001226

10

1   lawyers are not supposed, they're not supposed to be

2   contacting the other party's witnesses without going

3   through the lawyers.

4          And that is a serious problem that we have

5   today, because of that ex parte action taken by the

6   Department of Education. And that presents a serious

7   problem to us, which we submit for your knowledge.

8          JUDGE O'HAIR: Mr. Wolff?

9          MR. WOLFF: Yes. In fact the functionary

10  that counsel is referring to is my co-counsel who

11  specifically did knowingly, in my presence, properly

12  contact  two  independent  public  accountants  who

13  appeared on a witness list that Respondent presented

14  to both the Department and to this Tribunal.

15         It  would  have  been  improper  for  the

16  Department not to contact independent individuals who

17  are to appear before this Tribunal as witnesses. and

18  request the opportunity to speak with them.

19         Clearly the Department did not contact the

20  school, the school officials, anybody that counsel

21  would  be  representing.   We  would  not  contact

22  Respondent.

001227

1        Similarly we would not allow them to

2    contact someone that we purported as our client, for

3    purposes he described to us.

4        But an independent public accountant has

5    a duty to talk to the Department, as our regulations

6    specifically say.  It's the duty to present its work

7    papers for our evaluation.  And certainly, not only

8    was it not improper, but it was necessary that the

9    Department contact these two individuals.

10        I mean, I'll also say for the record,

11    since I was present for these conversations, that they

12    was certainly nothing that could possibly be intimated

13    as being intimidating.

14        The requests were simply would you, would

15    you, be willing to meet with us, and talk to us.  That

16    was the extent of it, and both parties said, Oh, we

17    have to check with Mr. Ruiz.  We're not sure if we

18    want to talk to you.  We'll get back to you.  They

19    never did.

20        So, in fact, we were denied an opportunity

21    to talk to them.  And rest assured, if they showed up,

22    they would be cross examined about their refusal to

001228

1    speak to the Department officials.

2              So I respectfully disagree with the

3    comments of counsel. In fact that they are improper

4    and inappropriate.

5              JUDGE O'HAIR: So the extent of the

6    conversation was just as you've represented to me.

7              MR. WOLFF: Absolutely, sir.

8              JUDGE O'HAIR: Mr. Cerezo?

9              MR. CEREZO: Well, that's precisely why

10   the Code of Ethics of lawyers established a

11   prohibition for lawyers to talk to other clients, to

12   other persons, without going through the process.

13   That's precisely. Now, brother counsel Wolff has the

14   pretension of being the judge and the arbiter of their

15   own actions.

16             What does he say? Well, it was my, my co-

17   counsel, she, I was there. So he is the witness. And

18   then he pronounces that it would have been improper.

19   And then he says that the accountants were forced,

20   because they had their duty to testify.

21             I'm not quarreling with that, despite the

22   fact that when their reply was submitted, if they

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C. 20005-3701

(202) 234-4433

(202) 234-4433

001229

1    intended, or they needed their testimony, or their

2    work documents, they could have requested them through

3    the administrative law judge.

4              No, but they don't do that. They just go

5    directly. I don't know what they said; I don't know

6    the contents of the conversation precisely because we

7    were left out of that conversation. That isn't

8    proper. I'm not inventing this. It's a code of

9    ethics for lawyers.

10             And that Code of Ethics applies in

11   administrative proceedings, applies in judicial

12   proceedings, because this is not that you are going to

13   be the judge, and the witness, and the party, and you

14   are going to adjudicate yourself. And that is the

15   conundrum where we are seeing right now in this

16   problem, created by this -- the word may be harsh --

17   it's improper, it's unethical, definitely unethical to

18   do that.

19             JUDGE O'HAIR: Well, I think disregarding

20   the ethics of the situation, I'm not convinced that

21   the Department's contacting the witnesses in any way

22   prevents them from testifying, appearing before me and

001230

3. IRS DOCUMENTS-COLLECTION  NOTICES

Department of the Treasury
Internal Revenue Service
ACS SUPPORT
PO BOX 57
BENSALEM, PA 19020-8514

Date:
    DEC. 13, 2005

Taxpayer Identification Number:
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    O 00

Contact Telephone Number:
TOLL FREE: 1-800-829-3903
BEST TIME TO CALL:
MON - FRI  8:00AM TO 8:00 PM
ASISTENCIA EN ESPANOL 1-800-829-3903

ANGEL A RUIZ
ONEYDA M PAMQUE GARCIA
PO BOX 191209
SAN JUAN  PR    00919

## CALL IMMEDIATELY TO PREVENT PROPERTY LOSS
## FINAL NOTICE OF INTENT TO LEVY AND NOTICE OF YOUR RIGHT TO A HEARING

### WHY WE ARE SENDING YOU THIS LETTER

We've written to you before asking you to contact us about your overdue taxes. You haven't responded or paid the amounts you owe. We encourage you to call us immediately at the telephone number listed above to discuss your options for paying these amounts. If you act promptly, we can resolve this matter without taking and selling your property to collect what you owe.

We are authorized to collect overdue taxes by taking, which is called levying, property or rights to property and selling them if necessary. Property includes bank accounts, wages, real estate commissions, business assets, cars and other income and assets.

### WHAT YOU SHOULD DO

This is your notice, as required under Internal Revenue Code sections 6330 and 6331, that we intend to levy on your property or your rights to property 30 days after the date of this letter unless you take one of these actions:
- Pay the full amount you owe, shown on the back of this letter. When doing so,
  - Please make your check or money order payable to the United States Treasury;
  - Write your social security number and the tax year or employer identification number and the tax period on your payment; and enclose a copy of this letter with your payment.
- Make payment arrangements, such as an installment agreement that allows you to pay off your debt over time.
- Appeal the intended levy on your property by requesting a Collection Due Process hearing within 30 days from the date of this letter.

### WHAT TO DO IF YOU DISAGREE

If you've paid already or think we haven't credited a payment to your account, please send us proof of that payment. You may also appeal our intended actions as described above.

Even if you request a hearing, please note that we can still file a Notice of Federal Tax Lien at any time to protect the government's interest. A lien is a public notice that tells your creditors that the government has a right to your current assets and any assets you acquire after we file the lien.

We've enclosed two publications that explain how we collect past due taxes and your collection appeal rights, as required under Internal Revenue Code sections 6330 and 6331. In addition, we've enclosed a form that you can use to request a Collection Due Process hearing.

We look forward to hearing from you immediately, and hope to assist you in fulfilling your responsibility as a taxpayer.

Enclosures: Copy of letter, Form 12153, Publication 594, Publication 1660, Envelope

Automated Collection System

Letter 1058 (Rev. 09-2002)(LT-11NC)

## Account Summary

ANGEL A RUIZ                                                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

| Type of Tax | Period Ending | Assessed Balance | Accrued Interest | Late Payment Penalty | Total |
|---|---|---|---|---|---|
| CIVPEN | 12-31-1995 | $ 336,842.83 | $ 279,191.43 | $ 0.00 | $ 616,034.26 |

| | | | | Total Amount Due | $ | 616,034.26 |

| Type of Tax | Period Ending | Name of Return |
|---|---|---|
| | | |

Department of the Treasury -- Internal Revenue Service

CERTIFICATE OF ASSESSMENTS AND PAYMENTS

ANGEL A RUIZ
BOX 3818 SAN JOSE CONTACT CT          EIN/SSN: 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
SAN JUAN            PR 00902-3818-180

TYPE OF TAX: Computation and Assessment of Misc Pen   FORM: 8278  Period Ending: DEC 1995
===============================================================================================

| Date | Transaction Explanation | Assessment (Abatement) | Credit (Credit Reversal) | Summary Record of Assessment Date |
|------|-------------------------|------------------------|--------------------------|-----------------------------------|
| 04/14/1997 | IRC 6672 Trust Fund Recovery Pen Assessed | 336,842.83 | | 04/14/199 |
| 04/14/1997 | First Notice | | | |
| 05/12/1997 | Fourth Notice (Final) | | | |

===============================================================================================
I certify that the foregoing transcript of the taxpayer named above in respect to the taxes
specified, is a true and complete transcript for the period stated, of all assessments,
penalties, interest, abatements, credits, refunds, and advance or unidentified payments
relating thereto as disclosed by the records of this office, as of the date of this
certification.
===============================================================================================
Signature of Certifying Officer

for Joseph H. Cloonan, Director                    Date

Location: Internal Revenue Service
          Northeast Region
JUL 1 9          Philadelphia, PA 19255

Page  1 of  1

| Form 668 (Y) (c)<br>(Rev. August 1997) | | Department of the Treasury - Internal Revenue Service<br># Notice of Federal Tax Lien | |
|---|---|---|---|

| District | Serial Number | For Optional Use by Recording Office |
|---|---|---|
| | | |

As provided by sections 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.

Name of Taxpayer

Residence

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax<br>(a) | Tax Period Ended<br>(b) | Identifying Number<br>(c) | Date of<br>Assessment<br>(d) | Last Day for<br>Refiling<br>(e) | Unpaid Balance of<br>Assessment<br>(f) |
|---|---|---|---|---|---|
| | | 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 | | 10/13/2007 | |

| Place of Filing | | | | |
|---|---|---|---|---|
| Registro de la Propiedad-Seccion I<br>Ponce<br>PO Box 1988, Ponce, PR 00731 | | Total | S | |

This notice was prepared and signed at _____, on this,

the _____ day of _____, 1999.

| Signature | Title Revenue Officer 66-01-0701<br>(787) 759-5465 |
|---|---|
| | |

(NOTE: Certificate of officer authorized by law to take acknowledgments is not essential to the validity of Notice of Federal Tax lien Rev. Rul. 71-455, 1971-2 C.B. 409)

EXHIBIT 1 - COLLECTION NOTICES FROM THE U.S. DEPARTMENT OF EDUCATION (USDE) ADDRESSED TO THE PETITIONER COLLECTING OVER $22,000,000.00 IN PAYMENTS ALLEGEDLY OWED TO THE USDE. THESE AND OTHER CLAIMS ARE PENDING JUDICIAL REVIEW. SEE CASE NO. 98-2225 (RLA) AT THE U.S. DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO.

1.1 - $     4,449.00

1.2 - $    160,782.60 ($150,000.00 Plus interests accrued until September 25, 1998).

1.3 - $    213,917.00

1.4 - $    331,752.81 ($314,752.00 Plus interests accrued until September 25, 1998).

1.5 - $  1,827.847.00

1.6 - $ 20,911,099.98 ($19,860,906.00 Plus interests accrued until September 25, 1998)

------------------

Total $ 23,449,848.39



UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON, D.C. 20202-_____

September 25, 1998

Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR  00917

REF:  AUPR00254007

The U.S. Department of Education's records show that your debt in the amount of $4,449.00 is delinquent.  This Department has previously contacted you concerning repayment of this debt; however, to date, you have not made satisfactory arrangement to repay this debt.

You are requested to pay this debt in full within ten (10) days of the date of this letter.  Checks or money orders should be made payable to the U.S. Department of Education and sent to the following address:

> U.S. Department of Education
> Office of the Chief Financial Officer
> Financial Improvement and Receivables Group
> 600 Independence Avenue, SW, Room 3400
> Washington, DC 20202-4330

If this Department does not receive payment in full within the next ten (10) days, we will refer your debt to the U.S. Department of the Treasury for further collection action, including administrative offset.  The Treasury Department will take whatever action it deems appropriate to collect on this indebtedness, including redirecting any payment you are scheduled to receive from the Federal Government to repay this debt.

The Treasury Department will initiate such action 30 days after the date of this letter.  Before Treasury launches this action, you have the following rights:

1. You may request in writing the right to inspect and copy the records the Department of Education possesses relating to this indebtedness.  The request must include reasonably specific identification of the records you wish to inspect and copy.  However, you may not request records that were previously made available to you as part of a formal appeal or other informal hearings.



UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON, D.C. 20202-_____

September 25, 1998

Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR  00917

REF:  PRAAD9802330

The U.S. Department of Education's records show that your debt in the amount of $150,000.00 is
delinquent.  Interest, penalties and administrative costs have increased the amount you owe to
$160,782.60.  This Department has previously contacted you concerning repayment of this debt;
however, to date, you have not made satisfactory arrangement to repay this debt.

You are requested to pay this debt in full within ten (10) days of the date of this letter.  Checks or
money orders should be made payable to the U.S. Department of Education and sent to the following
address:

               U.S. Department of Education
               Office of the Chief Financial Officer
               Financial Improvement and Receivables Group
               600 Independence Avenue, SW, Room 3400
               Washington, DC 20202-4330

If this Department does not receive payment in full within the next ten (10) days, we will refer your
debt to the U.S. Department of the Treasury for further collection action, including administrative
offset.  The Treasury Department will take whatever action it deems appropriate to collect on this
indebtedness, including redirecting any payment you are scheduled to receive from the Federal
Government to repay this debt.

The Treasury Department will initiate such action 30 days after the date of this letter.  Before
Treasury launches this action, you have the following rights:

    1.  You may request in writing the right to inspect and copy the records the Department of
    Education possesses relating to this indebtedness.  The request must include reasonably
    specific identification of the records you wish to inspect and copy.  However, you may not
    request records that were previously made available to you as part of a formal appeal or other
    informal hearings.

UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON, D.C. 20202-_____

September 25, 1998

Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR  00917

REF:  AUPR10240075

The U.S. Department of Education's records show that your debt in the amount of $213,917.00 is delinquent.  This Department has previously contacted you concerning repayment of this debt; however, to date, you have not made satisfactory arrangement to repay this debt.

You are requested to pay this debt in full within ten (10) days of the date of this letter. Checks or money orders should be made payable to the U.S. Department of Education and sent to the following address:

> U.S. Department of Education
> Office of the Chief Financial Officer
> Financial Improvement and Receivables Group
> 600 Independence Avenue, SW, Room 3400
> Washington, DC 20202-4330

If this Department does not receive payment in full within the next ten (10) days, we will refer your debt to the U.S. Department of the Treasury for further collection action, including administrative offset.  The Treasury Department will take whatever action it deems appropriate to collect on this indebtedness, including redirecting any payment you are scheduled to receive from the Federal Government to repay this debt.

The Treasury Department will initiate such action 30 days after the date of this letter.  Before Treasury launches this action, you have the following rights:

  1.  You may request in writing the right to inspect and copy the records the Department of Education possesses relating to this indebtedness.  The request must include reasonably specific identification of the records you wish to inspect and copy.  However, you may not request records that were previously made available to you as part of a formal appeal or other informal hearings.

UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON, D.C. 20202-_____

September 25, 1998

Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR  00917

REF: PRP2730213746

The U.S. Department of Education's records show that your debt in the amount of $314,752.00 is delinquent.  Interest, penalties and administrative costs have increased the amount you owe to $331,597.81.  This Department has previously contacted you concerning repayment of this debt; however, to date, you have not made satisfactory arrangement to repay this debt.

You are requested to pay this debt in full within ten (10) days of the date of this letter. Checks or money orders should be made payable to the U.S. Department of Education and sent to the following address:

> U.S. Department of Education
> Office of the Chief Financial Officer
> Financial Improvement and Receivables Group
> 600 Independence Avenue, SW, Room 3400
> Washington, DC 20202-4330

If this Department does not receive payment in full within the next ten (10) days, we will refer your debt to the U.S. Department of the Treasury for further collection action, including administrative offset.  The Treasury Department will take whatever action it deems appropriate to collect on this indebtedness, including redirecting any payment you are scheduled to receive from the Federal Government to repay this debt.

The Treasury Department will initiate such action 30 days after the date of this letter.  Before Treasury launches this action, you have the following rights:

1. You may request in writing the right to inspect and copy the records the Department of Education possesses relating to this indebtedness.  The request must include reasonably specific identification of the records you wish to inspect and copy.  However, you may not request records that were previously made available to you as part of a formal appeal or other informal hearings.



# UNITED STATES DEPARTMENT OF EDUCATION
### WASHINGTON, D.C. 20202-_____

September 25, 1998

Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR  00917

REF:  AUPR20240075

The U.S. Department of Education's records show that your debt in the amount of $1,827,847.00 is delinquent.  This Department has previously contacted you concerning repayment of this debt; however, to date, you have not made satisfactory arrangement to repay this debt.

You are requested to pay this debt in full within ten (10) days of the date of this letter.  Checks or money orders should be made payable to the U.S. Department of Education and sent to the following address:

> U.S. Department of Education
> Office of the Chief Financial Officer
> Financial Improvement and Receivables Group
> 600 Independence Avenue, SW, Room 3400
> Washington, DC 20202-4330

If this Department does not receive payment in full within the next ten (10) days, we will refer your debt to the U.S. Department of the Treasury for further collection action, including administrative offset.  The Treasury Department will take whatever action it deems appropriate to collect on this indebtedness, including redirecting any payment you are scheduled to receive from the Federal Government to repay this debt.

The Treasury Department will initiate such action 30 days after the date of this letter.  Before Treasury launches this action, you have the following rights:

1.  You may request in writing the right to inspect and copy the records the Department of Education possesses relating to this indebtedness.  The request must include reasonably specific identification of the records you wish to inspect and copy.  However, you may not request records that were previously made available to you as part of a formal appeal or other informal hearings.

UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON. D.C. 20202-_____

September 25, 1998

Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR  00917

REF:  PRP730213746

The U.S. Department of Education's records show that your debt in the amount of $19,860,906.00 is delinquent.  Interest, penalties and administrative costs have increased the amount you owe to $20,911,099.98.  This Department has previously contacted you concerning repayment of this debt; however, to date, you have not made satisfactory arrangement to repay this debt.

You are requested to pay this debt in full within ten (10) days of the date of this letter. Checks or money orders should be made payable to the U.S. Department of Education and sent to the following address:

> U.S. Department of Education
> Office of the Chief Financial Officer
> Financial Improvement and Receivables Group
> 600 Independence Avenue, SW, Room 3400
> Washington, DC 20202-4330

If this Department does not receive payment in full within the next ten (10) days, we will refer your debt to the U.S. Department of the Treasury for further collection action, including administrative offset.  The Treasury Department will take whatever action it deems appropriate to collect on this indebtedness, including redirecting any payment you are scheduled to receive from the Federal Government to repay this debt.

The Treasury Department will initiate such action 30 days after the date of this letter.  Before Treasury launches this action, you have the following rights:

1. You may request in writing the right to inspect and copy the records the Department of Education possesses relating to this indebtedness.  The request must include reasonably specific identification of the records you wish to inspect and copy.  However, you may not request records that were previously made available to you as part of a formal appeal or other informal hearings.

EXHIBIT 2 - COLLECTION NOTICES FROM THE U.S. DEPARTMENT OF THE TREASURY (USDT) ADDRESSED TO THE PETITIONER COLLECTING OVER $29,000,000.00 IN PAYMENTS ALLEGEDLY OWED TO THE USDT. The USDT determined that ARR was the person responsible for the taxes of IEU.

2.1 - $      6,226.66 ($ 4,449.00 Plus interests accrued until December 22,1998).

2.2 - $    195,582.07 ($160,782.60 Plus interests accrued until December 22,1998).

2.3 - $    325,577.66 ($213,917.00 Plus interests accrued until December 22,1998).

2.4 - $    405,012.16 ($331,752.81  Plus interests accrued until December 22,1998).

2.5 - $  2,781,948.87 ($1,827.847.00 Plus interests accrued until December 22,1998).

2.6 - $ 25,540,968.50 ($20,911,099.98 Plus interests accrued until December 22,1998).

        ------------------

Total $29,255,315.92



**DEPARTMENT OF TREASURY**
FINANCIAL MANAGEMENT SERVICE
BIRMINGHAM, AL 35283-0794
December 22, 1998

Financial Officer, Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR 00917

DMSC Account Number: 990011057-121626

Dear Financial Officer:

This is to advise you that your unpaid delinquent debt owed to the Department of Education has been referred to the U.S. Department of the Treasury for collection. According to the Department of Education's records, you owe $4,449.00 to the United States Government.

Aggressive legal collection action will commence against you unless you make payment in the amount of $6,626.66, which includes all administrative fees and applicable interest, within ten (10) days of the date of this letter.

If you wish to avoid the pending collection measures being prepared to collect your debt, you must immediately send your check or money order, made payable to the U.S. Treasury. To ensure proper credit to your account, include the account number in the memo section of your check, and forward the check with the enclosed PAYMENT COUPON to:

U.S. Department of the Treasury — FMS
Debt Management Services
P.O. Box 105576
Atlanta, GA 30348

Correspondence should be directed to:

Debt Management Servicing Center (TRFM)
Post Office Box 830794
Birmingham, AL 35283-0794

If you are unable to pay your debt in full, please contact Sharon Carter at (888) 826-3127 immediately.

Sincerely,

C R Wilson

Charles A. Wilson
Debt Management Services

Enclosure



**DEPARTMENT OF TREASURY**
FINANCIAL MANAGEMENT SERVICE
BIRMINGHAM, AL 35283-0794
December 22, 1998

Financial Officer, Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR 00917

DMSC Account Number: 990011060-121626

Dear Financial Officer:

This is to advise you that your unpaid delinquent debt owed to the Department of Education has been referred to the U.S. Department of the Treasury for collection. According to the Department of Education's records, you owe $160,782.60 to the United States Government.

Aggressive legal collection action will commence against you unless you make payment in the amount of $195,582.07, which includes all administrative fees and applicable interest, within ten (10) days of the date of this letter.

If you wish to avoid the pending collection measures being prepared to collect your debt, you must immediately send your check or money order, made payable to the U.S. Treasury. To ensure proper credit to your account, include the account number in the memo section of your check, and forward the check with the enclosed PAYMENT COUPON to:

U.S. Department of the Treasury – FMS
Debt Management Services
P.O. Box 105576
Atlanta, GA 30348

Correspondence should be directed to:

Debt Management Servicing Center (TRFM)
Post Office Box 830794
Birmingham, AL 35283-0794

If you are unable to pay your debt in full, please contact Sharon Carter at (888) 826-3127 immediately.

Sincerely,

Charles A. Wilson
Debt Management Services

Enclosure



**DEPARTMENT OF TREASURY**
FINANCIAL MANAGEMENT SERVICE
BIRMINGHAM, AL 35283-0794
December 22, 1998

Financial Officer, Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR 00917

DMSC Account Number: 990011058-121626

Dear Financial Officer:

This is to advise you that your unpaid delinquent debt owed to the Department of Education has been referred to the U.S. Department of the Treasury for collection. According to the Department of Education's records, you owe $213,917.00 to the United States Government.

Aggressive legal collection action will commence against you unless you make payment in the amount of $325,577.66, which includes all administrative fees and applicable interest, within ten (10) days of the date of this letter.

If you wish to avoid the pending collection measures being prepared to collect your debt, you must immediately send your check or money order, made payable to the U.S. Treasury. To ensure proper credit to your account, include the account number in the memo section of your check, and forward the check with the enclosed PAYMENT COUPON to:

> U.S. Department of the Treasury — FMS
> Debt Management Services
> P.O. Box 105576
> Atlanta, GA 30348

Correspondence should be directed to:

> Debt Management Servicing Center (TRFM)
> Post Office Box 830794
> Birmingham, AL 35283-0794

If you are unable to pay your debt in full, please contact Sharon Carter at (888) 826-3127 immediately.

Sincerely,

Charles A. Wilson
Debt Management Services

Enclosure



DEPARTMENT OF TREASURY
FINANCIAL MANAGEMENT SERVICE
BIRMINGHAM, AL 35283-0794
December 22, 1998

Financial Officer, Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR 00917

DMSC Account Number: 990011061-121626

Dear Financial Officer:

This is to advise you that your unpaid delinquent debt owed to the Department of Education has been referred to the U.S. Department of the Treasury for collection. According to the Department of Education's records, you owe $331,597.81 to the United States Government.

Aggressive legal collection action will commence against you unless you make payment in the amount of $405,012.16, which includes all administrative fees and applicable interest, within ten (10) days of the date of this letter.

If you wish to avoid the pending collection measures being prepared to collect your debt, you must immediately send your check or money order, made payable to the U.S. Treasury. To ensure proper credit to your account, include the account number in the memo section of your check, and forward the check with the enclosed PAYMENT COUPON to:

U.S. Department of the Treasury -- FMS
Debt Management Services
P.O. Box 105576
Atlanta, GA 30348

Correspondence should be directed to:

Debt Management Servicing Center (TRFM)
Post Office Box 830794
Birmingham, AL 35283-0794

If you are unable to pay your debt in full, please contact Sharon Carter at (888) 826-3127 immediately.

Sincerely,

Charles A. Wilson
Debt Management Services

Enclosure



**DEPARTMENT OF TREASURY**
FINANCIAL MANAGEMENT SERVICE
BIRMINGHAM, AL 35283-0794
December 22, 1998

Financial Officer, Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR 00917

DMSC Account Number: 990011059-121626

Dear Financial Officer:

This is to advise you that your unpaid delinquent debt owed to the Department of Education has been referred to the U.S. Department of the Treasury for collection. According to the Department of Education's records, you owe $1,827,847.00 to the United States Government.

Aggressive legal collection action will commence against you unless you make payment in the amount of $2,781,948.87, which includes all administrative fees and applicable interest, within ten (10) days of the date of this letter.

If you wish to avoid the pending collection measures being prepared to collect your debt, you must immediately send your check or money order, made payable to the U.S. Treasury. To ensure proper credit to your account, include the account number in the memo section of your check, and forward the check with the enclosed PAYMENT COUPON to:

U.S. Department of the Treasury – FMS
Debt Management Services
P.O. Box 105576
Atlanta, GA 30348

Correspondence should be directed to:

Debt Management Servicing Center (TRFM)
Post Office Box 830794
Birmingham, AL 35283-0794

If you are unable to pay your debt in full, please contact Sharon Carter at (888) 826-3127 immediately.

Sincerely,

C R Wilson

Charles A. Wilson
Debt Management Services

Enclosure

DEPARTMENT OF TREASURY
FINANCIAL MANAGEMENT SERVICE
BIRMINGHAM, AL 35283-0794
December 22, 1998

Financial Officer, Instituto De Educacion Universal
Mr. Angel Rivera, President
404 Avenida Barbosa
Hato Rey, PR 00917

DMSC Account Number: 990011062-121626

Dear Financial Officer:

This is to advise you that your unpaid delinquent debt owed to the Department of Education has been referred to the U.S. Department of the Treasury for collection. According to the Department of Education's records, you owe $20,911,099.98 to the United States Government.

Aggressive legal collection action will commence against you unless you make payment in the amount of $25,540,968.50, which includes all administrative fees and applicable interest, within ten (10) days of the date of this letter.

If you wish to avoid the pending collection measures being prepared to collect your debt, you must immediately send your check or money order, made payable to the U.S. Treasury. To ensure proper credit to your account, include the account number in the memo section of your check, and forward the check with the enclosed PAYMENT COUPON to:

U.S. Department of the Treasury — FMS
Debt Management Services
P.O. Box 105576
Atlanta, GA 30348

Correspondence should be directed to:

Debt Management Servicing Center (TRFM)
Post Office Box 830794
Birmingham, AL 35283-0794

If you are unable to pay your debt in full, please contact Sharon Carter at (888) 826-3127 immediately.

Sincerely,

C R Wilson

Charles A. Wilson
Debt Management Services

Enclosure

4. ARTICLES ON PROSECUTORIAL AND JUDICIAL MISCONDUCT.

The New York Times
nytimes.com

PRINTER FRIENDLY FORMAT GARDEN STATE
SPONSORED BY NOW PLAYING IN THEATERS

September 2, 2004

# Justice Dept. Seeks End to Its Detroit Terror Case

By DANNY HAKIM

DETROIT, Sept. 1 - The Justice Department on Wednesday assailed its own legal strategy in the case that had brought its first courtroom victory in the war on terror.

In a 60-page filing released Wednesday, prosecutors asked a federal judge to end the terror case against what they once called a "sleeper operational combat cell" based here. They are asking for a new trial of three men only on document fraud.

After nine months of investigation, federal prosecutors compiled a wealth of evidence that they said fatally undermined every aspect of their terror case. They also sharply rebuked the prosecutor who led the case, Richard G. Convertino, suggesting he knowingly withheld evidence that he was obligated to share with defense lawyers. Mr. Convertino, who was removed as the case prosecutor last year and is the subject of a department investigation, has denied accusations that he did anything wrong and has filed a lawsuit against the department.

The developments were a stunning reversal in a case once hailed by Attorney General John Ashcroft as a major victory in the war on terror.

"To have one of the department's few wins move into the loss category is pretty remarkable," said Jonathan Turley, a law professor at George Washington University. "The Detroit case is like a 20-car pileup for Ashcroft. You have an open feud with the former prosecutor and ultimately the abandonment of the case."

Some others were heartened that the department aired its missteps.

"We applaud the Justice Department's call for fairness in this case," said Ismael Ahmed, executive director of the Arab Community Center for Economic and Social Services, in a statement on Wednesday. "It clearly demonstrates why we feel that America is such a great country."

Mr. Ashcroft declined through a spokesman to comment.

"The filing does speak for itself," said Bryan Sierra, a Justice Department spokesman in Washington. "We are obligated to do the right thing if we feel something went wrong with the case."

In June 2003, two Moroccan men, Abdel-Ilah Elmardoudi, 38, and Karim Koubriti, 26, were convicted on terror and document fraud charges. A third Moroccan man, Ahmed Hannan, 36, was convicted of document fraud. A fourth man was acquitted. The men were never sentenced because of escalating problems over how the case was handled.

"In its best light, the record would show that the prosecution committed a pattern of mistakes and oversights that deprived the defendants of discoverable evidence," federal prosecutors said in their latest filing.

The nine-month review, which had been ordered by the presiding federal judge, showed that prosecutors did more than

The New York Times > National > Justice Dept. Seeks End to Its Detroit Terror Case     Page 34 of 115

Page 2 of 3

suppress evidence. The report said that prosecutors also "created a record filled with misleading inferences that such material did not exist."

The filing was largely a rebuke of Mr. Convertino, who was removed within months of winning the convictions. What is unclear is why the department allowed Mr. Convertino to try the case if it had concerns about his conduct.

The government said Wednesday that in the early stages of the investigation, in 2002, there were deep divisions within the department over Mr. Convertino's strategy to interview a main witness, Youseff Hmimssa, without letting the F.B.I. take notes, to prevent the defense from gaining access to the information.

"Convertino's approach caused significant controversy within the Department of Justice," prosecutors said, adding that department officials in Washington and Detroit cautioned him against the approach. One F.B.I. agent was said to have been "adamantly opposed." Keith Corbett, Mr. Convertino's supervisor and co-counsel on the case, also warned against the strategy.

Tension between Washington officials and Mr. Convertino grew, with a federal prosecutor assigned to the case saying in December that he was relegated to being more observer than participant.

Mr. Convertino has countered in his own suit that the department is retaliating against him for his agreement to testify about terrorism last year before the Senate Finance Committee. The committee chairman, Senator Charles E. Grassley, Republican of Iowa, is a critic of the department.

"Much of the evidence claimed to have been wrongfully withheld by Rick was evidence he wasn't aware of," said Mr. Convertino's lawyer, William Sullivan. "Even if he had been, it was not material to the defense and it would not have led to a different result at the trial."

Mr. Convertino, who declined to comment, has said that he was assigned only a barebones staff and could not have monitored every piece of information; he has also said the bureaucracy prevented him from seeing some of the evidence uncovered by the government.

He remains on the Justice Department's payroll, assigned to the Senate Caucus on International Narcotic Control, which is led by Mr. Grassley, who has in the past characterized Mr. Convertino as a whistleblower. Mr. Grassley's office declined comment.

Lawyers for the defendants have portrayed Mr. Convertino as a rogue prosecutor who withheld evidence in a potentially star-making case.

"We intend to file motions to have the case thrown out completely," said Jim Thomas, Mr. Hannan's lawyer. "Because of the taint that has been attached to this trial and the misconduct of the prosecutor, this case should not be tried again. The government has had their shot."

In its filing, the government lays out a rebuttal of Mr. Convertino's legal strategy based on evidence they say was withheld from the court.

The strategy relied on three strands of evidence: drawings and a videotape suggesting the men were collecting intelligence on targets in the United States and abroad; the testimony of an associate who said the men were hatching terrorist schemes, and corroborating evidence that they were using methods consistent with terror operations.

"Unfortunately, numerous developments since trial, including the discovery of significant materials not disclosed by the prosecution, have undermined each part of this three-legged stool," the government said in its filing.

One crucial piece of evidence was a day planner containing sketches that prosecution witnesses said included a military hospital in Jordan and an American air base in Turkey. During the trial, prosecutors contended that a portion of the sketch depicted an aircraft hangar at the base in Turkey. Defense lawyers said it was simply a doodle drawing of the Middle East. The government now says American investigators in Germany concluded that the supposed hangar drawing was, in fact, an outline of the Middle East.

An Air Force colonel who testified at the trial created the false impression that military officials were in agreement that the sketch represented a hangar, the government now says. And a C.I.A. official showed the sketch to various experts who doubted it was significant.

Prosecutors contended that another sketch showed a Jordanian military hospital. At trial, defense lawyers had asked for any photographs taken by the government of the hospital. Two government witnesses suggested such photographs had not been taken. But the government said Wednesday that the prosecutors did have photographs.

"It is difficult, if not impossible, to compare the day planner sketches with the photos and see a correlation," the government said.

Another piece of evidence was a videotape of what looked like tourist footage. Prosecutors contended at trial that it was interspersed with potential targets, including the MGM Grand Hotel. But prosecutors failed to reveal that F.B.I. agents disagreed the video was surveillance footage.

"Under the court's established protocol, the government should have brought this information to the court's attention," the government said.

Mr. Elmardoudi and Mr. Koubriti, who were convicted on the terror charge, remain in custody. Mr. Hannan, convicted of document fraud, was released to a halfway house this year. The government said that it would recommend Mr. Koubriti be released to a halfway house.

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

**The New York Times**

PRINTER FRIENDLY FORMAT SPONSORED BY **GARDEN STATE** NOW PLAYING IN THEATERS

September 3, 2004

# Judge Reverses Convictions in Detroit 'Terrorism' Case

### By DANNY HAKIM

DETROIT, Sept. 2 - A federal judge threw out the terrorism convictions of two Arab immigrants on Thursday, undoing what the Justice Department once proclaimed was its first major courtroom victory in the war on terror.

The department itself requested the dismissal this week in an extraordinary filing that savaged its own legal strategy against what it had characterized as a sleeper cell plotting acts of terrorism.

The judge, Gerald E. Rosen, acceded to the government's request for a new trial only on document fraud charges, ending the terrorism case against the men, Abdel-Ilah Elmardoudi, 38, and Karim Koubriti, 26, both from Morocco.

Judge Rosen was sharply critical of the prosecution of the case, citing a pattern of misconduct, though he did not mention Richard G. Convertino, the former lead prosecutor.

"Although prosecutors and others entrusted with safeguarding us through the legal system clearly must be innovative and think outside the conventional envelope in enforcing the law and prosecuting terrorists, they must not act outside the Constitution," the judge said in his decision. "Unfortunately," he added, "that is precisely what has occurred in the course of this case."

While criticizing the government's handling of the case, Judge Rosen praised the prosecutors who recently took it over and moved to disown it.

Mr. Elmardoudi and Mr. Koubriti remain in custody and face a new trial on the fraud charges. A third Moroccan, Ahmed Hannan, 36, convicted of document fraud, was released this year to a halfway house on an electronic tether. A fourth man was acquitted last year.

Three of the men were picked up in a raid six days after the Sept. 11 attacks. The group was eventually accused of forming a terrorist cell based in Detroit and collecting intelligence for terrorist plots.

But Judge Rosen said prosecutors developed early on a theory about what happened "and then simply ignored or avoided any evidence or information which contradicted or undermined that view."

The judge's comments echoed the Justice Department's sharp rebuke of Mr. Convertino, who was removed from the case late last year and is being investigated for possible misconduct. The department said in its filing that Mr. Convertino withheld a substantial amount of evidence from the court that undermined every critical aspect of his terrorism case.

Lawyers for Mr. Convertino, who is suing the department, have vigorously disputed that he knowingly withheld significant evidence and said that the department was retaliating against him for cooperating with a Congressional inquiry into the nation's antiterrorism strategy.

Judge Rosen said in his decision that "the prosecution materially misled the court, the jury and the defense as to the nature, character and complexion of critical evidence that provided important foundations for the prosecution's case."

Though the government's filing, and the judge, found fault overwhelmingly with Mr. Convertino, some observers saw other problems.

"The case fits into a broader pattern of the Ashcroft Justice Department overplaying its hand in terror cases and making broad allegations of terror without the evidence to back it up," said David Cole, a law professor at Georgetown University.

Judge Rosen, who was nominated to the federal court by the first President Bush, praised the prosecutor who led a nine-month post-trial review of the case, Craig S. Morford. Mr. Morford was dispatched from the federal prosecutor's office in Cleveland last year to lead the review, which was ordered by Judge Rosen after the government revealed evidence not disclosed before or during the trial. Last month, Mr. Morford was appointed the top federal attorney in Detroit after Jeffrey G. Collins, who led the office during the prosecution of the case, resigned.

"The position the government has now taken," Judge Rosen said, "confessing prosecutorial error and acquiescing in most of the relief sought by the defendants, is not only the legally and ethically correct decision, it is in the highest and best tradition of Department of Justice attorneys."

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

**The New York Times**

July 30, 2005

# Citing DNA, Court Annuls Murder Conviction From 1989

### By LAURA MANSNERUS

MOUNT HOLLY, N.J., July 29 - The rape and murder conviction of a New Jersey man imprisoned for 18 years was overturned by a Superior Court judge on Friday after DNA testing invalidated all the physical evidence tying him to the crime.

But expectations that the man, Larry Peterson, would leave the Burlington County Courthouse for his mother's house just a short drive away were dashed when prosecutors announced that they intended to retry him.

Judge Thomas S. Smith Jr. set bail at $200,000, which Mr. Peterson's lawyers said his family could not raise, after the assistant prosecutor refused to dismiss the charges. He cited the accounts of several witnesses who had testified that Mr. Peterson acknowledged killing a young woman and disclosed details to them.

"This is pretty unconscionable and unbelievable," Vanessa Potkin, one of Mr. Peterson's lawyers, said of the prosecutors' refusal to dismiss the charges. Ms. Potkin, noting that DNA tests had produced the genetic profile of an "unknown male" as the source of semen and fingernail scrapings from the victim's body, continued: "The focus right now should be on putting a name and face to the person who really did it."

Mr. Peterson's is the first homicide conviction in New Jersey to be vacated as a result of DNA testing, although three rape convictions have been overturned. Since the advent of DNA testing in the 1990's, it has exonerated more than 150 prison inmates nationwide, according to the Innocence Project, the Manhattan-based legal clinic that is representing Mr. Peterson.

Mr. Peterson, 54, was accused of raping and strangling a neighbor, Jacqueline Harrison, in the early morning hours of Aug. 24, 1987. The young woman's body was found in a soybean field near their apartment complex in rural Pemberton Township.

At his trial in 1989, a state forensic expert testified that hairs found at the crime scene "microscopically matched" Mr. Peterson's. The jury also heard testimony that Mr. Peterson had scratches on his arm, which Mr. Peterson said he had received while he was at his job at a lumberyard.

Mr. Peterson testified that he had spent the night of the murder at a motel with a female friend, who supported that account in testimony. But three men who shared a ride to work with Mr. Peterson the next morning testified that he described the murder to them.

In prison, Mr. Peterson fought the prosecutors for 10 years to get DNA testing - which was not available at the time of the crime - on the hairs, on semen found in Ms. Harrison's mouth and vagina and on blood found under her fingernails. The Appellate Division of the Superior Court ordered the testing in 2003 under a new law granting post-conviction DNA testing under certain circumstances.

After receiving the results three months ago, prosecutors asked for tests on more of the hairs from the crime scene. When those hairs were found to be the victim's, they said they would not oppose the motion to overturn the conviction.

But they strenuously disputed the defense's contention Friday that the results had unequivocally cleared Mr. Peterson. "The horror of this case is what was done to this woman," the assistant prosecutor, Thaddeus Drummond, told Judge Smith.

Despite the DNA results, Mr. Drummond said, the three men who had been in the car with Mr. Peterson and two inmates who talked to him in the Burlington County jail had corroborated one another's accounts of Mr. Peterson describing the crime.

The prosecutor, Robert D. Bernardi, acknowledged that the state's case was weakened -"of course it is," he told reporters after the hearing - but said, "There's nothing that leads us to conclude we're not going to move forward" with another trial.

Mr. Bernardi said investigators had talked to the witnesses recently but declined to say whether they were willing to testify again.

While denying Mr. Peterson's request to be freed on his own recognizance, Judge Smith set bail below the court guidelines of $250,000 to $750,000.

At the judge's announcement, Mr. Peterson, in a khaki shirt and trousers, cast his eyes downward. His mother, Susie Peterson, sitting in the front row of the crowded courtroom with the family pastor, was silent.

Ms. Potkin said later that Mr. Peterson was "very disappointed."

"He thought he would walk out of prison today," she said. "It's been 18 years. He deserves to walk out today and go home with his mother."

She said it was unlikely that the family could raise bail before the next court conference on the case, scheduled for Sept. 19.

Copyright 2005 The New York Times Company  | Home  | Privacy Policy  | Search  | C〈

# The New York Times

PRINTER FRIENDLY FORMAT
SPONSORED BY


March 23, 2004

# 2 Lawyers Barred From U.S. Tax Court

Two former Internal Revenue Service lawyers who won a case related to tax shelters by entering a secret agreement with three of the defendants, have been suspended from practicing before the United States Tax Court for two years and one of them has had his license to practice law in Arkansas suspended for a year.

Thomas B. Wells, the chief tax court judge, signed an order last month barring the two lawyers, William A. Sims and Kenneth W. McWade, from appearing in Tax Court until February 2006. The order became known yesterday when the Arkansas Supreme Court released an order, signed Friday, suspending the license of Mr. Sims for one year.

The lawyers were criticized last year by the Court of Appeals for the Ninth Circuit in San Francisco for making a secret deal with three taxpayers to the detriment of more than 1,300 others in a decade-old tax shelter case.

The three paid no taxes and received refunds, which they used to pay their own lawyers. The appeals court eventually extended the same deal to the other taxpayers, saying that was the only fair way to treat them in light of the I.R.S. fraud.

The appeals court also directed a lawyer for the 1,300 taxpayers, Michael Louis Minns of Houston, to pursue disciplinary action against Mr. McWade and Mr. Sims. The appeals court criticized the I.R.S. for failing to punish the lawyers, who received bonuses for the work and were later allowed to leave their jobs voluntarily.

Mr. Minns said that he was pursuing disbarment proceedings in Oregon against Mr. McWade.

Mr. McWade and Mr. Sims have maintained they did nothing wrong. The I.R.S. declined to comment.

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | Help | Back to Top

**The New York Times**

GARDEN STATE
NOW PLAYING IN THEATERS

August 21, 2004

# 2 Ex-I.R.S. Lawyers' Licenses Suspended for Misconduct

### By DAVID CAY JOHNSTON

The law licenses of two former Internal Revenue Service lawyers have been suspended for two years after a federal court ruling last year that they defrauded the courts so that the I.R.S. could win 1,300 tax shelter cases.

W. Kenneth McWade was suspended by the Oregon Supreme Court in an order dated Aug. 10 and released yesterday by the Oregon State Bar.

Four months ago Arkansas officials suspended the license of William A. Sims.

The United States Tax Court has also suspended both lawyers for two years, and the I.R.S. director of practice has suspended them indefinitely.

The suspensions followed complaints brought by Michael Louis Minns, a Houston lawyer who represented 124 of the tax shelter buyers, most of them airline pilots. One buyer is seeking a $6 million refund.

The Federal Court of Appeals for the Ninth Circuit in San Francisco found in January 2003 that the lawyers had defrauded the court by making a corrupt deal with a few of the pilots who bought tax shelters in the 1970's and 1980's. Under the deal, no tax-collection actions in regard to the shelters would be taken against these pilots in return for testimony that would hurt the others.

The court called this "extreme misconduct" and asked why the I.R.S. had not disciplined the lawyers, each of whom was paid a $1,000 bonus for his work on the cases.

Mr. Minns then asked the I.R.S. in which state each was licensed so that he could seek their disbarment. The I.R.S. refused, saying disclosure of their law licenses would violate their confidentiality.

In fighting suspension, the two lawyers filed papers contending that they had acted properly.

Mr. McWade, reached at home in Hawaii, said, "I guess the court has decided that Oregon lawyers are not entitled to due process." Mr. Sims did not respond to voice mail and e-mail messages.

The two men left the I.R.S. after their conduct came under scrutiny.

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

# The New York Times

September 29, 2005
## Judges Frees Man Jailed for '86 Murder, Citing Ex-Officer's Misconduct
By ALAN FEUER

It seemed bad enough when Louis J. Eppolito, a highly decorated former New York City detective, was indicted in March on charges of being a killer on the payroll of the Lucchese crime family.

Now, however, Mr. Eppolito's work with the badge has come under question, too: a judge in Brooklyn today tossed out the conviction of a man he had investigated and helped convict of murder charges nearly two decades ago, ruling that Mr. Eppolito had intimidated the only eyewitness in the case into lying on the stand.

The wrongly convicted man, Barry Gibbs, 57, walked out of a courtroom in State Supreme Court in Brooklyn, after serving 19 years in prison, and professed his profound desire for a shower and a decent cup of coffee. Mr. Gibbs was found guilty in 1988 of murdering a prostitute and dumping her body on the Belt Parkway, but the witness who fingered him at trial now claims that Mr. Eppolito, the investigating officer in the case, had forced him to lie.

It remains unclear whether Mr. Gibbs' reversal augurs the opening of a Pandora's box of tainted criminal cases that Mr. Eppolito worked on. Neither the Brooklyn district attorney's office, which would have prosecuted the cases he investigated, nor the United States attorney's office in Brooklyn, which is planning to try him and his former partner, Stephen Caracappa, on racketeering charges, would comment on the case.

Mr. Gibbs' story, nonetheless, stands as a striking example of justice delayed. According to a motion to vacate the conviction signed by Justice Michael A. Gary, Mr. Eppolito induced the witness, David Mitchell, "into identifying Barry Gibbs in a line-up and in court at trial" even though Mr. Mitchell "believed, and continues to believe, that Barry Gibbs is not the person he saw disposing of the victim's body."

At a brief hearing before Justice Gary today, Mr. Gibbs, a Navy veteran and former postal worker, looked very much like a man who had spent the last two decades behind bars. He was bedraggled in a baggy pair of blue jeans and maroon sweater with a wild mane of whitish hair and unkempt beard.

The moment Justice Gary mentioned tossing the conviction, Mr. Gibbs erupted into a burst of shoulder-shaking laughter. When the chief of the homicide unit for the district attorney's office, Kenneth Taub, agreed that the guilty verdict should be set aside, Mr. Gibbs raised his hands over his head, rubbing them gleefully together, then brought them down again in a prayerful gesture at his chin.

"Mr. Gibbs, the case is over," Justice Gary said.

Heading toward the street in a courthouse elevator, Mr. Gibbs said that what he really wanted was a shower and a cup of coffee. When his lawyer asked if he knew what Starbucks was, he said: "I don't know what a cellphone is. I don't know what freedom is."

After the body of the victim -Virginia Robertson - was found dumped on the Belt Parkway in 1986, Mr. Mitchell picked Mr. Gibbs out of police line-up arranged by Mr. Eppolito, said Barry Scheck, Mr. Gibbs' lawyer. Mr. Mitchell happened to be jogging on the bike path of the highway that day and his initial description of the suspect was of a midsized man, 5-foot-6 and 140 pounds, even though Mr. Gibbs is much taller and heavier, Mr. Scheck said.

Sent to prison, Mr. Gibbs began in 1992 to write to scientists asking their help in using DNA evidence to clear his name. The Innocence Project, a legal clinic that Mr. Scheck runs at the Benjamin Cardozo School of Law, took the case in 1999, but could not find any biological evidence to exculpate Mr. Gibbs.

Flash forward to March and Mr. Eppolito's face and the news of his indictment splashed across front pages all across New York. Mr. Scheck recognized Mr. Eppolito as the chief detective in his client's case and went immediately to the federal prosecutors in Brooklyn who were preparing Mr. Eppolito's case.

Federal agents sought out Mr. Mitchell, a former marine, who then recanted his testimony and finally unburdened himself of what Mr. Scheck called the "dark secret" he had been carrying around for years. The agents also searched Mr. Eppolito's home in Las Vegas and found a case file there - Mr. Gibbs' file.

Mr. Eppolito's lawyer, Bruce Cutler, denied the charges that his client intimidated anyone.

"This is a further attempt by the Brooklyn district attorney's office to besmirch Detective Eppolito's reputation and to discredit an otherwise outstanding police career," he said.

A clean and freshly shaven Mr. Gibbs turned up at Mr. Scheck's office later this afternoon for a press conference at which he looked cowed and baffled before a nattering armada of reporters.

Asked what he had to say to Mr. Eppolito, now under house arrest at his brother-in-law's house on Long Island, he said, "You got a lot a nerve doing to me what you did."

"It's been a rough road," he added, breaking down into tears with his lawyers at his side, "but we'll get through it just like everything else. I'm a survivor."

He had a word, too, for all the other wrongly accused.

"For all the guys out there that are innocent, keep hope, keep faith," he said.

His own hope and faith having led to his freedom after 19 years, he said he would now enjoy a dinner of lobster tail and crab meat.

Copyright 2005 The New York Times Company  |  Home  |  Privacy Policy  |  Search  |  Corrections  |  XML  | |

The New York Times

August 4, 2005

# Fixing an Old Injustice

Nine years ago, Elouise Cobell sued the Interior and Treasury Departments on behalf of more than half a million Native Americans who are the beneficiaries - if that is the right word - of individual trusts held for them by the federal government. Since that time, she has won the legal skirmishing, but has been impeded by obstruction on the part of the government. It's time she also got real justice.

This case harks back to a 19th-century attempt by Washington to break up some reservations and assign land to individual Indians instead. But the new property owners were not permitted to manage any timber, oil or mineral deposits. Instead, those assets were kept in trust for them by a paternalistic federal government. And those trusts have been criminally mishandled.

Records have been lost and destroyed, and Indians who should have enjoyed the benefit of the valuable leases on their property have died. Ms. Cobell's successes in court - and repeated contempt citations against the Interior Department - have illuminated the ongoing deceit over these accounts, but they have not yet resulted in real paybacks for the defrauded Indians. In recent years, Congress has addressed the issue only as part of an effort to void any attempt at a real historical accounting.

The current leaders of the Senate Indian Affairs Committee, Senators John McCain and Byron Dorgan, have better motives. In the last weeks before the Senate adjourned, they introduced legislation to amend the Indian Trust Reform Act. But as it stands, their proposal is at best a rough sketch of a bill. Its greatest merit is its honorable intentions.

The senators seek to end all the decades of fruitless litigation and give the Indians involved a settlement. The bill calls for the Treasury and Interior Departments to figure out how much money has flowed through the individual accounts since 1980, and use that as a basis for a guesstimate of what the overall amount should be.

The Indians do not actually expect to get all the money that they would be entitled to based on a strict accounting. But they do want their negotiations to be based on reality. While Ms. Cobell worked hard to strike a positive note in her testimony before the committee last week, she pointed out that the bill would do nothing to uphold her consistent victories in court, and in fact would end the court's role in this case. What's worse, it would do nothing to reform the supervision of individual Indian trust accounts.

There are good reasons for seeking a legislative resolution to this case. The Interior and Treasury Departments have shown no willingness to come to terms with the plaintiffs. But the Indians who are owed this money cannot be paid off with good intentions. When Congress returns from its recess, Mr. McCain and Mr. Dorgan should reframe their bill in a way that has justice as its guiding purpose.

Copyright 2005 The New York Times Company  | Home  | Privacy Policy | Search  | Cc

Case 1:05-cv-01678    Document    Filed 05/09/2007    Page 45 of 115

The New York Times

August 1, 2005

# Two Prosecutors Faulted Trials for Detainees

## By NEIL A. LEWIS

WASHINGTON, July 31 - As the Pentagon was making its final preparations to begin war crimes trials against four detainees at Guantánamo Bay, Cuba, two senior prosecutors complained in confidential messages last year that the trial system had been secretly arranged to improve the chance of conviction and to deprive defendants of material that could prove their innocence.

The electronic messages, obtained by The New York Times, reveal a bitter dispute within the military legal community over the fairness of the system at a time when the Bush administration and the Pentagon were eager to have the military commissions, the first for the United States since the aftermath of World War II, be seen as just at home and abroad.

During the same time period, military defense lawyers were publicly criticizing the system, but senior officials dismissed their complaints and said they were contrived as part of the efforts to help their clients.

The defense lawyers' complaints and those of outside groups like the American Bar Association were, it is now clear, simultaneously being echoed in confidential messages by the two high-ranking prosecutors whose cases would, if anything, benefit from any slanting of the process.

In a separate e-mail message, the chief prosecutor flatly rejected the accusations by his subordinates. And a military review supported him.

Among the striking statements in the prosecutors' messages was an assertion by one that the chief prosecutor had told his subordinates that the members of the military commission that would try the first four defendants would be "handpicked" to ensure that all would be convicted.

The same officer, Capt. John Carr of the Air Force, also said in his message that he had been told that any exculpatory evidence - information that could help the detainees mount a defense in their cases - would probably exist only in the 10 percent of documents being withheld by the Central Intelligence Agency for security reasons.

Captain Carr's e-mail message also said that some evidence that at least one of the four defendants had been brutalized had been lost and that other evidence on the same issue had been withheld. The March 15, 2004, message was addressed to Col. Frederick L. Borch, the chief prosecutor who was the object of much of Captain Carr's criticism.

The second officer, Maj. Robert Preston, also of the Air Force, said in a March 11, 2004, message to another senior officer in the prosecutor's office that he could not in good conscience write a legal motion saying the proceedings would be "full and fair" when he knew they would not.

Brig. Gen. Thomas L. Hemingway of the Air Force, a senior adviser to the office running the war crimes trials who provided a response from the Defense Department, said that the e-mail messages had prompted a formal investigation by the Pentagon's inspector general that found no evidence to support the two

officers' accusations of legal or ethical problems.

Colonel Borch, who has since retired from the military, sent his own e-mail message to Captain Carr and Major Preston on March 15, 2004, with copies to several other members of the prosecution team the same day, outlining his response.

In his message, Colonel Borch said he had great respect and admiration for Captain Carr and Major Preston. But their accusations, he said, were "monstrous lies." He did not, however, address any specifics, like stacking the panel.

"I am convinced to the depth of my soul that all of us on the prosecution team are truly dedicated to the mission of the office of military commissions," he wrote, "and that no one on the team has anything but the highest ethical principles."

Colonel Borch did not respond to telephone messages left at his home. Captain Carr, who has since been promoted to major, declined to comment when reached by telephone, as did Major Preston. Both Captain Carr and Major Preston left the prosecution team within weeks of their e-mail messages and remain on active duty.

General Hemingway said the assertions in the e-mail messages had been "taken very seriously and an investigation was conducted because of the allegations about potential violations of ethics and the law."

He said in an interview that the Defense Department's inspector general spent about two months investigating the accusations and reviewing the operations of the prosecutor's office. "It disclosed no evidence of any criminal misconduct, no evidence of any ethical violations, and no disciplinary action was taken against anybody," the general said. He also said that no evidence had been "tampered with, falsified or hidden."

General Hemingway declined to discuss any specifics of the two prosecutors' accusations, but he said he now believed that the problems underlying the complaints were "miscommunication, misunderstanding and personality conflicts." The inspector general's report has not been made public but was sent to the Pentagon's top civilian lawyer, he said.

Copies of the e-mail messages were provided to The Times by members of the armed forces who are critics of the military commission process. The documents' authenticity was independently confirmed by other military officials.

The Bush administration and the Pentagon have faced criticism about the legitimacy of the military commission procedures almost since the regulations describing them were announced in 2002.

The rules, which in essence constitute a new body of law distinct from military and civilian law, allow, for example, witnesses to testify anonymously for the prosecution. Also, any information may be admitted into evidence if the presiding officer judges it to be "probative to a reasonable person," a new standard far more favorable to the prosecution than anything in civilian law or military law. It is unclear whether information that may have been obtained under coercion or torture can be admissible.

The trials of the first four defendants began last August in a secure courtroom in a converted dental clinic at the naval base at Guantánamo. Before they could start in earnest, the trials were abruptly halted in November when a federal judge ruled they violated both military law and the United States' obligations to comply with the Geneva Conventions.

But a three-judge appeals court panel that included Judge John G. Roberts, President Bush's Supreme

Court nominee, unanimously reversed that ruling on July 15.

Defense Department officials have said they plan to resume the trials in the next several weeks. They said they also planned soon to charge an additional eight detainees with war crimes.

The two trials expected to resume shortly are those of Salim Ahmed Hamdan, a Yemeni who was a driver in Afghanistan for Osama bin Laden; and David Hicks, an Australian who was captured in Afghanistan, where, prosecutors say, he had gone to fight for the Taliban government.

In his March 2004 message, Captain Carr told Colonel Borch that "you have repeatedly said to the office that the military panel will be handpicked and will not acquit these detainees and we only needed to worry about building a record for the review panel" and academicians who would pore over the record in years to come.

Captain Carr said in the message that the problems could not be dismissed as personality differences, as some had tried to depict them, but "may constitute dereliction of duty, false official statements or other criminal conduct."

He added that "the evidence does not indicate that our military and civilian leaders have been accurately informed of the state of our preparation, the true culpability of the accused or the sustainability of our efforts." The office, he said, was poised to "prosecute fairly low-level accused in a process that appears to be rigged."

He said that Colonel Borch also said that he was close to Maj. Gen. John D. Altenburg Jr., the retired officer who is in overall charge of the war crimes commissions, and that this would favor the prosecution.

General Altenburg selected the commission members, including the presiding officer, Col. Peter S. Brownback III, a longtime close friend of his. Defense lawyers objected to the presence of Colonel Brownback and some other officers, saying they had serious conflicts of interest. General Altenburg removed some of the other officers but allowed Colonel Brownback to remain.

In his electronic message, Captain Carr said the prosecution team had falsely stated to superiors that it had no evidence of torture of Ali Hamza Ahmed Sulayman al-Bahlul of Yemen. In addition, Captain Carr said the prosecution team had lost an F.B.I. document detailing an interview in which the detainee claimed he had been tortured and abused.

Major Preston, in his e-mail message of March 11, 2004, said that pressing ahead with the trials would be "a severe threat to the reputation of the military justice system and even a fraud on the American people."

---

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Co

Case 1:07-cv-06919-RJH Document 2 Filed 08/09/2007 Page 48 of 115

**The New York Times**

July 30, 2005

# Other Legal Matters Hold Up Release of Palladium Convict

### By SABRINA TAVERNISE

Olmado Hidalgo went to court yesterday apparently thinking he would be freed after nearly 14 years in prison for a murder conviction that the Manhattan district attorney had agreed to throw out. But it was not to be, at least not yesterday.

Dressed smartly in a blue striped shirt and green pants, Mr. Hidalgo was smiling broadly and blowing kisses to his family in State Supreme Court. Two of his cousins, Divina and Joselin Castillo, said the family had gathered on Wednesday to plan a feast in the Bronx with his favorite food: a Dominican goat dish, rice and beans, and melon.

In court, the district attorney's office did indeed confirm that it was withdrawing its case against Mr. Hidalgo, 40, in the 1990 murder of a bouncer outside the Palladium nightclub. But because of pending legal matters, including a threat of deportation over a prior conviction for gun possession, his release was delayed until Aug. 19.

His lawyer, Daniel J. Horwitz, said it would be unjust to deport a man who had spent so many years in prison for a crime he did not commit. The 1990 gun possession conviction was "a youthful indiscretion," Mr. Horwitz said, adding, "What does this country stand for?"

Prosecutors have not dropped their case against Mr. Hidalgo's co-defendant, David Lemus. The presiding judge, Roger S. Hayes, will have to decide whether Mr. Lemus, too, should be released, or whether, as prosecutors say, he was guilty in the murder. Justice Hayes could also overturn Mr. Lemus's 1992 conviction and order a new trial.

Mr. Hidalgo came to the United States from the Dominican Republic in 1987, and was arrested for the Palladium murder in 1991, nearly a year after it happened. He maintains that he never met Mr. Lemus until their trial, even though the prosecutors' theory at the time was that they were friends. After an extensive re-investigation, prosecutors now say there was no connection.

As Mr. Hidalgo beamed, Mr. Lemus sat slumped at his right. His fate was less certain. Prosecutors say that Mr. Lemus confessed to the murder of the bouncer, Marcus Peterson, who was working outside the Palladium on East 14th Street on Thanksgiving night 1990.

On that night, a man struggled with a bouncer in the club, stalked out, returned with at least one friend and shot two bouncers, including Mr. Peterson, who died.

Prosecutors say that the man was Mr. Lemus and that he called his girlfriend and confessed - a telephone call that was taped by prosecutors. Mr. Lemus says that he was bragging to impress the woman, and that he had called to ask for money.

"The whole focus on Lemus arose because of Lemus's own words." said Joel Seidemann, one of the prosecutors handling the case. In addition, he said, four eyewitnesses picked him out of a lineup shortly afterward.

Mr. Lemus's lawyer, Gordon Mehler, said the fact that prosecutors released one man and continue to press their case against the other was a "puzzling result." He said that there were inconsistencies in the eyewitness identifications and that two bouncers who were there testified in a hearing in the spring that they had never seen Mr. Lemus. Also, two Bronx gang members have, at various times, confessed to the killing.

At a lull in yesterday's proceeding, Mr. Hidalgo turned to look at his family seated behind him. Smiling, he mouthed several sentences in Spanish. Joselin Castillo said he was expressing his happiness and saying he would call her later.

"He told me I looked nice," she said, adding that Mr. Hidalgo had called almost every day from jail, and that since the news of his imminent release last Friday he had grown very impatient.

She said he told her. "I want to throw all the watches in the garbage because they show how long the time goes."

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Co

Case 1:07-cv-00019-RBW Document 3 Filed 05/09/2009 Page 50 of 115

The New York Times

July 30, 2005

# Citing DNA, Court Annuls Murder Conviction From 1989

By LAURA MANSNERUS

MOUNT HOLLY, N.J., July 29 - The rape and murder conviction of a New Jersey man imprisoned for 18 years was overturned by a Superior Court judge on Friday after DNA testing invalidated all the physical evidence tying him to the crime.

But expectations that the man, Larry Peterson, would leave the Burlington County Courthouse for his mother's house just a short drive away were dashed when prosecutors announced that they intended to retry him.

Judge Thomas S. Smith Jr. set bail at $200,000, which Mr. Peterson's lawyers said his family could not raise, after the assistant prosecutor refused to dismiss the charges. He cited the accounts of several witnesses who had testified that Mr. Peterson acknowledged killing a young woman and disclosed details to them.

"This is pretty unconscionable and unbelievable," Vanessa Potkin, one of Mr. Peterson's lawyers, said of the prosecutors' refusal to dismiss the charges. Ms. Potkin, noting that DNA tests had produced the genetic profile of an "unknown male" as the source of semen and fingernail scrapings from the victim's body, continued: "The focus right now should be on putting a name and face to the person who really did it."

Mr. Peterson's is the first homicide conviction in New Jersey to be vacated as a result of DNA testing, although three rape convictions have been overturned. Since the advent of DNA testing in the 1990's, it has exonerated more than 150 prison inmates nationwide, according to the Innocence Project, the Manhattan-based legal clinic that is representing Mr. Peterson.

Mr. Peterson, 54, was accused of raping and strangling a neighbor, Jacqueline Harrison, in the early morning hours of Aug. 24, 1987. The young woman's body was found in a soybean field near their apartment complex in rural Pemberton Township.

At his trial in 1989, a state forensic expert testified that hairs found at the crime scene "microscopically matched" Mr. Peterson's. The jury also heard testimony that Mr. Peterson had scratches on his arm, which Mr. Peterson said he had received while he was at his job at a lumberyard.

Mr. Peterson testified that he had spent the night of the murder at a motel with a female friend, who supported that account in testimony. But three men who shared a ride to work with Mr. Peterson the next morning testified that he described the murder to them.

In prison, Mr. Peterson fought the prosecutors for 10 years to get DNA testing - which was not available at the time of the crime - on the hairs, on semen found in Ms. Harrison's mouth and vagina and on blood found under her fingernails. The Appellate Division of the Superior Court ordered the testing in 2003 under a new law granting post-conviction DNA testing under certain circumstances.

After receiving the results three months ago, prosecutors asked for tests on more of the hairs from the crime scene. When those hairs were found to be the victim's, they said they would not oppose the motion to overturn the conviction.

But they strenuously disputed the defense's contention Friday that the results had unequivocally cleared Mr. Peterson. "The horror of this case is what was done to this woman," the assistant prosecutor, Thaddeus Drummond, told Judge Smith.

Despite the DNA results, Mr. Drummond said, the three men who had been in the car with Mr. Peterson and two inmates who talked to him in the Burlington County jail had corroborated one another's accounts of Mr. Peterson describing the crime.

The prosecutor, Robert D. Bernardi, acknowledged that the state's case was weakened - "of course it is," he told reporters after the hearing - but said, "There's nothing that leads us to conclude we're not going to move forward" with another trial.

Mr. Bernardi said investigators had talked to the witnesses recently but declined to say whether they were willing to testify again.

While denying Mr. Peterson's request to be freed on his own recognizance, Judge Smith set bail below the court guidelines of $250,000 to $750,000.

At the judge's announcement, Mr. Peterson, in a khaki shirt and trousers, cast his eyes downward. His mother, Susie Peterson, sitting in the front row of the crowded courtroom with the family pastor, was silent.

Ms. Potkin said later that Mr. Peterson was "very disappointed."

"He thought he would walk out of prison today," she said. "It's been 18 years. He deserves to walk out today and go home with his mother."

She said it was unlikely that the family could raise bail before the next court conference on the case, scheduled for Sept. 19.

Copyright 2005 The New York Times Company  | Home  | Privacy Policy  | Search  | C

washingtonpost.com

## An Irrevocable Error

Tuesday, August 23, 2005; A14

SIXTY YEARS AGO, the state of Georgia executed a
woman named Lena Baker. Last week the state Board of
Pardons and Paroles announced that it would
posthumously pardon her. Officials said the execution was
a "grievous error" in a case that cried out for mercy. The
sentiment is noble, clearly meaningful to her surviving
family, which pushed for it. And it is always important for
anyone wielding the tremendous power of government to
be prepared to stare error in the face. But the nature of the
death penalty makes it impossible even to begin to right
the wrong that took place in this case. The error was grievous and irrevocable.



Living
improved daily

Ms. Baker, an African American woman of 44, was put to death in 1945 for killing her employer, a white
man named E.B. Knight. At her trial, she contended that he held her as a kind of sex slave and she shot him
in self-defense as he was attacking her with a crowbar. At most, this is manslaughter. But in the segregated
South, an all-white, all-male jury convicted her of capital murder in a one-day trial, and she was executed in
Georgia's electric chair less than a year later.

It is tempting to believe that these tragedies don't happen anymore, that the death penalty now is more
protective of innocent life. Indeed, trial standards are undoubtedly higher; southern states are no longer
organized governmental conspiracies against the rights of African Americans; and capital appeals today
ensure layers of review totally absent then.

Yet injustice is a resilient pestilence that -- like drug-resistant bacteria -- has myriad ways of defeating the
best human attempts to eliminate it. And Americans who believe the death penalty is foolproof are simply
kidding themselves. DNA testing has caused many people to be freed from death row, illustrating the
fallibility of even modern trials. And recently prosecutors in St. Louis reopened the case of a man executed
by the state of Missouri back in 1995 -- no longer being convinced that the state had killed the right person.
As long as the death penalty persists, cases like Ms. Baker's -- where recompense is impossible -- are
inevitable.

© 2005 The Washington Post Company

The New York Times

July 19, 2005

# Executed Man May Be Cleared in New Inquiry

**By KATE ZERNIKE**

ST. LOUIS, July 18 - The corner of Sarah and Olive looks almost nothing as it did 25 years ago when a 19-year-old drug dealer named Quintin Moss was gunned down from a slow-moving car. The boarded-up houses have been replaced by a new townhouse development marked by sleek stone gates; the drug dealers and prostitutes are gone.

And the man convicted of the killing, Larry Griffin, was executed 10 years ago.

Yet the city's top prosecutor has decided to re-investigate the murder as if it just happened, out of new concerns that the wrong man may have been put to death for the crime.

Prompted by questions raised in a report by the NAACP Legal Defense and Educational Fund, the prosecutor, Jennifer Joyce, hopes to decide once and for all whether Mr. Griffin was guilty or innocent - though she acknowledges that 25 years later it may be hard to do more than show the flaws in the earlier prosecution.

Still, should Ms. Joyce, the St. Louis circuit attorney, demonstrate Mr. Griffin was not the killer, as the report and even some members of the victim's family contend, it would be the first proven execution of an innocent person, so far as death penalty advocates or opponents can recall.

Though dozens of people have been exonerated while on death row - from 30 to 75 in the last two decades, depending on which side of the debate is talking - proving Mr. Griffin's innocence would hand death penalty opponents the example that they have lacked in arguing for the abolition of capital punishment.

Already, Ms. Joyce's decision last week to investigate has prompted newspaper editorials to suggest that the case could be cause for a moratorium on the death penalty. Even some death penalty supporters say that her willingness to officially re-open the investigation is a remarkable, and perhaps unprecedented, development in the debate.

"If they prove that he was innocent, that would be the gold standard," said Joshua Marquis, the prosecutor in Clatsop County, Ore., and a frequent speaker in support of the death penalty. "I'm not sure opponents of the death penalty would start prevailing, but they'd be able to say to people like me, 'What about Mr. Griffin?' "

Still, Mr. Marquis said, "innocence is very different than saying this guy maybe didn't do it."

And it is hard to sort out an absolute truth 25 years later.

Unlike many cases that have resulted in exonerations, this case has no DNA evidence. The man whose testimony is now being challenged died last year. Other witnesses have changed their stories; memories are hazy. And like the debate about the death penalty itself, beliefs about what really happened here that June afternoon in 1980 are colored by race.

The prosecutor has seen three exonerations since taking office in 2001.

"Every prosecutor conceptually has the notion that someone innocent can be convicted," Ms. Joyce said. "I've seen it firsthand."

Her decision to revisit the Griffin case followed the report by the NAACP group, which began investigating the case last year after people here expressed long-simmering doubts about Mr. Griffin's guilt. The report contends that three other men killed Mr. Moss. Mr. Moss's family joined the NAACP group in raising questions about Mr. Griffin's guilt.

According to the report and interviews, Mr. Moss's siblings had warned him to get out of town in the summer of 1980; people said he was a target because he was believed to have killed Dennis Griffin, a reputed drug dealer and Larry Griffin's older brother.

On June 26, Mr. Moss was at the corner of Sarah Avenue and Olive Street, a crime-infested strip known as the Stroll, when a 1968 Chevrolet Impala drove by slowly. Two black men leaned out and shot him 13 times, killing him almost instantly.

Another man, standing 75 feet away, was hit by a stray bullet but told the police he did not see the gunmen.

The car was found abandoned that night with the murder weapons, as well as a traffic ticket made out to Reggie Griffin, the 19-year-old nephew of Larry Griffin.

At Larry Griffin's trial a year later, the only eyewitness testimony came from Robert Fitzgerald, a career criminal from Boston and an admitted drug addict who was in St. Louis in the federal witness protection program. Mr. Fitzgerald said he and a friend had heard the shots from behind the hood of a car while replacing a battery.

Mr. Fitzgerald testified that he had a good view of the gunmen and memorized the license plate. He identified Larry Griffin in a lineup of photographs at the police station and later identified the abandoned car.

On June 26, 1981, exactly a year after the murder, Larry Griffin was convicted. Mr. Fitzgerald, who was then facing felony fraud charges, was cleared and released.

After losing several appeals, Mr. Griffin was executed by lethal injection at age 40 in June 1995. But some doubts about Mr. Fitzgerald's testimony were raised in the appeals process.

A judge who dissented from a decision that upheld Mr. Griffin's conviction in 1983 noted that Mr. Fitzgerald had "a seriously flawed background, and his ability to observe and identify the gunman was also subject to question."

Mr. Fitzgerald changed his account at a hearing in 1993, saying that a detective had shown him only one photograph, declaring, "We happen to know who did it."

The NAACP group hired an investigator last summer and tracked down the police officer who had testified that Mr. Fitzgerald was at the scene. The officer, Michael Ruggeri, now retired, said Mr. Fitzgerald was not there when he arrived; he would have recalled, Mr. Ruggeri said, because the Stroll was a black neighborhood, and Mr. Fitzgerald was white.

Mr. Ruggeri told investigators that if Mr. Fitzgerald had reported a license plate number, it would have

Case 1:07-cv-00012-REM    Document 3-2    Filed 05/09/2007    Page 55 of 115

been noted on the police report.

The investigators also tracked down the man shot by the stray bullet, Wallace Conners. This time, Mr. Conners said that he had seen the gunmen, that Larry Griffin was not among them and that no white man had been on the scene.

Patricia Moss Mason, the victim's sister, told the investigators that she had watched the shooting from a nearby window and had not seen any white man either.

Mr. Fitzgerald died last year before investigators could talk to him.

"Fitzgerald was the entire case and now there's very strong eyewitness evidence that Fitzgerald was not there, and what's more, Larry Griffin was not there," said Samuel Gross, a law professor at the University of Michigan who oversaw the NAACP group's investigation.

Mr. Fitzgerald, he said, had been "deeply motivated to please the police."

"It's hard to imagine why the victim's sister, a man who was shot at the same time himself, and a police officer - who live in three different states at this point and were interviewed separately - would all say, 'Actually, he wasn't there.' " Mr. Gross said.

The report suggests that three men, all now in prison without chance of parole, were the real killers: Ronnie Thomas-Bey, who owned the car and was arrested but released for lack of evidence in the case; Reggie Griffin; and Ronnie Parker, a drug dealer who ran in the same crowd.

Mr. Parker and Reggie Griffin have denied involvement. Mr. Thomas-Bey testified in another trial in 1995 that he was in the car when Mr. Moss was shot, and that Larry Griffin was not - though he said he was not sure of the last point. Mr. Thomas-Bey's uncle told investigators that his nephew had told him that the same three were in the car, and that it had been "gospel" in the neighborhood.

Mr. Moss's family, too, had long had doubts: they felt prosecutors had paid too much attention to a white witness. Walter Moss, a brother, said he called the police several times saying that his sister had seen the killing and was ignored. "It was, 'We don't need you, we know all we need to know,' " Walter Moss said.

The original prosecutor, Gordon Ankney, stands by the conviction. Mr. Conners, he said, would have been a flawed witness, even if he had not left town, as he did.

"We've got a witness who once said he didn't see a thing, and then refused to talk," Mr. Ankney said. "If I put him on the stand, even if he said it was Larry Griffin, I'd look like an idiot. Then we'd be looking like we had somebody making up a story."

Mr. Ankney noted that Larry Griffin's alibi had failed - while a family friend testified that Mr. Griffin had been helping him sell a canoe at home when the shooting occurred, records showed the canoe had sold the day before.

Mr. Ruggeri, the retired police officer, said in an interview that he was reluctant to have his recollections used to overturn a conviction. He does not recall testifying, he said. Still, he asked, "what would you trust, your memory 12 months later, or 25 years later?"

Mr. Griffin's family declined to comment; the case is complicated by the suggestion that a relative, Reggie Griffin, could have been the killer.

Mr. Conners, too, declined to speak through his lawyer, Barry Scheck, a co-founder of the Innocence Project, which says it has exonerated 159 people wrongfully convicted.

Ms. Joyce said she had begun re-reading testimony given at the trials and hearings for Larry Griffin and would re-interview any living witnesses. She hopes to finish by September, she said, and to declare him innocent or guilty.

More likely, she said, she will determine that some things about how the case was handled are troubling, but that the evidence as to Mr. Griffin's guilt or innocence is inconclusive.

Still, she said, it is important to show that prosecutors are willing to consider whether mistakes have been made.

"People say, 'Will this make citizens trust the criminal justice system less?' " she said. "I hope it makes them trust it more."

Copyright 2005 The New York Times Company  | Home  | Privacy Policy  | Search  | Co

**The New York Times**


KINSEY
NOW AVAILABLE ON DVD

July 15, 2005

# F.B.I. Message Says Agency Lacked Evidence in Terror Arrest

## By THE ASSOCIATED PRESS

PORTLAND, Ore., July 14 (AP) - The day before a Portland lawyer was arrested on suspicion of involvement in the Madrid train bombings, an F.B.I. official stated in an e-mail message that the agency did not have enough evidence to arrest him on criminal charges.

The lawyer, Brandon Mayfield, was later released, with an apology from the F.B.I.

The recently declassified message was written in May 2004 by Beth Anne Steele, a spokeswoman for the F.B.I. in Portland. It said that the F.B.I. had a plan to arrest Mr. Mayfield, a Muslim, as a material witness "if and when" his supposed link to the Madrid attack in March 2004 "gets outed by the media."

Mr. Mayfield was arrested a day later under the material-witness law, which allows the arrest and detention of witnesses who might flee before testifying in criminal cases.

The F.B.I. said at the time that Mr. Mayfield's fingerprints matched those found on a bag of detonators near the bombings. Two weeks later, it said the fingerprints belonged to someone else.

Mr. Mayfield, 38, has filed a lawsuit against the federal government, saying that he had been singled out as a Muslim and that the government had violated his constitutional rights, by wrongly arresting him and by wiretapping his phone before his arrest.

In a court document filed Wednesday, Mr. Mayfield's lawyers said that the e-mail message supported their case by showing that the government had "recognized it did not have probable cause to arrest Mr. Mayfield."

Ms. Steele declined to comment on the document.

In her 2004 e-mail message, Ms. Steele wrote to a colleague, whose name is blacked out, that Mr. Mayfield had been "tied" by a fingerprint to the Madrid attacks, which killed 191 people and injured more than 1,500.

"The problem is there is not enough other evidence to arrest him on a criminal charge," Ms. Steel wrote.

Michael Greenberger, a former Justice Department official who heads the Center for Health and Homeland Security at the University of Maryland, said Ms. Steele's e-mail message "corroborates what is already widely known: that when the Justice Department does not have probable cause to make a criminal arrest, but they have a suspicion that someone is involved in terrorist activities, one tactic is to arrest them as a material witness."

Such use of the material-witness law "raises constitutional problems," Mr. Greenberger said, because a

Case 1:03-cv-09010-RWS Document 52    Filed 05/09/2007    Page 58 of 115

person can be held for long periods without access to the legal protections that come with a normal arrest. like the right to a bail hearing.

Last month, the American Civil Liberties Union and Human Rights Watch accused the Bush administration of misusing the material-witness law in detaining 70 terrorism suspects since the Sept. 11 attacks.

Of those suspects, the groups said, 28 people were charged with crimes, most of which were unrelated to terrorism.

Copyright 2005 The New York Times Company  | Home | Privacy Policy | Search | Co

The New York Times

KINSEY
NOW AVAILABLE ON DVD

June 21, 2005

# Justices Overturn a Death Sentence, Citing an Inadequate Defense Counsel

### By LINDA GREENHOUSE

WASHINGTON, June 20 - The Supreme Court overturned a Pennsylvania man's death sentence on Monday on the ground that his lawyers' failure to search his record for evidence that could have persuaded the jury to spare his life fell below minimum constitutional standards for the effective assistance of counsel.

As a result of the 5-to-4 decision, Pennsylvania must now either give the defendant, Ronald Rompilla, a new capital sentencing hearing or sentence him to life in prison for the 1988 murder of the owner of a bar in Allentown, Pa.

The decision was the second in eight days in which the Supreme Court overturned a death sentence. Last Monday, in a case from Texas, the court overturned a 20-year-old murder conviction as well as the death sentence on the ground that the jury selection had been infected by racism.

The court also ruled in March that the Constitution barred capital punishment for those who committed crimes before the age of 18. In the new case, Rompilla v. Beard, No. 04-5462, as in the case last Monday, Miller-El v. Dretke, the justices accepted a death row inmate's appeal from a federal appeals court's denial of a writ of habeas corpus. The Supreme Court then proceeded itself to grant the writ, which is a judgment that a conviction or sentence was unconstitutional. Justice David H. Souter was the author of both opinions.

In both cases, the majority engaged in an unusually detailed examination of the record and concluded that the court's own precedents required a ruling for the defendant. In the Pennsylvania case, Justice Souter cited the court's precedents as well as the standards for performance of defense counsel published by the American Bar Association.

That publication, identifying a "duty to investigate" and instructing lawyers to "explore all avenues," "describes the obligation in terms no one could misunderstand in the circumstances of a case like this," Justice Souter said. The American Bar Association filed a brief on Mr. Rompilla's behalf.

But Justice Souter's assertion that the court was applying existing standards and not making new law provoked a sharply worded dissent from Justice Anthony M. Kennedy, who called the ruling a "remarkable leap" and a "radical departure" from the court's previous treatment of the question of inadequate legal counsel.

Justice Kennedy accused the majority of "distortion" of the most directly relevant precedent. "This elevation of needle-in-a haystack claims to the status of constitutional violations will benefit undeserving defendants and saddle states with the considerable costs of retrial and/or resentencing," he added.

Chief Justice William H. Rehnquist joined the dissent, as did Justices Antonin Scalia and Clarence

Thomas. Justice Souter's majority opinion was joined by Justices John Paul Stevens, Ruth Bader Ginsburg, Stephen G. Breyer and Sandra Day O'Connor, who also filed a concurring opinion.

There were indications that Justice O'Connor had changed sides in the five months the case was under consideration, enabling Justice Souter to convert a dissenting opinion into an opinion for the court.

This case was the last to be decided of the 10 cases the court heard during its January argument sitting. From this group, it was the second majority opinion for Justice Souter, with the other eight justices each having only one. Justice Souter almost never receives an extra assignment during an argument sitting. It happened only once in the last term, in a police interrogation case from Missouri, a 5-to-4 decision that was probably also the product of a late vote switch.

The point of contention among the justices in the case on Monday was the failure by Mr. Rompilla's defense lawyers, members of the Lehigh County public defender's office, to examine the file of a rape case in which he had been convicted 14 years earlier. The case was germane because the prosecution had announced its intention to use the case to show that Mr. Rompilla was a previously convicted violent felon, one of the "aggravating circumstances" on which the Pennsylvania death penalty law permits juries to rely in imposing a sentence of death.

The file was maintained in the same courthouse where Mr. Rompilla's murder trial was taking place and was easily obtainable by the defense, Justice Souter noted. "It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking," Justice Souter said, adding that "no reasonable lawyer would forgo examination of the file."

Had the lawyers looked in the old file, Justice Souter continued, they would have been led to evidence of the defendant's limited mental capacity and background as an abused child, as well as his likely diagnoses of fetal alcohol syndrome and schizophrenia. According to evidence later unearthed by the new lawyers who handled Mr. Rompilla's habeas corpus case in federal court, he and his brother had been locked by their father in a small wire-mesh dog pen that was "filthy and excrement filled." Mr. Rompilla was sent to school in rags. He dropped out in the ninth grade.

Mr. Rompilla's initial lawyers had not extracted this information in interviews with their client, who was often uncooperative, or with family members, who presented a more benign image of his upbringing. Justice Souter said that an adequate defense would have presented the information as evidence mitigating against the death penalty, and that there was a "likelihood of a different result" had the lawyers done so.

In his dissent, Justice Kennedy said "there is no reasonable probability" that, short of giving "intense scrutiny to every single page of every single document," the defense lawyers would have been led to the information about Mr. Rompilla's childhood.

A "rigid requirement" that defense lawyers give that kind of scrutiny to trial records, he said, would harm defendants by steering their lawyers away from other strategies. "The Constitution does not mandate that defense attorneys perform busy work," Justice Kennedy said.

Both Justice Souter and Justice O'Connor, in her concurring opinion, denied that the court was imposing any such "rigid requirement." Justice O'Connor, in fact, said she was joining the majority "because the court's opinion is consistent with the case-by-case examination of the evidence called for under our cases."

The effective assistance of counsel is guaranteed by the Constitution's Sixth Amendment. The Supreme Court's major precedent, Strickland v. Washington, established a two-part test for defendants to meet in order to show that their defense was constitutionally inadequate: first, that the representation "fell below

an objective standard of reasonableness," and second, a "reasonable probability" that the outcome would have been different but for the defense lawyer's failings.

For 16 years after announcing that test in 1984, the Supreme Court did not find any case in which a defendant's legal representation was inadequate. Beginning in 2000, however, it has decided three consecutive cases, including Monday's, in which it found the representation to have been constitutionally deficient.

Eric M. Freedman, a professor at Hofstra University School of Law who is a specialist in the death penalty and habeas corpus, said the trend indicated that the court was increasingly troubled by problems of adequate representation for capital defendants. "They are starting to put some teeth in their scrutiny" of these cases, Professor Freedman said in an interview. "The basis themes of fundamental fairness in the administration of the death penalty have penetrated the Supreme Court as well as the general public."

---

Copyright 2005 The New York Times Company  | Home  | Privacy Policy  | Search  | Co

Case 1:07-cv-00049-RBW    Document 3-2    Filed 05/09/2007    Page 62 of 115

**The New York Times**

KINSEY
NOW AVAILABLE ON DVD

June 27, 2005

# In Reversals, Questions for Ex-Judge Challenging Morgenthau

## By LESLIE EATON

It was hardly an unusual moment in the career of Leslie Crocker Snyder. a New York State judge known for tough talk and long sentences, who is now running for Manhattan district attorney.

Synell Sims had been convicted of robbery and criminal possession of a weapon for holding up a Gap store on West 57th Street. At his sentencing in 2002, the prosecutor and Mr. Sims's lawyer agreed that the harshest sentence he could get was 25 years to life.

But Judge Snyder sentenced him to 40 years to life, piling one sentence after another rather than having him serve them at the same time. Her reasoning, according to court records, was that he had committed two crimes: not only robbing the store but also pointing his gun at police afterward.

Except that there was no evidence that he had aimed a gun at the police. Mark Dumas, who as a student at Benjamin N. Cardozo Law School helped represent Mr. Sims, made that argument in an appeal. "The error almost jumped off the page," Mr. Dumas said recently.

An appeals court agreed unanimously, and struck down the sentence last month.

It was the third time in six months that an appeals court - the Appellate Division, First Department - has reversed or modified decisions made by Judge Snyder before she left the bench in late 2003.

In a fourth case, the majority supported her, but one judge filed a lengthy dissent contending that a ruling by Judge Snyder had violated a defendant's constitutional rights; that case will be heard by the Court of Appeals, New York's highest court, probably late this year.

Ms. Snyder's record as a judge was bound to come under scrutiny during her campaign to unseat Robert M. Morgenthau, the longtime district attorney in Manhattan. In that light, the recent spate of reversals for her is striking for several reasons, according to lawyers and others who are closely following the race for the Manhattan prosecutor's post.

One is that Judge Snyder has historically had a very strong record of prevailing when her decisions have been appealed. (By her reckoning, she has been overturned outright just seven times out of more than 450 appeals.)

The other reason is that these cases, according to the appellate rulings, involve significant errors on the judge's part that may provide fuel for critics who contend that Ms. Snyder's temperament - her desire to be tougher than tough - has sometimes led her to go too far.

Ms. Snyder does not see it that way. "My record is not only a good one, it shows that I'm fair and balanced," she said in an interview.

She disagreed that the recent appellate decisions suggested that she had made major errors, and noted that higher courts had upheld what she described as her most innovative procedures (defense lawyers tend to call them controversial).

And, in a twist, she noted that in the cases that have been overruled and or criticized, she was backed by Mr. Morgenthau.

"In most cases," she said, "the positions reversed were originally advanced by the district attorney's office."

The significance of judges' being reversed, and of the rates of those reversals, is a matter of debate within the legal world. They can be both telling and misleading, experts say.

For the most part, reversals are actually quite rare, especially at the highest judicial level, the Court of Appeals.

That court, which tends to focus on cases with broad legal applications, has upheld Ms. Synder in 7 out of the 11 appeals since 1988. "That's a pretty darn good record," said Vincent M. Bonventre, a professor at Albany Law School who studies the Court of Appeals.

Things are a little murkier at the level of the Supreme Court Appellate Division, the intermediate courts that review cases based on the facts as well as on the law.

What is clear is that Ms. Snyder, during her two decades as a judge, went for long stretches without having the Appellate Division disagree with her; in 2000 and 2001, it affirmed her 30 straight times.

Her record "has been, 'affirmed,' 'affirmed,' 'affirmed,' " said Robert Rosenthal, a lawyer in private practice who supervised the Sims appeal.

So there has been a stir in some legal circles about the recent negative decisions from the Appellate Division. The first of them occurred last September and involved the jury selection in a case called People v. Claudio, which dates to 1992.

Chris Claudio and Sammy Arroyo were on trial for trying to shoot an acquaintance who worked as a pizza deliveryman in the Bronx. Their lawyers objected after the prosecutor tried to remove the only three Hispanics among the prospective jurors; jurors cannot be rejected simply on the basis of race.

The prosecutor said she had other reasons for challenging these jurors. According to the appellate court, the judge was required to examine the credibility of the prosecutor's explanations.

Instead, she discussed her own experience as a defense lawyer and prosecutor and then decided to seat one of the Hispanic jurors, saying: "I am not God. I can't second-guess" the prosecution.

The Appellate Division said that Judge Snyder had made "a series of errors" and cited her "apparently arbitrary procedure." It reversed her and ordered a new trial, although the accused eventually pleaded guilty, said his lawyer, Andrea G. Hirsch.

Ms. Snyder said the procedures the court found she had violated had not been made clear at the time of her decision.

The third appellate decision that went against the judge came out last October and involved the 1999 case of Cedric Darrett, who had been accused of agreeing to perform a contract hit for $2,000 (though he shot

the wrong man).

At a hearing, Mr. Darrett's lawyer warned the judge that she feared he was about to lie on the witness stand and went on to say that she believed that he had, in fact, shot the victim. In the end, he was never cross-examined about the things his lawyer was afraid he would lie about, said his appellate lawyer, Jan Hoth, and there was no evidence that he had committed perjury.

But after a jury convicted him and Judge Snyder was sentencing him to life without parole, she said that he had committed perjury. Her "inappropriate and substantially inaccurate statements at sentencing," as the appellate court put it, entitled Mr. Darrett to, among other things, a new sentencing proceeding. (A new judge gave him the same sentence.)

Even if a judge is accused of making a mistake, an appeals court may decide not to rule on it if the judges conclude it would not have affected the outcome of a trial. That is what the Appellate Division found last December in the case of Corby Norcott, who was convicted of murder and robbery in 2000.

Judge Snyder had prevented his lawyer from asking questions of the prosecution's main witness that were intended to show that she had a motive to lie and implicate Mr. Norcott. The appeals court found that "the witness's motive to lie was readily apparent to the jury, and, therefore, the court's error, if any, was harmless."

But Justice Richard T. Andrias strongly dissented, writing that the defense should have been able to ask whether the witness had implicated Mr. Norcott only after a detective had told her that Mr. Norcott had accused her of the crime. "The trial court's ruling violated defendant's right guaranteed by the Confrontation Clause" of the Sixth Amendment to the Constitution, Justice Andrias wrote.

Judge Snyder responded, "I respectfully disagree with him, totally." The Court of Appeals will decide who is right.

As for the Sims case, involving the man who robbed the Gap, "I don't really think I made a big mistake," Ms. Snyder said, adding that while the appellate court had not agreed with her interpretation of the facts, "the testimony was very confusing."

That's not the opinion of Mr. Dumas, the former law student, who is now a lawyer for a company in Connecticut.

"Regardless of whether she was running for district attorney," he added, "this would probably be reversed."

---

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Co

The New York Times

KINSEY
NOW AVAILABLE ON DVD

June 22, 2005

# Former Klansman Guilty of Manslaughter in 1964 Deaths

### By SHAILA DEWAN

PHILADELPHIA, Miss., June 21 - In what is likely to be the final chapter in a story that has troubled a generation, a jury pronounced Edgar Ray Killen guilty of manslaughter on Tuesday in the deaths of three young and idealistic civil rights workers who disappeared on a summer night here exactly 41 years ago.

Mr. Killen, 80, sat in a wheelchair, the thin, greenish tubes of an oxygen tank under his nose, his expression impassive as the verdict was read aloud. Throughout the courtroom, people wept - the Killen family on the right, the victims' relatives on the left, as well as townspeople deeply invested in seeing the case brought to trial in hopes that Neshoba County could overcome its past.

Roscoe Jones, a tall, elderly black man with tear-rimmed eyes who had worked alongside the three men who died, pushed his way through the crowd to the side of Rita Bender, a diminutive white woman who had been married to one of them. "Excuse me," Mr. Jones said, politely urgent. "Excuse me." When he reached Ms. Bender, they embraced.

The disappearance of the three men, Andrew Goodman, 20, Michael Schwerner, 24, and James Earl Chaney, 21, on June 21, 1964, drew the national news media and hundreds of searchers to Neshoba County, while Mississippi officials said publicly that the disappearance was a hoax intended to draw attention. When the three bodies - two white, one black - were found under 15 feet of earth on a nearby farm, the nation's horror helped galvanize the civil rights movement. The case, dramatized in the movie "Mississippi Burning," is one of the biggest in what some have called the South's "atonement trials" revisiting civil-rights-era atrocities.

Jurors said the evidence fell short of what they needed to convict Mr. Killen, a former member of the Ku Klux Klan, of murder.

"I should say I heard a number of very emotional statements from some of the white jurors," said Warren Paprocki, 54, a white juror. "They had tears in their eyes, saying that if they could just have better evidence in the case that they would have convicted him of murder in a minute. Our consensus was the state did not produce a strong enough case."

The defense plans to appeal. "At least he wasn't found guilty of a willful and wanton act," said James McIntyre, one of Mr. Killen's lawyers. "Manslaughter is a negligent act."

Although the federal government tried 18 men, including Mr. Killen, on a conspiracy charge in 1967, Mr. Killen - a preacher and sawmill operator - was the first to be charged by the state. The 1967 jury deadlocked over Mr. Killen, and he has maintained his innocence. He faces up to 20 years in prison on each count when he is sentenced on Thursday.

As he was wheeled out of the courthouse, Mr. Killen swatted away television cameras and microphones.

With witnesses dead and memories fading, he could be the only one of the mob of Klansmen responsible for the killings to be tried. Prosecutors say that a grand jury heard all the available evidence against the eight original defendants still living but returned only one indictment, against Mr. Killen. While some in Neshoba County said it was too late and too painful to revisit the episode, others thought that in doing so, the county might find redemption.

"Finally, finally, finally," said Jim Prince, the editor of the local weekly newspaper, The Neshoba Democrat. "This certainly sends a message, I think, to the criminals and to the thugs that justice reigns in Neshoba County, unlike 41 years ago."

Ben Chaney, James Earl Chaney's younger brother, said he spoke briefly to his 82-year-old mother after the verdict. "She's happy," he said. "She finally believes that the life of her son has some value to the people in this community."

But for some of those who had hoped to see Mr. Killen convicted of murder, the manslaughter verdict was less than a total victory. "The fact that some members of this jury could have sat through that testimony, indeed could have lived here all these years and could not bring themselves to acknowledge that these were murders, that they were committed with malice, indicates that there are still people unfortunately among you who choose to look aside, who choose to not see the truth," Ms. Bender, who was married to Mr. Schwerner, said after the trial.

To Nettie Cox, the first black to run for mayor in Philadelphia, the verdict was an affront. "Manslaughter," Ms. Cox said, putting her hands to her temples. "I just can't absorb manslaughter."

But two jurors interviewed said there was not enough evidence that Mr. Killen, who was accused of orchestrating the killings and recruiting the mob that abducted the men and beat Mr. Chaney, shooting all three, had intended for the men to die.

Both the defense and the prosecution failed to impress the jury of nine whites and three blacks. Jurors said neither presented enough witnesses and that the case relied too heavily on transcripts from the federal trial.

On Monday evening, after deliberating more than two hours, the jury reported to Judge Marcus Gordon that they were evenly divided, and he dismissed them for the night. But after deliberating for nearly three hours on Tuesday morning, they reached a unanimous verdict.

Jurors disputed an inference that manslaughter may have been a compromise verdict. One, Troy Savell, a white history teacher and coach, said he was initially in favor of acquittal, but his opinion changed as the jury deliberated. "I think the reasonable doubt was not there that he didn't have anything to do with it," Mr. Savell said.

Mr. Paprocki said race did not play a role in the deliberations. One of the three blacks on the jury was vocally in favor of a murder conviction at first, Mr. Paprocki said, but he was not sure where the other two stood.

Willis Lyon, the only one of the three black jurors who could be reached by phone on Tuesday, said: "The only thing I'll say to that regard is that we were as fair with Mr. Killen as we could have been. I think we gave him as fair a verdict on his behalf as was allowable."

Reached by phone, Shirley Vaughan, the forewoman, said she was emotionally drained by the trial and reluctant to speak. "With the little amount of evidence that we had, we did the very best that we could," she said.

Mark Duncan, the county district attorney, said he did not blame the jury for finding Mr. Killen guilty of a lesser charge than murder, pointing out that three of the four key witnesses were dead. "I think it was asking a lot of a jury to convict a man based on testimony of people who they couldn't see. All they had were their words on paper."

Mr. Duncan's partner in the prosecution, Attorney General Jim Hood, said two witnesses that had come forward since the case was reopened in 1999 had died, one by suicide and the other under questionable circumstances.

There were other obstacles for the prosecutors. Although seven of the original defendants, besides Mr. Killen, are still alive, they refused to testify before the grand jury in exchange for immunity, Mr. Hood said.

Confessions and other statements about the crime were not admissible if the witness was not available for cross-examination, they said.

Asked about the possible legacy of the trial, Mr. Hood said: "I'm just a prosecutor. I don't pretend to be a sociologist. I will allow the historians to analyze what impact this trial may have on this community and the state of Mississippi and its reputation throughout the world."

Jurors, on the other hand, said they were keenly aware of the significance and symbolism of the trial. "I felt dispirited last night because of the six-six split," Mr. Paprocki said. "I was very concerned that in the event of a hung jury that it would just reinforce the prejudicial stereotypes that have been attached to Philadelphia and Neshoba County. I was very much saddened by the fact."

But on Tuesday, he said, "Folks that had been fairly well saying no, they just couldn't convict him, said, 'Well, manslaughter.' I don't know what happened. It was fairly dramatic. It made quite an impression on me."

Ariel Hart contributed reporting from Atlanta for this article.

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Co

**The New York Times**

PRINTER FRIENDLY FORMAT — **KINSEY**
SPONSORED BY NOW AVAILABLE ON DVD

June 2, 2005

# After 50 Years, Emmett Till's Body Is Exhumed

### By MONICA DAVEY and GRETCHEN RUETHLING

CHICAGO, June 1 - Fifty years after Emmett Till's swollen, battered body was pulled from the muck of the Tallahatchie River in Mississippi, it was removed from the ground once more on Wednesday, carried away from a quiet cemetery in south suburban Chicago for an autopsy at last.

Three relatives of Emmett, the 14-year-old black Chicagoan whose killing helped galvanize the civil rights movement, gathered before dawn at the Burr Oak Cemetery in the town of Alsip, listened to a preacher say a prayer and stood by as a backhoe dug into the earth. Before noon, a concrete vault that contained the metal coffin bearing the remains was driven off on a flatbed truck, surrounded by squad cars, to the office of the Cook County medical examiner.

Federal authorities ordered the exhumation as part of their new investigation into Emmett's kidnapping and death, one of more than 20 cases of killings in the Jim Crow South that have been reopened in recent years. The new inquiries have been prompted by a new generation of prosecutors and investigators, by the work of historians and filmmakers, by witnesses who have unexpectedly come forward and, simply, by the interest that has grown with each new investigation.

The Till inquiry is aimed at determining who might have been involved in Emmett's killing other than the two men who were acquitted of it by an all-white jury but who later told Look magazine that they were responsible. Both are now dead.

The authorities said Wednesday that the autopsy would confirm, once and for all, the identity of the body in Emmett's grave and, they hope, determine the cause of his death and identify any remaining evidence that might link him to his killers. Although he was beaten beyond recognition - and is believed to have been shot - there is little question that the body is his. Still, an autopsy was never done, for reasons that have since grown obscure.

"Someone asked me if I was sad today," said Simeon Wright, a first cousin of Emmett's mother who waited at the grave site on Wednesday. "I was sad in 1955. My heart was broken then."

"But now I'm not sad," Mr. Wright said, adding, "We are almost at the end of it."

Mr. Wright, now 62, was sharing a room with Emmett on Aug. 28, 1955, the night when, accused of whistling at a white woman, he was taken from a relative's Mississippi home, where they were staying.

"The last time I saw him, some men were forcing him to get out of bed and get his clothes on, and that was it," Mr. Wright said. "I never dreamed we would finally get to this day."

With the passing of time, the Till case had become mostly just a memory to many, one chapter of a fading struggle. Then, last year, after two filmmakers made separate documentaries on the case, the Justice Department announced that it was opening a new investigation. Prosecutors said information uncovered in the making of the documentaries had disclosed that people in addition to the two acquitted defendants,

Case 1:07-cv-00019-RRW  Document 3-2    Filed 05/09/2007    Page 69 of 115

Roy Bryant and J. W. Milam, might also have been involved.

On Wednesday, in a telephone interview from New York, Keith Beauchamp, one of the filmmakers, said of the exhumation: "This was a day that we hoped for. This is something that I prayed for for a long period of time."

At the cemetery in Alsip, the mood was tense and somber on Wednesday morning. Agents from the Federal Bureau of Investigation shrouded the burial site in a white tent so that outsiders could not watch. Reporters were held at the cemetery gates. No one spoke during the digging, said Arthur Everett of the bureau's Chicago office.

Mr. Everett said he was uncertain how long the medical examiner's investigation would take.

At the trial of Mr. Bryant and Mr. Milam, half a century ago, their lawyers suggested that the body recovered from the river might not even have been Emmett's and that he might be alive somewhere. On Wednesday, Frank Bochte, an F.B.I. spokesman, said: "The first and foremost thing we're trying to do is to put to rest any theories that the body inside there is not Emmett Till. We would like to settle that issue once and for all."

Beyond that, the authorities said they were uncertain precisely how much they would be able to learn about the killers and the cause of death from remains so old.

Once the examination is complete, the remains will be returned to Emmett's family, to bury again.

In recent weeks, the question of exhumation had become a matter of debate within the family. At least one member of the extended family, Bertha Thomas, speaking in early May, publicly expressed concern about any need for it.

On Wednesday, though, Emmett's relatives said they were united.

"The family talked about it," said Crosby Smith Jr., one of the three relatives who stood by for more than three hours at the cemetery. "The family's in agreement."

The Rev. Jesse Jackson, who had been alongside Ms. Thomas as she expressed her doubts, said Wednesday that he supported the family's agreement on the question but that he wondered why the authorities had taken so long to investigate properly.

"In pursuing this 50 years later, it just leaves you with questions," Mr. Jackson said. "Justice delayed is justice denied."

---

Copyright 2005 The New York Times Company  | Home  | Privacy Policy  | Search  | Co

Case 1:07-cv-09311-JPW  Document 3-2  Filed 05/09/2007  Page 70 of 115

**The New York Times**

KINSEY
NOW AVAILABLE ON DVD

June 24, 2005

# 41 Years Later, Ex-Klansman Gets 60 Years in Civil Rights Deaths

## By ARIEL HART

PHILADELPHIA, Miss., June 23 - Edgar Ray Killen, an 80-year-old former Klansman in a wheelchair, was sentenced Thursday to 60 years in prison for his role in the deaths of three civil rights workers in 1964.

Judge Marcus D. Gordon handed down the maximum sentence, 20 years for each death, after the jury convicted Mr. Killen of manslaughter and rejected charges of murder.

"All we're trying to do is do what's right under the law and the facts of the case," the judge said. "The law does not recognize the distinction of age."

In his statement before pronouncing the sentence, Judge Gordon seemed at first to be veering toward leniency. He pointed to Mr. Killen's infirmity and age. He noted his own anguish at deciding sentences, saying it was "one of the things I never really learned how to do."

He criticized those who "demeaned" the community because the jury's verdict on Tuesday was manslaughter rather than murder, saying it amounted to "attacking the integrity of the jury system."

Mr. Killen, a sawmill operator and preacher, sat impassively in a yellow jumpsuit, two days into his confinement at the Neshoba County jail. Finally, Judge Gordon said, "Edgar Ray Killen, come around," and the ailing defendant's wheelchair was pushed out to face the bench. "I take no pleasure at all in pronouncing sentence," he said.

"There are three lives involved in this case, and the three lives should absolutely be respected and treated equally," the judge said. Then he ordered Mr. Killen to serve three consecutive sentences of 20 years each.

Mr. Killen was convicted in the deaths of James Chaney, Andrew Goodman and Michael Schwerner, who were murdered by a group of men who prosecutors said were organized by Mr. Killen. Their disappearance, and the discovery of their bodies in an earthen dam, galvanized the civil rights movement.

Mr. Killen's brother, Oscar K. Killen, expressed contempt for the judicial system and reporters. "Money will do anything," he said.

Supporters of the prosecution embraced. "I think we got a little justice this morning," said Rita Bender, the widow of Mr. Schwerner.

Murmurs of dismay rose up earlier when the judge rued that "I have to pass upon a sentence to a person who is 80 years old, a person who has suffered a serious injury."

Jim Hood, the state attorney general, who tried the case with Mark Duncan, the district attorney, had said

Mr. Killen could receive as little as one year on each charge.

"There was a knot in my stomach until he actually gave the sentence," said Angela Lewis, who was 10 days old when her father, Mr. Chaney, was killed. "The only thing I could do was sit and hope and pray it would be the maximum on all three convictions."

It was justice, Ms. Lewis said, but too long delayed. "It's what he deserves. But he's had 41 years to sit down to dinner with his children," she said. "That's something that me and my dad will never have."

Prosecutors said that a sheriff's deputy pulled over the three men on June 21, 1964, and jailed them long enough for Mr. Killen to organize a death trap. Jurors said they rejected murder charges because the evidence, much of it transcripts of testimony from a 1967 federal trial, did not prove that Mr. Killen knew that the men would be killed.

In 1967 the federal government tried 18 men for conspiring to deprive the victims of their civil rights. Seven were convicted; none served more than six years in prison. That jury deadlocked 11 to one in favor of convicting Mr. Killen; the holdout said she could not convict a preacher. The state had not brought charges in the deaths until Mr. Killen was prosecuted this year.

Mr. Hood said no other prosecutions were likely unless a new witness came forward. Mr. Duncan said that prosecutors had submitted evidence on eight living suspects to a grand jury, but that only Mr. Killen was indicted.

The prosecutors said Mr. Killen would be eligible for parole after 20 years.

Mr. Killen spent the trial in a wheelchair; he broke his legs in March while chopping wood. During the trial, he sometimes breathed through oxygen tubes, and at one point was taken to the hospital with high blood pressure.

One of Mr. Killen's lawyers, James McIntyre, said he would appeal and ask that Mr. Killen be released on bond. Mr. McIntyre said that the charge of manslaughter was introduced too late for Mr. Killen's team to prepare a defense, and that he would subpoena members of the news media whose coverage he said was biased against his client.

Mr. Killen's trial is one of several recent efforts by prosecutors to revisit notorious killings from the civil rights era. Mr. Killen is expected to join Sam Bowers, an imperial wizard in the Klan who was convicted in 1998 of the murder of the civil rights advocate Vernon Dahmer, at the state prison in Rankin County. Mr. Bowers also served time on a federal conviction in the Philadelphia case.

Each man will probably be in solitary confinement, Mr. Hood said.

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Co

Case 4:05-cv-00879-RBW Document 3-2 Filed 05/09/2007    Page 72 of 105

The New York Times

May 22, 2005

# How Judges Hide From Justice

### By ROBERT H. TEMBECKJIAN

IN the last three months, the New York State Commission on Judicial Conduct has publicly disciplined four metropolitan-area judges: two from Brooklyn, one from Manhattan and one from Westchester. Apart from some intense public commentary over the merits of these decisions - three public censures and one removal from office - these cases had at least one thing in common. They were all conducted in secret. That should be changed.

Judges are among the most powerful of public servants. They decide who goes to jail, who wins or loses millions of dollars and who gets custody of children. Public confidence in their integrity and impartiality is essential to the rule of law. While a vast majority of judges are honorable, there will always be some who engage in unethical behavior. Disciplining such judges is important business that should be transacted in public, just as any civil or criminal trial would be.

In 38 states, judicial misconduct hearings are indeed open to the public. Not so in New York, where proceedings that stretch over months are held behind closed doors. Only when the results are announced does the public even learn such cases existed. By then, it is usually too late to convey in a meaningful way the strength of the case, the credibility of the witnesses and the merits of the defense. The four recent decisions in New York offer cases in point.

The commission voted to remove a Surrogate's Court judge in Brooklyn for awarding a long-time friend millions of dollars in fees from estates where there was no executor, without confirming that he had done enough work to earn such fees. The judge is appealing the decision.

The commission censured a Westchester Family Court judge who attempted to influence other judges and court workers on behalf of friends in two divorce and custody cases, and who testified in a manner she conceded was inaccurate. It also censured a Brooklyn Criminal Court judge for coming off the bench in unprovoked anger and grabbing and screaming at a defense lawyer. Finally, it censured a Manhattan Civil Court judge for presiding over a personal injury case involving a litigant who was also a lawyer with whom she continued to socialize, and to whom she awarded a fiduciary appointment worth about $80,000 in fees, while the case was pending.

Reasonable people may differ with these decisions. As the prosecutor of judicial misconduct cases in New York, I myself am sometimes at odds with the commission. Yet while some criticized the removal as severe, and others derided the censures as lenient, most tended to miss the context and nuance of the deliberations. The subtleties of an individual disciplinary decision tend to get short shrift in the news. Were the press and public able to follow along as these cases unfolded, the disciplinary process would not seem so sudden and mysterious, and citizens would be better informed along the way. For example, the case against the Brooklyn Surrogate's Court judge lasted 22 months, and the record was over 13,000 pages long. It would be difficult, if not impossible, to capture the complexities of such a proceeding in a single article that reported the final result.

New York's chief judge, Judith Kaye, proposed legislation in 2003, which the commission endorsed, to

open up the disciplinary process at the point when a judge is formally charged with misconduct. Unfortunately, the Legislature did not act. Perhaps the commission's recent decisions might spur the Senate and Assembly to revisit the issue. The more citizens know about what goes on at the commission, the more likely they will appreciate that no case is as cut and dried as a critic may suggest. The press and public could follow the arguments as they develop, rather than try to digest them all at once when the decisions are rendered.

Moreover, an open proceeding would shed important light on the rare instance in which a formal charge against a judge is dismissed without any disciplinary action. It would provide the public with the means to assess that a dismissal was deserved and the system was honest.

In short, a public process would transform judicial discipline from a secretive game to one in which the commission's judgments were open to scrutiny and improvement as we went along, while there was time enough to make a difference. Public confidence in the judiciary, and in the disciplinary system that holds them accountable, requires nothing less.

Robert H. Tembeckjian is administrator of and counsel to the New York State Commission on Judicial Conduct.

---

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Co

Case 1:06-cv-00495-RBW   Document 3-2   Filed 05/09/2007   Page 74 of 115

**The New York Times**

PRINTER-FRIENDLY FORMAT   Melinda and Melinda
SPONSORED BY   NOW PLAYING IN THEATERS

May 12, 2005

# Judge Indicted on Charge of Taking Aunt's Money

By ANDY NEWMAN

A Brooklyn judge accused of siphoning money from his elderly aunt's assets has been indicted on charges of grand larceny and forgery, a law enforcement official said yesterday.

The judge, Michael J. Garson of State Supreme Court in Brooklyn, has been unable to provide receipts for $163,000 of his aunt's money that he withdrew while he had power of attorney over her. He is already under court order to repay the money.

"We believe he took it so he could cover some debts," said the law enforcement official, who spoke on the condition of anonymity. He added that Justice Garson had large losses in the stock market in 2000 and had filed a "doctored document" with the courts that gave him more control over the aunt's money than the power of attorney provided.

Justice Garson, 60, has claimed that the missing money went to cover his aunt's living expenses. His lawyer, Ronald J. Aiello, declined to comment yesterday on any potential charges against his client, who, according to the law enforcement official, has been ordered to surrender this morning.

Justice Garson, who has been on the bench since 1992 and hears civil cases, becomes the second Garson to be charged with a felony while sitting as a Supreme Court judge. His cousin Gerald P. Garson is awaiting trial on charges of receiving bribes in divorce cases.

The aunt, Sarah Gershenoff, a retired legal secretary who is now 92, gave Michael and Gerald power of attorney in 1997, putting Michael in control of her checkbooks.

Case 1:07-cv-00001-RBW Document 3-2 Filed 05/09/2007 Page 75 of 115

In 2000, a niece of Ms. Gershenoff's complained that money was missing from her accounts. When Gerald was confronted by investigators in 2003 with evidence of his bribe-taking, he sought leniency by implicating Michael in the theft of his aunt's accounts, lawyers involved in Gerald's case have said.

Ordered to account for the aunt's money by a judge in Manhattan, Michael Garson could not supply receipts for $163,000. He testified that about $95,000 of the missing money went for restaurant meals for Ms. Gershenoff and her health aide. But the Manhattan judge found Michael's cash-flow analysis "fundamentally flawed" and ordered him to repay the $163,000. Michael lost an appeal of that decision last month.

The law enforcement official said that a grand jury voted to indict Justice Garson, who is still sitting, in November, but that the Brooklyn district attorney, Charles J. Hynes, declined to file the indictment until yesterday because Justice Garson had been cooperating with his office.

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | **RSS** | H:

## TEXAS: REPORT CRITICIZES LAWYERS' PRACTICES

Prosecutors and defense lawyers were criticized in a special investigation of how courthouse practices added to a scandal involving prosecutions over fake drugs in Dallas. Dozens of innocent people, mostly immigrants, were jailed after a former Dallas police officer, Mark De La Paz, and his informants set them up with fake drugs. Jack Zimmerman, a Houston lawyer appointed by the district attorney to investigate, found that drug-court prosecutors worked too closely with the police and failed to review questionable work thoroughly. Defense lawyers received blame for inadequately representing their clients. (AP)

*The New York Times*

NOW PLAYING IN THEATERS

December 11, 2004

# Judge Censured for Conduct Unbecoming His Authority

### By AL BAKER

ALBANY, Dec. 10 - An upstate judge has been censured for his conduct in two cases in which he sent people to jail for minor misbehavior at his courthouse; one was a college student who had talked back to him.

The student, Jason Kalenkowitz, had just been acquitted of a charge of drinking beer at a house party in 1999, when he got in trouble for talking back to the judge, Douglas C. Mills.

The judge told Mr. Kalenkowitz, a student at Skidmore College, that he was "an obnoxious young man," and Mr. Kalenkowitz replied that Judge Mills was an "obnoxious old man." Judge Mills ruled that the student was in contempt and sent him to jail, where he was held for four days in solitary confinement.

In the other case, a young man, Anthony Caton, had just pleaded guilty on some traffic tickets when the judge abruptly ordered his parents before him. From the bench, he said that he had heard them exchange curse words during a spat in the parking lot before court convened.

The judge, who is in his 16th year on the Saratoga Springs City Court, then had the man's father, Terry Caton, handcuffed and taken to a jail cell. And over the objections of Mr. Caton's wife, Laura, the judge said that she needed an order of protection from her husband of 22 years.

"He's barred from the house; we'll talk about it later," the judge said at the hearing, on Sept. 24, 2002. "You're going to behave like that around me, you're going to be arrested."

In jail, Mr. Caton could not get access to medication he needed after a recent surgery.

The state's Commission on Judicial Conduct, an 11-member panel charged with protecting the public from misconduct by judges on or off the bench, determined that it

was the judge who had behaved badly. The commission censured him on Monday, publicly condemning his conduct in the two cases.

"These two acts were a gross abuse of power by a judge who did not respect the limits on his awesome authority," said Robert H. Tembeckjian, the panel's administrator and counsel. "I imagine he will be more responsible in the future."

The punishment carried no suspension or fine. Nor was it the most severe punishment the commission could mete out: removal from office, which three members argued, in a dissenting opinion, was warranted.

In that opinion, Raoul Lionel Felder, a well-known divorce lawyer who is on the commission, wrote, "just as there is no small death, there is no small tyranny."

"Tyrants come in more varieties than Baskin-Robbins has flavors," wrote Mr. Felder, who was appointed to the commission by Gov. George E. Pataki. "Arrogance and narcissism are not uncommon human qualities, but this judge's sense of self is so inflated that he chose to fuel his ego by burning the fundamental rights of citizens in his courtroom."

Judge Mills's lawyer, Matthew J. Jones, said the judge had accepted the determination by the commission and had elected not to appeal it. "So from that standpoint, the judge considers the matter to be at an end."

Mr. Jones said Mr. Mills, who last ran for city court judge as a Republican, is a married father and a charitable person, known for his work with those afflicted by drug and alcohol abuse and is particularly sensitive to incidents of domestic violence.

"There is not a mean-spirited bone in his body," said Mr. Jones, who, in trying to explain the judge's comments, said the tenor of the proceedings was lost in the transcript provided by the commission.

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

**The New York Times**

December 5, 2004

# Chief's Retrial, 146 Years in the Making

### By SARAH KERSHAW

TACOMA, Wash., Dec. 3 - There are no living witnesses, and the defendant himself has been unavailable since 1858, when he was hanged before a crowd after being convicted of capital murder.

But 146 years later, the chief justice of the Washington State Supreme Court has convened what for this state may be the ultimate trial in absentia: a new day in court for Chief Leschi, a revered icon of the Nisqually Indians of Washington and a celebrated American Indian martyr who was convicted in the killing of a white militiaman in an 1855 war.

The trial, to begin here on Friday, should determine, after a century and a half of debate, whether Chief Leschi was wrongly put to death for killing A. B. Moses, a volunteer colonel, in what historians say was the first recorded case of capital punishment in Washington territory. The chief's descendents and some historians insist he did not kill the colonel.

"This really is uncharted territory," said the chief justice, Gerry L. Alexander, who convened the court after the State Legislature last March asked the court to reexamine Chief Leschi's case, following lobbying by descendents of the chief and others. "It's got real challenges and greater difficulty."

The judges will have to step back into the 19th century and make sense of a dusty historical record rife with gaps and unanswered questions and containing dense trial minutes scrawled by hand. The witnesses to be called are historians, military law experts and a few of the chief's 100 or so descendents. But the case will be tried by prosecutors and defense lawyers, including a county official here who supports the death penalty but is defending Chief Leschi.

"We can't even reconstruct this because nobody is living," said Justice Alexander, who declined to have the Supreme Court retry the case but created a special court instead. "The passage of time makes it extremely difficult to do this. But it is like a regular trial, because what you are doing at a trial is searching for the truth. So we're searching for it as best as we humanly can."

Such re-examinations of trials and other historical events are not unheard of, and re-enactments are common. They have ranged from bar association mock trials to official inquiries, addressing questions like whether Mrs. O'Leary's cow really did start the Great Chicago Fire of 1871 or whether John Wilkes Booth assassinated Abraham Lincoln. They included a 2001 case here in which the State Supreme Court ruled that a Japanese-American law school graduate who was denied entry to the state bar in 1902 should be posthumously admitted.

In the Leschi case, Washington's Historical Court of Inquiry and Justice, as the one-time court here has been christened, will have no legal authority to reverse the chief's murder conviction. But even if only symbolic, the findings of this court, comprised of seven active and recently retired Washington judges, may provide Chief Leschi's descendents with the exoneration they have long sought.

"We finally have a generation that's willing to listen clearly to the evidence," said Cynthia Iyall, a descendent of the chief and an economic development planner for the Nisqually Tribe, on a visit this week to his grave here.

If Chief Leschi (pronounced LESH-eye) is found not guilty, Ms. Iyall said some members of the Nisqually tribe of about 500 would try to update the many history books and other pieces of literature that mention him in Washington, where one tranquil lakeside Seattle neighborhood, Leschi, is named after him, along with schools and a waterfront park.

"At least we will be able to add a chapter or a paragraph to every story that is out there, a correct ending to every story, added in 2004," Ms. Iyall said.

The chief was hanged after two federal territorial court trials. After the first resulted in a deadlocked jury, he was convicted in the 1855 killing. The victim was a militiaman, and he was shot to death in an ambush on a prairie in western Washington in Indian-settler wars, according to historical accounts. Questions were raised from the outset about whether Chief Leschi was even at the ambush, said Melissa Parr, a curator at the Washington State History Museum and member of the Committee to Exonerate Chief Leschi, which lobbied the Legislature for a re-examination of the case and an official apology to the tribe.

Even if the chief did kill the man, the descendents and some historians say that as a lawful combatant in war, Chief Leschi should never have been accused of murder. They also say that the second jury was not instructed to consider the laws of war, which could have exonerated him even if he had been found to have killed the militiaman.

And the chief's descendents, who live on a small reservation 30 miles south of here and who grew up hearing stories about him, said only a judicial exoneration, not a re-enactment of a trial or even a pardon from a governor or president, would bring the case to a close for them.

"I think he's watching from up above and he's clapping his hands and saying, 'Well, you finally did it,' " said Cecelia Svinth Carpenter, 80, a Nisqually Indian elder, historian and author, who wrote a biography of Chief Leschi, and with Ms. Iyall and Ms. Parr led a two-year effort to get the case reopened. "My dream was always to clear his name. Even as a child I thought about it, that it was a necessary thing to do."

Chief Leschi's gravestone, on a hill in a small tribal cemetery here, has regular visitors, who have left necklaces, flowers and baskets of pine cones around the small granite monument. An inscription on the back of Chief Leschi's stone, written in 1929, says the chief was "judicially murdered Feb. 19, 1858, owing to misunderstanding."

Two prosecutors from the Pierce County Prosecuting Attorney's office who volunteered to argue in the new trial in support of the chief's conviction will try to prove that he was given his due process, including an appeal.

One of the prosecutors, Carl T. Hultman, said he once lived in the Leschi neighborhood in Seattle and was stunned later to discover that it was named after a convicted murder. Mr. Hultman said he was still preparing his arguments for the trial but that his basic approach was that cases have to end some time.

"We have a process that's supposed to allow for a fair ending, but it's also supposed to allow for the ending of conflicts, a finality," he said. "You don't just argue on forever about things."

But one of the lawyers defending Chief Leschi, John W. Ladenburg, the Pierce County executive who supports the death penalty, said he felt the case had long cried out for re-examination.

"We can't un-hang him," Mr. Ladenburg said.

But, he added: "I think it is important to set the record straight in these kinds of cases. It will be a challenge to make it come alive for people, as if Leschi were there in the courtroom and we were arguing over his life."

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

Case 1:07-cv-00018-RBW    Document 2-2    Filed 05/09/2007    Page 82 of 115

# The New York Times
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY    NOW PLAYING IN THEATERS

November 6, 2004

# Negated Murder Conviction Prompts Suit Against the City

By JULIA PRESTON

A man who served 12 years in prison on a Brooklyn murder conviction before an appeals court found that the prosecutors had withheld crucial evidence has sued New York City and the Brooklyn district attorney, Charles J. Hynes, seeking damages for malicious prosecution.

The man, Sami Leka, was convicted of shooting Rahman Ferati in 1988 amid a child custody dispute between Mr. Ferati and some of Mr. Leka's relatives. In July 2001 the federal appeals court in Manhattan threw out the conviction, finding that the prosecutor's office had prevented the defense from contacting a witness to the crime who would have helped Mr. Leka's case.

Mr. Leka's civil suit, which was filed Thursday in Federal District Court in Manhattan and became public yesterday, charges that the city and Mr. Hynes pursued policies of "deliberate indifference" because they failed to discipline any of the prosecutors or police officers responsible for withholding the witness. Mr. Hynes and other prosecutors are protected by immunity from being sued as individuals.

A spokesman for Mr. Hynes's office, Jerry Schmetterer, said that the district attorney had not seen the suit and would not comment yesterday.

After the ruling by the United States Court of Appeals for the Second Circuit overturning the conviction, Mr. Hynes, who took office in 1989, said he would bring a new case against Mr. Leka. He sought to bar Mr. Leka from being released from prison on bail while the new investigation went forward.

A judge granted Mr. Leka's bail request, and he was released in July 2001. The following January, Mr. Hynes told the court that he did not have sufficient evidence for a new trial, and he dismissed the murder indictment.

A lawyer for Mr. Leka, Michael S. Sommer, first filed a civil suit seeking damages for wrongful prosecution in the New York State Court of Claims. The office of Eliot Spitzer, the state attorney general, contested that suit, and it was dismissed on procedural grounds earlier this year. Mr. Sommer has appealed.

In the federal suit, Mr. Sommer, a former federal prosecutor, has joined forces with Joel B. Rudin, a lawyer who won a $5 million settlement from the city last year in a similar case in the Bronx. In that suit, on a behalf of a day care teacher, Alberto Ramos, Mr. Rudin argued there was a pattern of tolerance of misconduct by prosecutors in the Bronx district attorney's office. Mr. Ramos served seven years in prison on a rape conviction that was thrown out after it was revealed that prosecutors had failed to disclose information undermining the accuser's claims.

"The Brooklyn district attorney's office had a similar policy of not doing anything no matter how egregious their prosecutors' misconduct," Mr. Rudin said yesterday, speaking about Mr. Leka's suit.

The appeals court found that the prosecutors had failed to tell Mr. Leka's defense lawyer that an off-duty New York police officer, Wilfredo Garcia, had seen the shooting from a second-floor window and had given an account that undercut the prosecutors' theory.

"I'm a former prosecutor myself, so I don't lightly accuse prosecutors," said Mr. Sommer, who is working at no charge. "But this case was so extreme that it really cried out for some judicial review."

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

Case 1:07-cv-09600-RJH   Document 28-2   Filed 05/09/2007   Page 84 of 115

The New York Times
nytimes.com

PRINTER FRIENDLY FORMAT GARDEN STATE
SPONSORED B   NOW PLAYING IN THEATERS

September 15, 2004

# Bill to Require Sanctions on Lawyers Passes House

### By CARL HULSE

WASHINGTON, Sept. 14 - Taking aim at the nation's trial lawyers and what it says is a glut of unnecessary legal actions, the Republican-led House approved a measure on Tuesday requiring sanctions against lawyers who file lawsuits deemed frivolous.

The legislation, passed on a 229-to-174 vote, was one of four court-related measures taken up by the House in an election-year push to spotlight Republican efforts to reduce litigation.

Both the House and Senate also worked to ease a backlog of spending bills that need to be completed by Oct. 1, with the House moving ahead with an $89.9 billion measure for the Treasury and Transportation Departments that includes a raise of about 2.5 percent for members of Congress. On a 235-to-170 procedural vote, lawmakers dodged a direct vote on the pay increase. Senators neared completion of a $33.1 billion measure for the Department of Homeland Security.

The House leadership dubbed its effort Lawsuit Abuse Prevention Week, but Representative Tom DeLay of Texas, the majority leader, also said it was "John Edwards Appreciation Week." Senator Edwards, the Democratic vice presidential nominee, had a successful career as a trial lawyer, and has said he backs such penalties for frivolous lawsuits.

The Senate is considered unlikely to take up the House bill this year.

Republicans said the mandatory penalties - including payment of court costs and lawyers' fees, followed by potential contempt citations and disciplinary procedures for repeat incidents - were needed to end nuisance lawsuits that they said were driving companies out of business and costing consumers.

Democrats said the measure could have a "chilling effect" on bringing suits and could make it harder for less-affluent Americans to retain legal counsel if lawyers were nervous about facing sanctions. They accused Republicans of wasting time with frivolous legislation and said it represented a needless Congressional intrusion into local court matters.

"Give the decision back to the courthouse, and let's have a fair judicial system for all," said Representative Sheila Jackson Lee, Democrat of Texas.

The legislation would change what is known as Rule 11 of the Federal Rules of Civil Procedure and require courts to impose penalties if a lawsuit is deemed frivolous. According to the Judicial Conference of the United States, a group of judges who make policy for the federal courts, any penalties have been left to a judge's discretion since 1993 after a 1983 decision to make them automatic was determined to have backfired.

"It spawned thousands of court decisions and generated widespread criticism," Leonidas Ralph Mecham, secretary of the judicial conference, wrote in a letter to Congress spelling out the organization's objections to the bill. "The rule was abused by resourceful lawyers, and an entire 'cottage industry' developed that churned tremendously wasteful satellite

litigation that had everything to do with strategic gamesmanship and little to do with underlying claims."

The House proposal would abolish a provision that allows those filing a lawsuit to escape any sanctions if the suit is withdrawn within 21 days of a motion for sanctions being filed.

House members also easily passed two measures meant to reduce civil liability for those who donate equipment to volunteer fire departments and for pilots who volunteer their expertise during local emergencies. A measure providing some immunity for interscholastic sports organizations was blocked when it failed to win a sufficient majority under House rules for considering less contentious measures.

The Republican majority in the House has sought to exert authority over the courts with other bills this year, passing a measure in July that would prohibit federal courts from overturning parts of the federal Defense of Marriage Act. And lawmakers are expected to take up a bill soon that would prevent judges from hearing legal challenges to the inclusion of the phrase "under God" in the Pledge of Allegiance.

Although such bills have largely been successful in the House and have provided political fodder for both parties, they have received little attention in the Senate, where the rules make it easier to block such legislation and there is little room on the agenda in the few weeks remaining in the session.

"It is not going to get through here," a top Republican Senate aide said Tuesday about the frivolous-lawsuit measure.

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

The New York Times

PRINTER FRIENDLY FORMAT GARDEN STATE
SPONSORED BY NOW PLAYING IN THEATERS

September 3, 2004

# Judge Reverses Convictions in Detroit 'Terrorism' Case

By DANNY HAKIM

DETROIT, Sept. 2 - A federal judge threw out the terrorism convictions of two Arab immigrants on Thursday, undoing what the Justice Department once proclaimed was its first major courtroom victory in the war on terror.

The department itself requested the dismissal this week in an extraordinary filing that savaged its own legal strategy against what it had characterized as a sleeper cell plotting acts of terrorism.

The judge, Gerald E. Rosen, acceded to the government's request for a new trial only on document fraud charges, ending the terrorism case against the men, Abdel-Ilah Elmardoudi, 38, and Karim Koubriti, 26, both from Morocco.

Judge Rosen was sharply critical of the prosecution of the case, citing a pattern of misconduct, though he did not mention Richard G. Convertino, the former lead prosecutor.

"Although prosecutors and others entrusted with safeguarding us through the legal system clearly must be innovative and think outside the conventional envelope in enforcing the law and prosecuting terrorists, they must not act outside the Constitution," the judge said in his decision. "Unfortunately," he added, "that is precisely what has occurred in the course of this case."

While criticizing the government's handling of the case, Judge Rosen praised the prosecutors who recently took it over and moved to disown it.

Mr. Elmardoudi and Mr. Koubriti remain in custody and face a new trial on the fraud charges. A third Moroccan, Ahmed Hannan, 36, convicted of document fraud, was released this year to a halfway house on an electronic tether. A fourth man was acquitted last year.

Three of the men were picked up in a raid six days after the Sept. 11 attacks. The group was eventually accused of forming a terrorist cell based in Detroit and collecting intelligence for terrorist plots.

But Judge Rosen said prosecutors developed early on a theory about what happened "and then simply ignored or avoided any evidence or information which contradicted or undermined that view."

The judge's comments echoed the Justice Department's sharp rebuke of Mr. Convertino, who was removed from the case late last year and is being investigated for possible misconduct. The department said in its filing that Mr. Convertino withheld a substantial amount of evidence from the court that undermined every critical aspect of his terrorism case.

Lawyers for Mr. Convertino, who is suing the department, have vigorously disputed that he knowingly withheld significant evidence and said that the department was retaliating against him for cooperating with a Congressional inquiry into the nation's antiterrorism strategy.

Case 1:07-cv-00019-RBW    Document 3-2    Filed 03/09/2007    Page 87 of 115

Judge Rosen said in his decision that "the prosecution materially misled the court, the jury and the defense as to the nature, character and complexion of critical evidence that provided important foundations for the prosecution's case."

Though the government's filing, and the judge, found fault overwhelmingly with Mr. Convertino, some observers saw other problems.

"The case fits into a broader pattern of the Ashcroft Justice Department overplaying its hand in terror cases and making broad allegations of terror without the evidence to back it up," said David Cole, a law professor at Georgetown University.

Judge Rosen, who was nominated to the federal court by the first President Bush, praised the prosecutor who led a nine-month post-trial review of the case, Craig S. Morford. Mr. Morford was dispatched from the federal prosecutor's office in Cleveland last year to lead the review, which was ordered by Judge Rosen after the government revealed evidence not disclosed before or during the trial. Last month, Mr. Morford was appointed the top federal attorney in Detroit after Jeffrey G. Collins, who led the office during the prosecution of the case, resigned.

"The position the government has now taken," Judge Rosen said, "confessing prosecutorial error and acquiescing in most of the relief sought by the defendants, is not only the legally and ethically correct decision, it is in the highest and best tradition of Department of Justice attorneys."

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘

GARDEN STATE
NOW PLAYING IN THEATERS

September 1, 2004

# Justice Dept. Assails Way It Won Key Terror Case

**By DANNY HAKIM**

**D**ETROIT, Sept. 1 — The Justice Department assailed its own legal strategy today in the case that brought its first courtroom victory in the war on terror.

In a 60-page filing, federal prosecutors presented a wealth of previously undisclosed evidence that they conceded undermines their terror case against what they once called a "sleeper operational combat cell" based in the Detroit area. They also sharply rebuked the conduct of the prosecutor who led the case, suggesting that he knowingly withheld a multitude of evidence that he was obligated to share with defense attorneys.

The developments marked a sharp reversal in a case once hailed by Attorney General John Ashcroft as a major victory in the war on terror.

In June 2003, two Moroccan men, Abdel-Ilah Elmardoudi, 38, and Karim Koubriti, 26, were convicted on terror and document fraud charges. A third Moroccan man, Ahmed Hannan, 36, was convicted of document fraud and an Algerian, Farouk Ali-Haimoud, 24, was acquitted.

The men were never sentenced because of escalating problems and controversies surrounding the case.

In a filing released today, the government concurred with a defense motion for a new trial, but only on document fraud. Prosecutors have asked a federal judge to drop a material support of terrorism charge, ending their pursuit of a terror case.

"In its best light, the record would show that the prosecution committed a pattern of mistakes and oversights that deprived the defendants of discoverable evidence," federal prosecutors said in their filing.

They conceded that evidence uncovered in a nine-month review ordered by the presiding federal judge undermined every major aspect of their terror case. They also said prosecutors "created a record filled with misleading inferences that such material did not exist."

The filing was largely a rebuke of Richard G. Convertino, the federal prosecutor who led the case. Shortly after the government won convictions last June, Mr. Convertino was removed and is now being investigated by the Justice Department for misconduct.

He has sued the Justice Department and contended that he was being retaliated against because he agreed to testify about terrorism before the Senate Finance Committee, whose chairman, Charles E. Grassley, an Iowa Republican, is a persistent critic of the department.

"Much of the evidence claimed to have been wrongfully withheld by Rick was evidence he wasn't aware of," said Mr. Convertino's lawyer, William Sullivan. "Even if he had been, it was not material to the defense and it would not have led to a different result at the trial."

Mr. Convertino remains on the Justice Department's payroll but is detailed to the Senate Caucus on International Narcotic Control, run by Senator Grassley, who has in the past characterized Mr. Convertino as a whistle-blower. His office declined to comment today.

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top



**The New York Times**

PRINTER FRIENDLY FORMAT GARDEN STATE
SPONSORED BY NOW PLAYING IN THEATERS

September 2, 2004

# Justice Dept. Seeks End to Its Detroit Terror Case

By DANNY HAKIM

DETROIT, Sept. 1 - The Justice Department on Wednesday assailed its own legal strategy in the case that had brought its first courtroom victory in the war on terror.

In a 60-page filing released Wednesday, prosecutors asked a federal judge to end the terror case against what they once called a "sleeper operational combat cell" based here. They are asking for a new trial of three men only on document fraud.

After nine months of investigation, federal prosecutors compiled a wealth of evidence that they said fatally undermined every aspect of their terror case. They also sharply rebuked the prosecutor who led the case, Richard G. Convertino, suggesting he knowingly withheld evidence that he was obligated to share with defense lawyers. Mr. Convertino, who was removed as the case prosecutor last year and is the subject of a department investigation, has denied accusations that he did anything wrong and has filed a lawsuit against the department.

The developments were a stunning reversal in a case once hailed by Attorney General John Ashcroft as a major victory in the war on terror.

"To have one of the department's few wins move into the loss category is pretty remarkable," said Jonathan Turley, a law professor at George Washington University. "The Detroit case is like a 20-car pileup for Ashcroft. You have an open feud with the former prosecutor and ultimately the abandonment of the case."

Some others were heartened that the department aired its missteps.

"We applaud the Justice Department's call for fairness in this case," said Ismael Ahmed, executive director of the Arab Community Center for Economic and Social Services, in a statement on Wednesday. "It clearly demonstrates why we feel that America is such a great country."

Mr. Ashcroft declined through a spokesman to comment.

"The filing does speak for itself," said Bryan Sierra, a Justice Department spokesman in Washington. "We are obligated to do the right thing if we feel something went wrong with the case."

In June 2003, two Moroccan men, Abdel-Ilah Elmardoudi, 38, and Karim Koubriti, 26, were convicted on terror and document fraud charges. A third Moroccan man, Ahmed Hannan, 36, was convicted of document fraud. A fourth man was acquitted. The men were never sentenced because of escalating problems over how the case was handled.

"In its best light, the record would show that the prosecution committed a pattern of mistakes and oversights that deprived the defendants of discoverable evidence," federal prosecutors said in their latest filing.

The nine-month review, which had been ordered by the presiding federal judge, showed that prosecutors did more than

New York Times > National > Justice Dept. Seeks End...

Case 1:07-cv-00019-RBW     Document 3-2     Filed 05/09/2007     Page 91 of 115

press evidence. The report said that prosecutors also "created a record filled with misleading inferences that such erial did not exist."

filing was largely a rebuke of Mr. Convertino, who was removed within months of winning the convictions. What nclear is why the department allowed Mr. Convertino to try the case if it had concerns about his conduct.

government said Wednesday that in the early stages of the investigation, in 2002, there were deep divisions within department over Mr. Convertino's strategy to interview a main witness, Youseff Hmimssa, without letting the .I. take notes, to prevent the defense from gaining access to the information.

onvertino's approach caused significant controversy within the Department of Justice," prosecutors said, adding that artment officials in Washington and Detroit cautioned him against the approach. One F.B.I. agent was said to have n "adamantly opposed." Keith Corbett, Mr. Convertino's supervisor and co-counsel on the case, also warned against e strategy.

nsion between Washington officials and Mr. Convertino grew, with a federal prosecutor assigned to the case saying December that he was relegated to being more observer than participant.

. Convertino has countered in his own suit that the department is retaliating against him for his agreement to testify out terrorism last year before the Senate Finance Committee. The committee chairman, Senator Charles E. Grassley, epublican of Iowa, is a critic of the department.

Much of the evidence claimed to have been wrongfully withheld by Rick was evidence he wasn't aware of," said Mr. onvertino's lawyer, William Sullivan. "Even if he had been, it was not material to the defense and it would not have d to a different result at the trial."

Mr. Convertino, who declined to comment, has said that he was assigned only a barebones staff and could not have onitored every piece of information; he has also said the bureaucracy prevented him from seeing some of the vidence uncovered by the government.

He remains on the Justice Department's payroll, assigned to the Senate Caucus on International Narcotic Control, which is led by Mr. Grassley, who has in the past characterized Mr. Convertino as a whistleblower. Mr. Grassley's office declined comment.

Lawyers for the defendants have portrayed Mr. Convertino as a rogue prosecutor who withheld evidence in a potentially star-making case.

We intend to file motions to have the case thrown out completely," said Jim Thomas, Mr. Hannan's lawyer. "Because of the taint that has been attached to this trial and the misconduct of the prosecutor, this case should not be tried again. The government has had their shot."

In its filing, the government lays out a rebuttal of Mr. Convertino's legal strategy based on evidence they say was withheld from the court.

The strategy relied on three strands of evidence: drawings and a videotape suggesting the men were collecting intelligence on targets in the United States and abroad; the testimony of an associate who said the men were hatching terrorist schemes, and corroborating evidence that they were using methods consistent with terror operations.

"Unfortunately, numerous developments since trial, including the discovery of significant materials not disclosed by the prosecution, have undermined each part of this three-legged stool," the government said in its filing.

The New York Times > National > Justice Dept. Seeks End to Its Detroit Terror Case

Case 1:07-cv-00019-RBW   Document 3-2   Filed 05/09/2007   Page 92 of 115   Page 3 of 3

One crucial piece of evidence was a day planner containing sketches that prosecution witnesses said included a military hospital in Jordan and an American air base in Turkey. During the trial, prosecutors contended that a portion of the sketch depicted an aircraft hangar at the base in Turkey. Defense lawyers said it was simply a doodle drawing of the Middle East. The government now says American investigators in Germany concluded that the supposed hangar drawing was, in fact, an outline of the Middle East.

An Air Force colonel who testified at the trial created the false impression that military officials were in agreement that the sketch represented a hangar, the government now says. And a C.I.A. official showed the sketch to various experts who doubted it was significant.

Prosecutors contended that another sketch showed a Jordanian military hospital. At trial, defense lawyers had asked for any photographs taken by the government of the hospital. Two government witnesses suggested such photographs had not been taken. But the government said Wednesday that the prosecutors did have photographs.

"It is difficult, if not impossible, to compare the day planner sketches with the photos and see a correlation," the government said.

Another piece of evidence was a videotape of what looked like tourist footage. Prosecutors contended at trial that it was interspersed with potential targets, including the MGM Grand Hotel. But prosecutors failed to reveal that F.B.I. agents disagreed the video was surveillance footage.

"Under the court's established protocol, the government should have brought this information to the court's attention," the government said.

Mr. Elmardoudi and Mr. Koubriti, who were convicted on the terror charge, remain in custody. Mr. Hannan, convicted of document fraud, was released to a halfway house this year. The government said that it would recommend Mr. Koubriti be released to a halfway house.

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

**The New York Times**

GARDEN STATE
NOW PLAYING IN THEATERS

August 11, 2004

ON EDUCATION

# Challenging Lawyers' Training, and Finding Some Ethics

### By SAMUEL G. FREEDMAN

In the Polish city of Radom, back before World War II, Norman Rosenbaum practiced law. Then the Germans invaded and under their statutes stripped Jews of their rights and ultimately shipped them to death camps. By the time Mr. Rosenbaum emerged from Bergen-Belsen and made his way to America, he had lost faith in two former certainties: God and the law.

So perhaps it was destined that his son, Thane, would grow into a very dissident sort of lawyer. At first, he did all the things an ambitious, aspiring lawyer was supposed to do - editing the law review in law school, clerking for a federal judge, winning an associate's position with the prestigious Manhattan firm of Debevoise Plimpton. After just three years, however, he quit.

He wrote several novels and collections of short stories, most recently "The Golems of Gotham," all of them shadowed by the Holocaust. He became a professor at Fordham University Law School, teaching courses not in evidence or contracts or the usual staples but human rights, law and literature, and legal humanities.

And several months ago, the lawyer and the author in him collaborated on a jeremiad against the legal profession titled "The Myth of Moral Justice."

The book contends that from law school on through their careers, lawyers are so imbued with the concepts of serving a client in an adversarial arena ("zealous advocacy," in legal parlance) and unemotionally evaluating facts and rules ("thinking like a lawyer," as the phrase goes) that they fail to answer to any overarching sense of right and wrong.

"These ideas are very foreign to lawyers," Mr. Rosenbaum put it in a recent interview. "They haven't been trained to think in moral terms.

Starting in law school, they learn the conventional paradigm in which the legal profession is detached and withdrawn. It's the cold, rigid, mechanical application of rules. The legal profession is about functioning as the reasonable, objective man, as opposed to asking what is just."

Any accredited law school must provide instruction in ethics, most often in a stand-alone course. These classes typically explore issues such as lawyer-client privilege, confidentiality, conflict of interest and obstruction of justice.

Mr. Rosenbaum, in contrast, wants to remake the very essence of the profession and its education system. Lawyers would seek reconciliation rather than conquest, and courtrooms would serve as forums for aggrieved parties cathartically to tell their stories rather than pursue monetary settlements.

With that sweeping critique, more in the style of Old Testament prophet than a contemporary reformer, Mr. Rosenbaum has accomplished what multitudes of professors long for and so rarely achieve: He has set the terms of public debate.

Reviewers in both The Washington Post and The New York Times, while disputing a number of Mr. Rosenbaum's proposals for change, recommended that "The Myth of Moral Justice" be taught in every law school in the country.

Both the American Bar Association Journal and Legal Affairs magazine devoted lengthy essays to wrestling with Mr. Rosenbaum's thesis.

And at lunchtime one Wednesday in late July, Mr. Rosenbaum appeared amid the deli delivery men 10 floors above Park Avenue at the reception desk of Pryor Cashman Sherman & Flynn. Like several other firms in New York and Washington, this one had asked Mr. Rosenbaum to address its lawyers.

However radical his position, however long his cascading brown locks, he remained part of the tribe, with an insider's acute sense of exactly where to find the vulnerable part of the lawyer's psyche.

Mr. Rosenbaum took his seat at the cherry-wood table of Pryor Cashman's conference room, a place designed for civility with its Japanese woodcuts and sound-absorbent wall fabric. Around him, in cufflinks and cravats or dress-down oxford shirts, there gathered 15 lawyers, more than a tenth of the firm's complement. The next hour and a half was not going to be billed to any client.

"We're here to ask whether there is a spiritual void in this law firm," said Selig D. Sacks, a member of the firm's executive committee, who had arranged the session. When the laughter quieted, he went on more seriously. "What does the way law is administered in this country say about us? What does it say about the way justice is dispensed?" For his part, Mr. Rosenbaum invited the assemblage "to challenge the book's claims and presumptions."

They did something more fascinating and complex than that. For the next 90 minutes, the Pryor Cashman people spoke not only as the lawyers they are but as the comparative literature professors and concert pianists they had been, and as closet idealists prodded into inquiry. Amid knowing references to Moses and Jonathan Swift, they revealed their own moral dilemmas.

Bill Levine, a partner, recalled his experience in a previous firm of having resigned the assignment of representing a pajamas manufacturer that used flammable fabric. "I was severely chastised by several partners," he added.

Richard Frazier, a partner in corporate law, remembered his unease in an earlier job representing Swiss banks against the claims of Holocaust survivors. Ira Goldstein, a senior lawyer in the corporate department, talked about his former specialty in helping "highly profitable corporations become more highly profitable" by laying off workers. He tried to take solace in asking his client to offer ample severance pay.

"But what are we going to say to the client who says, 'Let me get this straight? I'm paying you $450 an hour to have a debate over the morality of what I do?' " asked Steve Goodman, a partner and the most skeptical listener in the room. "Should I say, 'Raise my rate to $750 an hour and we can drop the morality?' "

Mr. Rosenbaum did not expect instant conversions, much less wholesale reform of the profession or legal education.

"If any individual at any time of the day asks how they stand against the moral criteria of the book," he said later, "it's a huge achievement."

He got just such an achievement from Mr. Frazier near the end of the session. "When I went to law school, I didn't intend to have 'lawyer' on my tombstone someday," he said. "Because I knew what I was leaving behind - the ethics class in my philosophy major."

E-mail: sgfreedman@nytimes.com

The New York Times



June 21, 2004

# Starting Over, 24 Years After a Wrongful Conviction

**By JOHN M. BRODER**

**P**ASADENA, Calif., June 20 - Over the many long years in prison, Thomas Lee Goldstein's sense of disbelief, his bitterness at the judicial system, even his revenge fantasies slowly faded, leaving only a feeling of numbness and a grim patience.

He screamed his innocence to an unhearing world until finally one judge, then another, then another - five federal judges in all - agreed that he had been wrongly convicted of murder in 1980 and ordered him set free late last year. Even then, local authorities kept him locked up for four more months before turning him loose on April 2, more than 24 years after he was first picked up for a murder that it now seems clear he did not commit.

He emerged from the black hole of the California prison system on a Friday afternoon in a white-and-yellow jail jumpsuit, his feet in cheap slippers and his pockets empty, a white-haired man of 55. His first stop was at a Veterans Administration office in Los Angeles, hoping to get some clothes, a little money, a place to live. But the V.A.'s computers were down and officials could find no record of Mr. Goldstein's three years in the Marine Corps. He drove away with his lawyer, homeless and still empty-handed.

On his first night of freedom since November 1979, Mr. Goldstein's lawyer, Ronald O. Kaye, took him to a Mexican restaurant in Boyle Heights, east of downtown Los Angeles, where he had a big plate of chicken enchiladas and his first beer in a quarter-century, a Bohemia.

The next morning, Mr. Goldstein said in an interview at Mr. Kaye's offices in Pasadena: "I called up an old girlfriend hoping for a day of wild sex. Of course she wasn't home, so I went to the law library instead."

Mr. Goldstein, whose dark hair has turned white and whose slight build has slid into a middle-aged paunch, told his story in the language of the trained legal investigator that he has become.

He said that he survived his years in a succession of California prisons, from San Quentin to Folsom to the maximum-security lockup at Tehachapi, with a combination of Transcendental Meditation and a return to his Jewish roots. While in prison, he had a Star of David tattooed on his forearm. He said he observed the High Holy Days and on several occasions he led Passover dinners with three or four fellow Jewish fellow prisoners, sharing a single Haggadah.

Mr. Goldstein, a native of Kansas and Texas who drifted out to California in the 1970's, spent countless hours in prison law libraries, eventually earning a paralegal certificate. He filed repeated habeas corpus petitions, first on his own, later with the help of public defenders, until in 1996 a federal judge agreed to hold a hearing on his case.

In 2002, Magistrate Judge Robert N. Block delivered a lengthy opinion stating that Mr. Goldstein had been wrongly convicted and ordered him released. Judge Dickran Tevrizian of Federal District Court in Los Angeles and a three-judge panel of the United States Court of Appeals for the Ninth Circuit later affirmed his opinion.

The case arose from the shotgun killing on Nov. 3, 1979, of John McGinest in an alley in Long Beach near where Mr. Goldstein was living in an unheated $85-a-month garage. At the time, Mr. Goldstein said, he was an engineering student at Long Beach City College and drinking heavily. He had three arrests for disturbing the peace and public drunkenness, but no record of violence.

The police came to his residence two weeks after the crime to interview him and conduct a search. Although they found no forensic evidence linking him to the shooting, they arrested him and administered a polygraph exam, which was inconclusive. Nonetheless, they charged him with the murder based on what was later - years later - shown to be tainted testimony.

Mr. Goldstein's central contention was that the two chief witnesses against him - a jailhouse snitch named Edward Fink and a supposed eyewitness to the 1979 murder in Long Beach named Loran Campbell - had testified falsely at his 1980 murder trial, which lasted barely a week.

Both have since died, but Mr. Goldstein was able to establish conclusively that Mr. Fink, a habitual criminal, heroin addict and serial liar, had fabricated his account of Mr. Goldstein's "confession" to him when they were together briefly in a Long Beach police holding pen. Mr. Fink said on the stand at Mr. Goldstein's trial that he was receiving no benefit or leniency in exchange for his testimony, a statement that bolstered his credibility with the jury but that was flatly untrue, according to court documents. Mr. Fink became a central figure in a later grand jury investigation into the misuse of informant testimony in numerous criminal trials in Los Angeles County.

Mr. Campbell's testimony was the other key to Mr. Goldstein's conviction, the courts later found. He testified at trial that he saw Mr. Goldstein shoot the victim, but two years ago he recanted his testimony, saying he had been overeager to help the police and had been prompted in his identification of Mr. Goldstein by investigators. Other witnesses to the crime gave conflicting accounts, but none positively identified Mr. Goldstein as the shooter.

Mr. Goldstein was sentenced to 25 years in prison, plus two years for using a gun in a felony. A state appeals court affirmed the verdict after a relatively brief hearing.

Mr. Goldstein said that from the time of his arrest to his conviction nine months later he never believed he would be found guilty. He said that he wanted the proceedings speeded up to bring a quick end to his nightmare. "I just felt let's get this over with," he said. "I thought they'd give me a second polygraph and that would be the end of it."

But, he said: "Not only did no one believe what I said, but the police were putting words into witnesses' mouths. It was just a betrayal of trust by municipal and county employees."

He said that his mother, who still lives in Kansas, never believed he was guilty, but that he stopped corresponding with her and other members of the family after about five years in prison. "I got kind of depressed and I cut them all loose," he said. "It was very, very difficult on me and I just didn't want to deal with it."

Mr. Goldstein says he does not harbor dreams of revenge, but rather of holding the system that so

betrayed him accountable. He spends his days as a paralegal at the small Pasadena law firm of Hadsell & Stormer and working with Mr. Kaye on a damage claim against the authorities who took his freedom.

Mr. Kaye said he had not yet decided how large that claim would be.

"How do you really evaluate in financial terms what 24 years of life are worth?" Mr. Kaye said. "He was locked up from age 30 to 55. He didn't have a chance to find a wife, have children, build a career. He is a talented legal researcher, a talented draftsman. I ask you, is $25 million enough? Is $50 million enough?"

Mr. Goldstein said his "sustaining fantasy" in prison was of a farm in Kansas, far from the confining gray walls of prison and the back streets of Long Beach.

"I dream of owning a large plot of land in the Midwest with a house and a dog and huge field of flowers and a grassy area," he said. "I want to just sit back there and look at the fields and fields of nothing, the antiprison."

Copyright 2004 The New York Times Company | Home | Privacy Policy | Search | Corrections | Help | Back to Top

**The New York Times**



June 12, 2004

# Hearing Ordered on Charge That I.R.S. Influenced Jury

By DAVID CAY JOHNSTON

A federal appeals court ordered a hearing yesterday into a Nevada couple's claim that Internal Revenue Service agents and Justice Department lawyers in a courtroom audience "glared" at jurors in a successful effort to intimidate them into reaching a guilty verdict.

The hearing could lead to the overturning of the tax evasion convictions of Dr. Martin P. Rutherford, a Reno chiropractor, and his wife, Nanja. Pending appeal, their sentences of five months in prison each and payment of $141,815 in restitution for taxes owed in 1992 and 1993 have been stayed.

Dr. Rutherford said, "Nine to 15 I.R.S. agents and Justice Department people sat in on our trial, which lasted 19 days, and then under oath some of them initially denied they had been there. Then they changed their story a bit to say they were there for training."

Dr. Rutherford said he and his wife were not tax protesters. He said they had retained a lawyer whose tax advice they followed only to learn later that he was not a lawyer. He said they then hired proper counsel but that the I.R.S. seized more money from their bank accounts and from insurance payments for treating patients than the couple owed in taxes.

The Rutherfords asked the original trial judge, Edward C. Reed of Federal District Court in Reno, to set aside the verdict because they said the government agents intimidated the jurors.

During a hearing, the government officials denied glaring or seeking to influence the jury. An I.R.S. agent, Dick Stettlebeam, who was in the jury pool until he was dismissed, and others said they attended the trial as part of their training. Dr. Rutherford said he accepted that assertion as accurate.

The hearing came about because jurors submitted affidavits stating that jurors discussed the prospect of retaliation by the I.R.S. if the jury acquitted the Rutherfords.

One juror, Vicki Walker, wrote that "several jurors discussed the power of the I.R.S., the treatment of Dr. Rutherford and his wife by certain I.R.S. auditors and the possibility of retaliation on the part of the I.R.S."

Graham Hartung, another juror, added that "there was also some discussion as to possible retaliation against jurors by certain I.R.S. auditors and the fact that given the behavior of the I.R.S. in the Rutherford matter the I.R.S. would be able to make it very difficult for individuals to cross them."

Judge Reed, after the hearing, concluded that the I.R.S. and Justice Department agents did not intend to influence the jury.

A three-judge panel of the United States Court of Appeals for the Ninth Circuit reversed that finding

yesterday and said the wrong legal standard was applied.

The issue, Judge Stephen Reinhardt wrote, is whether the jurors had reason to believe they were being _____ by the government or its agents.

Because of ___ perceptions about the power of government officials, and the actual power they wield, Judge Reinhardt wrote, "we have held that even seemingly innocuous conversations and contact _____ _____ ___ _____ ___ a "suggestion of corruption of prejudice" against defendants.

The appellate court did not conclude that the jury had been influenced. Instead, it ordered a broader hearing and directed Judge Reed to reinstate or vacate the convictions based on whether he found that the government influenced the jury's verdict, even unintentionally.

Dr. Rutherford said he thought Judge Reed had been careful and fair in the trial and that he expected the government could now move to drop the prosecution. "That it took 19 days of trial over whether two tax returns were filed shows how complicated the government's case was," he said.

Robert E. Lindsay, the prosecutor, said he was not authorized to comment. Government offices were closed yesterday because of the funeral of former President Ronald Reagan and efforts to reach I.R.S. representatives were unsuccessful.

_____ _____ _____ _____ _____ _____ | Search | Corrections | Help | Back to Top

washingtonpost.com

# Lawyer Is Cleared Of Ties to Bombings

FBI Apologizes for Fingerprint Error

By Susan Schmidt and Blaine Harden
Washington Post Staff Writers
Tuesday, May 25, 2004; Page A02



A federal judge yesterday cleared Oregon lawyer Brandon Mayfield of any connection to the March terrorist bombings in Madrid, saying the FBI had erroneously matched his fingerprint to a latent print found on a bag of bomb detonators shortly after the attack.

The FBI apologized to Mayfield and his family "for the hardships that this matter has caused." It blamed the error on similarities between the fingerprints and the poor quality of digital fingerprint images provided by Spanish authorities.

According to the U.S. attorney in Portland, Ore., four FBI fingerprint examiners and an independent expert hired by Mayfield's lawyer had agreed that the print belonged to Mayfield, 37. But Spanish officials, who had been doubtful of the fingerprint match, announced last week that the print belongs to an Algerian man, prompting the FBI to review its findings and agree it had erred.

The FBI said it will review its guidelines for handling fingerprint images and will ask an international panel of fingerprint experts to examine its work in the case.

Mayfield, speaking to reporters in Portland, said that what happened to him "shouldn't happen to anybody, at least in the manner it happened to me."

"This has caused a lot of trauma to myself and to my family," he said. "I am two or three days out of the detention center, and I am just now starting to not shake."

Mayfield was arrested on a material witness warrant May 6 and jailed for two weeks. He was released from custody Thursday but remained a material witness until U.S. District Judge Robert Jones yesterday ordered all proceedings dropped. Jones instructed authorities to return Mayfield's seized property and destroy all copies of documents they took from him.

The March 11 train bombings in Madrid killed 191 people and injured 2,000. Spanish investigators have blamed the blasts on Islamic militants tied to al Qaeda.

The print was found on a bag left in a van near a train station where three of the four bombed trains originated. Spanish police sent copies of it to other law enforcement agencies, and the FBI, after making the apparent match, put Mayfield under surveillance. He was rushed into federal custody May 6 when word leaked to the media, prompting the federal court in Portland to issue a gag order on all parties in the case.

washingtonpost.com: FBI Cleared of Ties to Bombings    Page 2 of 2

U.S. Attorney Karin Immergut said in a motion dropping the case that "facts developed during the preliminary stages of the investigation, when coupled with the fingerprint identification, suggested that Mayfield may have information relevant to the Madrid bombings." But without the fingerprint match, authorities concluded, there is no probable cause to believe Mayfield has any such information.

Mayfield's only known link to Islamic extremists involved his work in a child custody case for a Portland man convicted of attempting to get into Afghanistan to fight U.S. troops. Mayfield is a convert to Islam, but Immergut said at a news conference that his detention "was not based on his religious beliefs."

The FBI statement said two fingerprint examiners were dispatched to Madrid when Spanish authorities alerted the Bureau to "additional information that cast doubt on our findings." There they compared the image the FBI had been given to the image Spanish police had.

They determined that the FBI identification was based "on an image of substandard quality," complicated by a "remarkable number of points of similarity" between Mayfield's prints and the latent print obtained by Spanish police.

Minutes of court proceedings unsealed yesterday show that last Wednesday, a fingerprint expert chosen by Mayfield's lawyers confirmed in his testimony the fingerprint match.

The next day, as the Spanish police issued their conclusions, Mayfield was ordered released from jail. The court said then that he remained a material witness; he was placed under court supervision and prevented from leaving the state.

*Harden reported from Seattle.*

© 2004 The Washington Post Company

| Results matter. | CCFA | Iran Earthquake Relief |
|---|---|---|
| Your investment in United Way has the power to get results. | Help us cure Crohn's & Ulcerative Colitis. Learn about these diseases. | Help the 20k+ victims. Your financial support will save lives. |

**washingtonpost.com**

# Judge Cites Prosecutors' Error in Adelphia Case



From News Services
Tuesday, March 16, 2004; Page E02

NEW YORK, March 15 -- The federal judge in the corporate fraud trial of the Rigas family said Monday that the government had made "an egregious error" in the presentation of its case and said he would consider how to respond if the defense made a motion for a mistrial.

The issue arose as defense lawyers continued to attack the testimony of former director Dennis Coyle about his knowledge of the compliance of cable television company Adelphia Communications Corp. with agreements for syndicated loans taken jointly by the company and Rigas family businesses.

Coyle initially testified that Adelphia -- which was controlled by the Rigas family -- and the family businesses faced separate tests for their compliance with debt to operating cash flow ratios and that the Rigas entities didn't comply with the terms. He based that on term sheets that described the loans, not on the final agreements.



After reviewing the actual loan agreements on Thursday, Coyle said he was mistaken and the ratios that governed compliance required combining debt and cash flow for Adelphia and the family businesses.

In arguments before U.S. District Judge Leonard Sand on Monday, Peter Fleming, attorney for John J. Rigas, said he may ask the judge to declare a mistrial because prosecutors failed to show Coyle the correct documents.

"The fact that the government made what appears to be a very egregious error is very unfortunate and appears would be dealt with in a motion for a mistrial," Sand said. The judge said he was not commenting on the merits of such a motion.

In testimony Monday, actress Peta Wilson, who starred for five years in USA Network's spy thriller, "La Femme Nikita," told federal jurors that she took at least nine flights on Adelphia planes, including trips to Jamaica and Los Angeles with former finance chief Timothy J. Rigas.

Timothy Rigas, 47, is accused with his father, John, and brother Michael of looting Adelphia, the No. 5 U.S. cable television operator, and engaging in accounting fraud.

Prosecutors allege the Rigases hid billions of dollars of debt before Adelphia's 2002 bankruptcy, stole $100 million and lied about company finances and operations.

© 2004 The Washington Post Company

washingtonpost.com: Prosecutors Err in Adelphia Case

| David Finn | Flamm on Judge Recusal | San Diego Consumer Lawyer |
|---|---|---|
| Former Dallas Criminal Judge Board Certified Criminal Defense | Books on Judicial Disqualification Other Books by R. Flamm, Esq. | Former Government Attorney Since 1971. A Law Firm that Cares! |

**washingtonpost.com**

# Justices Question Officials' Conduct
Tex. Execution Hinges on Trial Fairness

By Charles Lane
Washington Post Staff Writer
Tuesday, December 9, 2003; Page A02


▼ADVERTISING

Supreme Court justices expressed concern about Texas law enforcement's conduct in a two-decade-old capital murder case, as the court heard oral arguments yesterday on Delma Banks Jr.'s bid to escape execution for the murder of a 16-year-old boy in Texarkana in April 1980.

Banks was convicted in 1982, largely on the strength of testimony from two associates with long criminal records. But his lawyers say police paid one of the witnesses for his information and coached the other -- and withheld these facts from the jury and Banks's attorneys, even after the witnesses falsely denied them.

"There is clearly a pattern of misconduct by the government in this case," Banks's lawyer George H. Kendall told the court yesterday.

Texas says its case against Banks was strong, that his lawyers failed to raise those claims through years of appeals -- and that he would have been convicted and sentenced to death even if the jury had known the full story.

But several justices bristled when Assistant Texas Attorney General Gena Bunn made those arguments in court yesterday.

Justice Ruth Bader Ginsburg asked, "Why isn't it the prosecution's burden to come clean . . . rather than let this falsehood remain in the record?"

Bunn replied that, in an appeal based on constitutional objections to the fairness of a defendant's trial, it is up to the defendant to prove government wrongdoing.

Conservative as well as liberal justices seemed to have trouble with Bunn's arguments.

"Do you want us to say that the defendant relies at his peril on the representations of the state?" Justice Anthony M. Kennedy asked.

Banks lost all of his appeals in state courts, but in 2000 a federal district judge in Texas overturned his death sentence.

Two years later, the New Orleans-based U.S. Court of Appeals for the 5th Circuit reinstated the sentence, ruling that the state's mistakes did not alter the outcome of Banks's sentencing hearing.

Banks's supporters argue that the Supreme Court's decision to intervene is an implicit rebuke to the 5th Circuit, which is in charge of making sure that the death penalty is applied constitutionally in Texas,

Louisiana and Mississippi -- and rarely rules in favor of defendants.

In February, the court ordered the 5th Circuit to redo its decision in another high-profile Texas death penalty case, ruling that the case might have been tainted by racial bias in the jury-selection process.

Among those who filed friend-of-the-court briefs supporting Banks are former FBI director and federal judge William S. Sessions and the American Bar Association.

The Banks case began in April 1980, when police found 16-year-old Richard Whitehead shot to death in a park. Whitehead, who was white, was last seen alive in the company of Banks, who is African American.

Charles Cook of Dallas told the all-white jury at Banks's trial that Banks told him of the shooting and asked him to dispose of the getaway car and the murder weapon. Though he denied being coached by police, a 74-page transcript of his preparation later surfaced.

At the sentencing hearing, Robert Lee Farr testified that Banks had asked him to retrieve his gun from Cook so that they could commit armed robberies. The testimony helped the state establish that Banks would be a danger in the future, without which he could not be sentenced to death.

Farr told the jury he had received no inducements to testify, but it later emerged that the local sheriff had paid him $200.

The case is *Banks v. Dretke*, No. 02-8286. A decision is expected before July.

© 2003 The Washington Post Company

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY



December 9, 2003

# Man on Death Row 24 Years Seems to Gain Before Justices

**By LINDA GREENHOUSE**

WASHINGTON, Dec. 8 — Delma Banks Jr., a Texas death row inmate, lay strapped to a gurney barely 10 minutes before execution last March when the Supreme Court granted him a stay in order to hear his claim that prosecutorial misconduct rendered his murder conviction and death sentence unconstitutional.

Mr. Banks, the longest-serving of 453 prisoners on Texas' death row, has had 15 execution dates in the nearly 24 years since he was sentenced to die at age 20 for killing a 16-year-old acquaintance and stealing his car. Given the justices' reactions on Monday to the arguments in his Supreme Court appeal, it is unlikely that he will face an execution date again in the near future.

The court appeared strongly inclined to set aside at least the death sentence, if not the conviction itself, in a case that death penalty opponents have cited as an example not only of what can go wrong in a capital prosecution but also of what they deem the casual attitude that the federal appeals court with jurisdiction over Texas has adopted toward the capital cases it reviews.

The Federal District Court in Texarkana granted Mr. Banks a writ of habeas corpus and overturned his death sentence, but the United States Court of Appeals for the Fifth Circuit, in New Orleans, reversed that decision with a 78-page opinion marked "not for publication," a designation most courts reserve for cases that involve straightforward applications of law with little consequence to anyone beyond those directly involved.

In Mr. Banks's habeas corpus petition, his lawyers demonstrated that the prosecution had withheld from the defense and the jury the knowledge that its main witness, who gave damaging evidence at the sentencing hearing, was a paid police informant. The defense maintained that this knowledge would have substantially undermined the man's credibility.

Another main prosecution witness lied when he said he had spoken to no one in advance about his courtroom testimony. That lie was uncovered only in 1999, when Mr. Banks's defense team obtained a transcript of the witness's pretrial interview with law enforcement officials, in which he was coached in what to say.

During Monday's arguments, the state's lawyer, Gena A. Bunn, chief of the Texas attorney general's capital litigation division, acknowledged errors in the prosecution's handling of the case but said they were not "material," because, she maintained, they would not have led to a different verdict had they been known to the jury. In any event, she said, the Banks defense team failed to uncover and present evidence of those errors in a timely manner. "There was an obligation for them to pursue their claims further," she said.

Several justices challenged Ms. Bunn on those points. "Why wasn't it the obligation of the prosecution,

having deceived the jury and the court, to come clean?" Justice Ruth Bader Ginsburg asked Ms. Bunn. "I just don't understand," Justice Ginsburg continued. "The prosecution was best situated to know what happened."

Justice Stephen G. Breyer took up the challenge. "What bothers me about your position," he told Ms. Bunn, "is that if we were to say that defense counsel behaves unreasonably if he relies on the prosecution, that's to say that the justice system lacks integrity, and indeed it might contribute to that lack of integrity."

One of the witnesses, Robert Farr, answered "no" during the trial to the question "Have you ever taken any money from some police officers?" In fact, the police had paid him $200 to assist them in locating the gun that was linked to the crime. Suspecting that Mr. Farr was an informer, the Banks lawyers included such an allegation in their habeas corpus petition, to which the state responded by denying all allegations in the 145-page petition.

"So the prosecution can lie and conceal, and the defense still has the burden to discover the evidence?" Justice Anthony M. Kennedy asked in a tone of incredulity.

Even Justice Antonin Scalia, who challenged Mr. Banks's lawyer, George H. Kendall, on several points and tried to be helpful to Ms. Bunn, appeared persuaded that the appeals court's decision could not stand. Justice Scalia portrayed as at least doubtful the appeals court's ruling on an important procedural point: that the prosecution's failure to disclose the existence of the 74-page pretrial-interview transcript could not be challenged at the habeas corpus stage because it had not been part of the initial appeal. "There are a lot of questions on that part of the holding," he said.

The case, Banks v. Dretke, No. 02-8286, reached the Supreme Court against a backdrop of increasing concern about the death penalty in Texas, which has accounted for more than one-third of all executions in the country since 1976, including 23 of 63 this year.

Earlier this year, with only Justice Clarence Thomas dissenting, the court ordered a new sentencing hearing for another Texas death row inmate, Thomas Miller-el, and rebuked the Fifth Circuit, describing it as overly deferential to the state courts. "Deference does not imply abandonment or abdication of judicial review," Justice Kennedy said in that decision, Miller-el v. Cockrell.

In the Banks case, the justices may have been persuaded to issue the last-minute stay by the intervention of a group of retired federal and state judges and prosecutors, who filed an unusual "friend of the court" brief in support of the stay application. The group subsequently filed a more extensive brief supporting the appeal on its merits.

Those who signed the brief included Harold R. Tyler Jr., a former federal district judge who was deputy attorney general during the administration of President Gerald R. Ford; William S. Sessions, former director of the Federal Bureau of Investigation and also a former judge; and John J. Gibbons, a retired chief judge of the United States Court of Appeals for the Third Circuit, to which he was appointed by President Richard M. Nixon.

"We are not a bunch of left-wing kooks trying to undermine the social order in the state of Texas," Judge Gibbons said last week.

Copyright 2003 The New York Times Company | Home | Privacy Policy | Search | Corrections | Help | Back to Top

*boston*.com

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# Drumgold says he has no anger against prosecutors for flawed murder case

*Associated Press*

**By Theo Emery, Associated Press, 11/10/2003**

BOSTON -- When Shawn Drumgold was released from prison last week, he found the city he knew had changed almost beyond recognition. He's surrounded by relatives he didn't have when he went to prison in 1989, and he's found himself befuddled by the technology of cellular phones.

Drumgold, now 36, said Monday that he bears no ill will toward prosecutors who put him in prison for almost 15 years for a crime he says he did not commit, and said that for now he wants to concentrate on his family and his future.

"I'm ready to start my life, because if I stay stuck in the past, then I won't ever be able to move on. So I'm ready to move on," he said at a press conference, flanked by his attorney, mother and supporters.

Drumgold was sentenced to life in prison in 1989, the year after 12-year-old Darlene Tiffany Moore was shot while sitting atop a mailbox in the city's Roxbury neighborhood. He has consistently denied any connection with the killing.

"I hope in some way or another that the wrong will be corrected, because there's a lot of other people that's incarcerated in my same position that don't have opportunity like I have," said Drumgold, who was released Thursday.

A six-day hearing in July and August raised questions about Drumgold's trial, and Suffolk District Attorney Daniel Conley's office filed a motion last week asking that Drumgold's conviction be reversed, citing new evidence and flaws in the original case.

Prosecutors did not say that Drumgold was innocent, and refused to apologize for his conviction.

His attorney, Rosemary Scapicchio, called the lack of an apology "insulting. She joined with other attorneys in calling for a commission to review Drumgold's case and others like it.

"Without finding out the why, and the how, we can't prevent it from happening again," she said.

A spokesman for Conley could not immediately be reached for comment.

© Copyright 2003 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# Drumgold says he has no anger against prosecutors for flawed murder case

*Associated Press*

**11/10/2003**

BOSTON -- When Shawn Drumgold was released from prison last week, he found the city he knew had changed almost beyond recognition. He's surrounded by relatives he didn't have when he went to prison in 1989, and he's found himself befuddled by the technology of cellular phones.

Drumgold, now 36, said Monday that he bears no ill will toward prosecutors who put him in prison for almost 15 years for a crime he says he did not commit, and said that for now he wants to concentrate on his family and his future.

"I'm ready to start my life, because if I stay stuck in the past, then I won't ever be able to move on. So I'm ready to move on," he said at a press conference, flanked by his attorney, mother and supporters.

Drumgold was sentenced to life in prison in 1989, the year after 12-year-old Darlene Tiffany Moore was shot while sitting atop a mailbox in the city's Roxbury neighborhood. He has consistently denied any connection with the killing.

A six-day hearing in July and August raised questions about Drumgold's trial, and Suffolk District Attorney Daniel Conley's office filed a motion last week asking that Drumgold's conviction be reversed, citing new evidence and flaws in the original case.

Prosecutors did not say that Drumgold was innocent, and refused to apologize for his conviction.

His attorney, Rosemary Scapicchio, called the lack of an apology "insulting. She joined with other attorneys in calling for a commission to review Drumgold's case and others like it.

A spokesman for Conley could not immediately be reached for comment.

------

Tellers describe Sampson robberies before killing spree

BOSTON (AP) -- Amanda Laws was 7 1/2 months pregnant the first time a man walked into her bank and calmly ordered her to fill a plastic grocery bag with cash.

Exactly two weeks later, Laws looked up and saw the same man in her teller's line again. This time, he wasn't so calm.

"No funny business," the man yelled, according to Laws. "I'll blow your (expletive) head off. I do not care."

Laws later identified the robber as Gary Sampson, who allegedly carried out a string of bank robberies in North Carolina in 2001, weeks before going on a murderous rampage in Massachusetts and New Hampshire.

Laws was one of four bank tellers who testified Monday before a federal jury that will decide whether Sampson should receive the death penalty for two of the three murders.

Through the tellers' testimony, prosecutors sought to show evidence of Sampson's increasingly violent behavior in the months before he killed 69-year-old Philip McCloskey, of Taunton, and 19-year-old Jonathan Rizzo, of Kingston, in July 2001.

Sampson has pleaded guilty to the two murders, and the jury must now weigh whether to give him the death penalty or life in prison.

------

Suit challenges legislative redistricting

BOSTON (AP) -- Attorneys for minority activists claimed Monday in federal court that the way several legislative districts in Boston and neighboring Chelsea were redrawn was illegal and unconstitutional.

Their lawsuit claims, among other things, that some of the Suffolk County districts were packed with minority voters, while minority voters were drained away from others, making them more favorable for white candidates.

Attorney Richard Belin said changes to districts in Boston had dealt black and Hispanic voters a "setback of

diluted and diminished voting power." '.

But Steven Perlmutter, representing the state, defended the redistricting plan as fair.

"The evidence will show that the opportunity to participate in the political process and elect representatives of choice ... is wide open, wide open for all," he said.

The case, which alleges violations of the federal Voting Rights Act and the Constitution, is being heard by a three-judge panel in U.S. District Court. It was expected to resume on Thursday.

------

Some say stale pricing the real issue in mutual fund world

BOSTON (AP) -- Regulators may be cracking down on the mutual fund industry. but some people think they're missing the forest for the trees.

The string of allegations against Putnam Investments and employees at several firms has turned "market timing" into the financial industry's latest dirty word. But some want the spotlight on another term -- "stale pricing" -- which they believe is the real source of the $7 trillion mutual fund industry's woes.

In short, stale pricing -- the fact that many mutual fund prices are adjusted just once a day, and may not reflect the true value of their underlying assets -- is the reason market timing is a temptation in the first place.

"The SEC has consistently ignored that problem over a number of years," said Mercer Bullard, a former Securities and Exchange Commission official who now heads the Oxford, Miss.-based watchdog group Fund Democracy.

Market timing is a nebulous and even misleading term that refers to trading quickly in and out of mutual funds. It isn't illegal, though many companies discourage or prohibit it. Regulators aren't going after market timing per se; instead, they're alleging fraud by the fund companies for turning a blind eye to the practice, or by individual employees for using deception to skirt the fund companies' rules.

The scandals may prompt further limitations on market timing by regulators and fund companies, whose tools for discouraging the practice include charging stiff fees for frequent fund redemptions.

------

Child killed, four others injured in Taunton car accident

TAUNTON, Mass. (AP) -- Police say charges are likely after a preliminary investigation found the uncle of a toddler killed in an automobile accident ran a red light and that no car seats were in the vehicle.

Police Chief Raymond O'Berg said Monday that the investigation also found that no one in the vehicle was wearing a seat belt at the time of Sunday's accident.

Jovantae Vega, who was two weeks away from his second birthday, and his 4-year-old brother Jovannie were in the back seat when another vehicle hit the rear passenger-side door, according to nursing supervisor Rosemarie Miles of Morton Hospital in Taunton. Their car then struck a third car that was stopped at the intersection.

Jovantae was pronounced dead at Morton Hospital at 6:45 p.m., less than an hour after the accident. Jovannie was flown to Children's Hospital in Boston for abdominal trouble, and was upgraded to good condition Monday, spokeswoman Bess Andrews said.

The boys' uncle, Jason Vega, was driving the car. O'Berg said an initial investigation found no use of seat

belts.

Jenili Vega of Fall River, who said she was the boys' aunt and was in the car, told reporters at the scene that the youngsters were not in car seats, but were wearing seat belts.

"We don't have car seats for them because they only come over on weekends, and their dad usually picks them up," she said.

O'Brien said charges would likely be filed in the near future. The investigation continues.

------

Doctor switches meds at mental health center to be eligible for research

BOSTON (AP) -- A doctor at a state mental health facility switched the medication of four patients without proper permission so they would be eligible to participate in a new drug study, a state investigation found.

The change in medication caused dangerous side effects in a 43-year-old man with schizophrenia who was being treated by Boston Medical Center physicians at the Solomon Carter Fuller Mental Health Center, according to findings by the Disabled Persons Protection Commission reported in The Boston Globe.

The report found the patients' medications were switched without informed consent and without a clear medical need; the changes were made more than two months before the human-studies review boards approved the research protocol; and the patients involved were clearly not eligible under the criteria for the study, which specified that subjects be outpatients.

The commission is an independent state agency that investigates alleged abuse against disabled people in Massachusetts.

One of the four patients whose medication was switched, a man who had been stable for 10 years on the drug Clozaril, became so ill and acutely psychotic that he spent months in and out of hospital wards. He was diagnosed with neuroleptic malignant syndrome, a rare, sometimes lethal side effect of medication changes, according to the commission's report.

A year ago, Janssen Pharmaceutica was preparing to introduce Risperdal Consta, a two-week injectible form of Risperdal, its drug to treat schizophrenia. Janssen asked a number of researchers -- including Dr. Domenic Ciraulo, Boston Medical Center's chief of psychiatry -- to test the transition on a total of 60 adult patients who were on oral Risperdal, said Carol Goodrich, a Janssen spokeswoman.

Each site would be paid on completion of the trial, Goodrich said. Janssen declined to reveal the amount.

© Copyright 2003 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

© Copyright 2003 The New York Times Company

**washingtonpost.com**

# Court Throws Out Former CIA Officer's Conviction After 20 Years in Prison

The Associated Press
Wednesday, October 29, 2003; 1:03 PM

HOUSTON -- A federal judge threw out the conviction of a former CIA operative who has spent 20 years in prison for selling arms to Libya, saying the government knowingly used false evidence against him.

Edwin P. Wilson, 75, was convicted in 1983 of shipping 20 tons of C-4 plastic explosives to Libya -- something he said he did to ingratiate himself with the Libyan government at the CIA's request.

In a scathing opinion released Tuesday, U.S. Judge Lynn N. Hughes said the federal government failed to correct information about Wilson's service to the CIA that it admitted internally was false.

"Confronted with its own internal memoranda, the government now says that, well, it might have misstated the truth, but that it was Wilson's fault, it did not really matter, and it did not know what it was doing," the judge wrote in a 24-page ruling.

Defense attorney David Adler said the judge's decision ultimately could free Wilson from prison. However, the ruling's immediate effect was not clear because Wilson received prison time for two other convictions -- including one for conspiring to have prosecutors killed.

The CIA declined to comment specifically on the ruling.

"The CIA didn't authorize or play any role whatsoever in his decision to sell arms to Libya," agency spokesman Mark Mansfield said. "That decision was his and that is why he went to jail."

The Justice Department will review the decision and study its options, a spokesman said. "Beyond that, there's not much that we would comment on at this point," Bryan Sierra said.

At his 1983 trial in Texas, prosecutors introduced a sworn statement from a top-ranking official that Wilson didn't do anything for the CIA after his retirement in 1971.

"It was just a flat-out lie. He did a lot," Adler said Tuesday.

Adler said the Reagan-era officials who pushed the case had been embarrassed by revelations they were trading arms for information and made Wilson a scapegoat.

"For over 20 years he's been claiming he was not some kind of rogue CIA officer and he did not get a fair trial and, of course, it turns out he was right," Adler said.

Days after his conviction, but before his sentencing, the CIA forwarded a memo to the U.S. attorney's office saying at least five projects Wilson had worked on for the CIA after 1971 had surfaced -- including a planned trip to Iran with the CIA's deputy director.

Hughes said officials failed to inform Wilson's attorneys of the memo and that in his appeal, the government failed to acknowledge that the affidavit was false and suppressed other evidence that might have helped him.

The memo and documents about later discussions were obtained by Wilson's defense under the Freedom of Information Act and through court discovery for his 1999 appeal.

Prosecutors have the option of appealing the judge's ruling or retrying Wilson. Adler said he didn't expect prosecutors to appeal, but U.S. Attorney Michael Shelby of the Southern District of Texas said his office had not made a decision.

"Obviously the charges (against Wilson) are very significant and we want to make sure we do the right thing," Shelby said in a story in Wednesday's Houston Chronicle.

Wilson, who set up front companies abroad for the CIA and posed as a rich American businessman, is serving a 52-year prison sentence in a federal prison in Allenwood, Pa.

In 1982, he was lured out of hiding in Libya and brought to New York for arrest. A federal court in Virginia convicted him of exporting firearms to Libya without permission and sentenced him to 10 years.

He was convicted in Texas in 1983, receiving a 17-year sentence for similar crimes, and a New York court sentenced him to 25 years, to run consecutively with the Texas and Virginia sentences, for attempted murder, criminal solicitation and other charges involving claims that Wilson conspired behind bars to have witnesses and prosecutors killed.

With the Texas sentence thrown out, Wilson could be eligible for parole this year or next year based on time already served in the other cases, Adler said. Wilson also could seek to have the Virginia case overturned, he said. If successful in that effort, he would probably be eligible for immediate release, he said.

© 2003 The Associated Press

Wild for wildlife?
Help ensure a future for America's wildlife.
www.nwf.org/support

MSAA needs your support
to help people with MS lead a better life. Help us today!
msaa.com

In Mississippi, Justices' Charges Lead to Inquiry Into a Colleague

**The New York Times**
nytimes.com

# In Mississippi, Justices' Charges Lead to Inquiry Into a Colleague

### By THE ASSOCIATED PRESS

JACKSON, Miss., Sept. 28 (AP) — A judicial review board has begun an inquiry into accusations against a State Supreme Court justice, including assertions that he threatened to "whip" the chief justice and intentionally delayed cases as payback.

The justice, C. R. McRae, said today that the complaint was "much ado about nothing" and called it a strong-arm tactic by the five justices who made the accusations, including Chief Justice Edwin L. Pittman.

"Justice Pittman is trying to run this court with an iron fist," Justice McRae said.

The complaint, dated Sept. 17, charged that since his election defeat last fall, Justice McRae had tried to "deliberately and maliciously bring dishonor to the Supreme Court."

It said the Mississippi Commission on Judicial Performance had begun an inquiry after Chief Justice Pittman and Justices James W. Smith Jr., William L. Waller Jr., Kay B. Cobb and George C. Carlson Jr. said Justice McRae had told them he intended to make the rest of his term as difficult as possible for the others.

The commission will hold a hearing on Oct. 20 on whether to recommend that a tribunal of judges suspend him during the inquiry.

Justice McRae, a Supreme Court judge since 1991, finished third in a three-way race last fall. His term ends in January.

The complaint said Justice McRae had threatened the chief justice, saying he would "whip" him.

The complaint also accused Justice McRae of saying he intended to delay the cases of Justice Smith and of failing to recuse himself in cases involving family.

Justice McRae said he would not comment on the charges. But he accused the five justices of meeting to decide cases before the entire court reviewed them.

Chief Justice Pittman said that the court had never done business outside regular meetings but that "on occasions we meet in advance for coffee or to decide what's on the agenda."

Last summer, Justice Oliver Diaz Jr. took leave from the court after fraud and bribery indictments.

Copyright 2003 The New York Times Company | Home | Privacy Policy | Search | Corrections | Help | Back to Top



**The New York Times**
nytimes.com

August 31, 2003

# Sting Finds Officers Ignoring Complaints

**By THE ASSOCIATED PRESS**

LOS ANGELES, Aug. 30 — An independent monitor hired in the wake of a police corruption scandal has found that officers have often brushed aside complaints of misconduct.

The monitor, Michael Cherkasky, hired under a Justice Department consent decree, called the actions by Los Angeles Police Department officers and supervisors in 19 sting operations shocking and disturbing.

He found improvement in other areas, including antidiscrimination training, but his quarterly report, posted on the department's Web site, says supervisors and officers did not properly respond to complaints in 11 of the 19 operations, in which undercover officers posed as civilians.

One sergeant stonewalled an officer posing as a juvenile until 10 p.m., then held him on a curfew violation.

Chief William J. Bratton urged the stings, Deputy Chief Michael Berkow said, and has pushed to improve receptivity to complaints. A new operation found one violation in 27 stings, Deputy Chief Berkow said.

Copyright 2003 The New York Times Company | Home | Privacy Policy | Search | Corrections | Help | Back to Top