**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**RECEIVED**

MAY 1 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ANGEL RUIZ RIVERA

Petitioner

v.                                              07-0019 (EGS)(RBW)

ALBERTO R. GONSALES, et al.,

Respondents

---

## PETITIONER'S MOTION IN RESPONSE TO RESPONDENTS' MOTION TO DISMISS

TO THE HONORABLE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
(HUSDCDC):

Comes now the Petitioner, Angel Ruiz Rivera (ARR), appearing here Pro Se Ipso, and

respectfully states, alleges and prays as follows:

1. On January 3, 2007, the Petitioner ARR, respectfully filed before this HUSDCDC, a

Petition for Mandamus to be issued against the U.S. Attorney General (USAG), and/or its Office

of the Inspector General (OIG), and/or its Office of Professional Responsibility (OPR) Director,

and/or other unknown U.S. Attorney's Office (USAO) attorneys.

2. It was respectfully filed based on the *fait accompli* that a Complaint timely filed by

ARR for the prosecutorial misconduct incurred into by various USAO's Attorneys, was

neglected and same misconduct was covered up by the whomever OIG, OPR, or USAO's

Attorneys in charge of the investigation of same Complaint. The cover up transpired amidst the

fact that the overwhelming, hard, objective,"smoking gun", beyond doubt, and clear and

convincing evidence produced in same Complaint clearly demonstrate, that various USAO's

Attorneys were derelict in their compliance of their ministerial and ethical duties in their

investigative role by not properly sifting the evidence produced by their client agency (the U.S. Department of Education -USDE) legal counsels against the Petitioner and the non-profit educational institution he founded and presided, (Instituto de Educacion Universal-IEU), related to pseudo-audits by the USDE's Office of the Inspector General (OIG) and its Institutional Review Branch (IRB) over the Petitioner's management of Title IV of the Higher Education Act (HEA), Student Financial Assistance Programs (SFAP's).

The alluded to Complaint also challenged the evident lack of compliance by the OIG and/or OPR and/or USAO's Attorneys with their ministerial and ethical duties by not adequately advising their client-agency legal counsels as to dropping and/or eliminating the above mentioned pseudo-audits' "findings", and their corresponding and consequential civil liabilities attached.

3. The Respondents, appearing here through various USAO's Attorneys, have filed before this HUSDCDC, an undated and evidently temerarious "Motion To Dismiss", together with an undated and also temerarious "Memorandum Of Points And Authorities In Support". That Motion and Memorandum have followed the same pattern of the cover up of the obvious and evident prosecutorial misconduct against the Duke University Lacrosse Sport players, totally unfounded and engineered by governmental attorneys who falsely accused, indicted and filed criminal charges. This malicious prosecution uncover-up have been fairly recently well published. See related article of April 12, 2007, in The New York Times, entitled: "Duke Prosecutor Throws Out Case Against Players." (Exhibit 1) It has also followed the pattern of the present U.S. Attorney General's conspiracy against various of its own USAO's Attorneys by expelling them from their tenure, for purely politically or ideologically based discriminatory reasons. See related article of April 20, 2007, In the Washington Post, entitled: "Senators

Chastise Gonsales At Hearing." (Exhibit 2).

4. The foregoing is the response by the Petitioner to the undated Motion To Dismiss and undated Memorandum in Support.

For the reasons stated in this Motion and its accompanying Memorandum, we pray that this HUSDCDC becomes persuaded that upon the set of the facts, applicable law and the exceptional and extraordinary circumstances of the instant controversy, the Respondents' Motion should be denied for reasons of Law, Equity and Justice. Instead, this HUSDCDC should grant this Petitioner's Motion in Opposition and proceed to issue a show cause order addressed to the Respondents, ordering them to produce the evidence de minimis that can persuade this forum that the Complaint claims were not neglected nor covered up, with sufficiently enough muster as to legally justify the denial of this Mandamus Petition or, in case they cannot come with same evidence, face its issuance by this forum. So we state, allege and pray.

Respectfully submitted, today May 4, 2007.

Angel Ruiz Rivera
Pro Se Ipso
P.O. Box 191209
San Juan, P.R. 00919-1209.
787-435-3512
aruizrivera@aol.com

CERTIFICATE OF SERVICE

I, Angel Ruiz Rivera, appearing here Pro Se ipso, hereby certify that I have sent a copy of this writing by priority mail of the USPS to the appearing counsel for the Respondents, Ms. Judith A. Kidwell, AUSA, 555 Fourth St., NW.-Room E4905, Washington, D.C. 20530. (202) 514-7250.

EXHIBIT 1

The New York Times

April 12, 2007

# DUKE PROSECUTOR THROWS OUT CASE AGAINST PLAYERS

**By DUFF WILSON AND DAVID BARSTOW; DUFF WILSON REPORTED FROM RALEIGH, N.C., AND DAVID BARSTOW FROM NEW YORK. BRENDA GOODMAN CONTRIBUTED REPORTING FROM ATLANTA, AND MOSI SECRET FROM DURHAM, N.C.**

North Carolina's attorney general declared three former Duke University lacrosse players accused of sexually assaulting a stripper innocent of all charges on Wednesday, ending a prosecution that provoked bitter debate over race, class and the tactics of the Durham County district attorney.

The attorney general, Roy A. Cooper, said the players -- Reade W. Seligmann, David F. Evans, and Collin Finnerty -- had been wrongly accused by an "unchecked" and "overreaching" district attorney who had ignored contradictory evidence and instead relied on the stripper's "faulty and unreliable" accusations.

"We believe that these cases were the result of a tragic rush to accuse and a failure to verify serious allegations," Mr. Cooper said at a news conference.

"We have no credible evidence that an attack occurred," he added.

Mr. Cooper said he had considered but ultimately rejected the possibility of bringing criminal charges against the accuser, who continues to insist she was attacked at a team party on March 13, 2006, and asked him to go forward with the case. Mr. Cooper said his investigators had told him that the woman "may actually believe the many different stories that she has been telling." He said his decision not to charge her with making false accusations was also based on a review of sealed court files, which include records of the woman's mental health history.

Mr. Cooper reserved his harshest criticism for the Durham County district attorney, Michael B. Nifong, at one point even depicting him as a "rogue prosecutor."

"In this case, with the weight of the state behind him, the Durham district attorney pushed forward unchecked," said Mr. Cooper, who took over the case in January. "There were many points in the case where caution would have served justice better than bravado. And in the rush to condemn, a community and a state lost the ability to see clearly."

Nevertheless, Mr. Cooper said that for now he would leave any official sanctions to the North Carolina State Bar, which has already taken the extraordinary step of formally accusing Mr. Nifong of numerous ethical violations, including withholding exculpatory evidence and misleading the judge who presided over the case. Mr. Cooper said he would instead seek new legislation to give the North Carolina Supreme Court greater power to remove prosecutors.

"We need to learn from this and keep it from happening again," he said.

At an emotional news conference of their own on Wednesday, the three former teammates, flanked by defense lawyers and families, spoke of relief and vindication, but also of their lingering anger toward Mr. Nifong and many in the news media for what they described as a rush to believe the worst about them.

"This entire experience has opened my eyes up to a tragic world of injustice I never knew existed," Mr. Seligmann said. "If police officers and a district attorney can systematically railroad us with absolutely no evidence whatsoever, I can't imagine what they'd do to people who do not have the resources to defend themselves. So rather than relying on disparaging stereotypes and creating political and racial conflicts, all of us need to take a step back from this case and learn from it.

"The Duke lacrosse case has shown that our society has lost sight of the most fundamental principle of our legal system: the presumption of innocence."

Mr. Seligmann, 21, of Essex Fells, N.J.; Mr. Evans, 24, of Annapolis, Md.; and Mr. Finnerty, 20, of Garden City, N.Y., were initially charged with rape, sexual offense and kidnapping -- crimes that could have put them in prison for three decades. The rape charges were dropped in December.

From the start, all three repeatedly proclaimed their innocence. "These allegations are lies," Mr. Evans insisted on the day of his indictment.

On Wednesday, looking a bit older but every bit as resolved, Mr. Evans looked across a roomful of reporters and said, "We are just as innocent today as we were back then."

Mr. Nifong could not be reached for comment Wednesday. But his lawyer, David B. Freedman, said Mr. Nifong was "devastated" by the attorney general's criticisms of his conduct. Mr. Freedman said that while Mr. Nifong had "no problem" with the decision to exonerate the players, he was deeply wounded by Mr. Cooper's attack on his judgment and performance.

"He's a person who has dedicated himself to public service for 29 years," Mr. Freedman said in a telephone interview on Wednesday night. "All he cares about is public service."

Mr. Nifong has denied violating any ethics rules, although he has acknowledged mishandling some evidence and making intemperate and unjustified remarks about the Duke lacrosse team. In the first weeks of his investigation, for example, Mr. Nifong told reporters he was certain that a rape had occurred and called the lacrosse players "hooligans" who were hiding behind a "wall of silence."

In fact, three co-captains, including Mr. Evans, had cooperated fully with the police. Other team members canceled interviews on the advice of lawyers. "There was never a blue wall of silence," Mr. Evans said Wednesday.

If the ethics charges against him are upheld, Mr. Nifong faces a range of possible penalties, including disbarment. A preliminary hearing Friday will decide Mr. Nifong's motion to dismiss the most serious charges.

Some parents of the players, meanwhile, have suggested that they might sue Mr. Nifong and Durham County. "All options are on the table," Joseph B. Cheshire, a lawyer for Mr. Evans, said Wednesday when asked about possible legal action against Mr. Nifong.

The accuser could not be reached for comment. Her father, a retired truck driver, said that his family continued to believe her accusations. "I think if it had gone to court, it would be a different story altogether," he said in an interview at his home on Wednesday night. "The jury would hear both sides of it. But they didn't want it to go to court. They made that clear last year."

Duke's president, Richard H. Brodhead, who weathered heavy criticism throughout the case, particularly from supporters of the three players, issued a statement welcoming the exonerations and praising the players. "They have carried themselves with dignity through an ordeal of deep unfairness," Mr. Brodhead said.

Even some community leaders who had previously argued that the case should have gone to trial did not object to Mr. Cooper's decision. The North Carolina chapter of the N.A.A.C.P. released a statement saying it respected and accepted the work of the attorney general's office. Irving Joyner, a law professor at North Carolina Central University, who had been monitoring the case for the N.A.A.C.P., echoed that theme, saying, "Based on my personal knowledge of him and high respect of him, I accept his conclusions."

Likewise, the Rape, Abuse and Incest National Network, one of the largest such groups in the nation, released a statement saying it was satisfied with the attorney general's decision to drop all charges.

With its overtones of race, sex and privilege, the Duke case instantly drew national news media attention. The accuser was a poor, black, local single mother working at an escort service while enrolled at the predominantly black North Carolina Central University in Durham; the Duke students were relatively well-off, white out-of-staters -- members of a storied lacrosse team at one of the nation's most prestigious universities. The accuser's vivid account of racist and misogynistic taunts also fueled a simmering debate about the off-field behavior of elite athletes and the proper role of big-time sports on America's college campuses.

Yet as the months passed, as the specifics of her accusations kept shifting, and as defense lawyers skillfully highlighted other glaring weaknesses and contradictions in the evidence, the case came to be seen by many as justice run off the rails by political correctness and the political ambitions of Mr. Nifong.

When the accusations arose, Mr. Nifong was in a close political campaign. Appointed acting district attorney in 2005 by Gov. Michael F. Easley, he was seeking election against a better-known opponent. Mr. Nifong, who mentioned the case at some campaign appearances, won the crucial primary election -- and most of the black vote -- on May 2, weeks after announcing indictments against two of the players.

The players' supporters have long contended that Mr. Nifong used the Duke case to advance his political prospects.

"In his search for a false conviction, this is a man who appealed to racial and class hatred," Mr. Cheshire said at Wednesday's news conference.

Mr. Nifong just as vehemently denied the accusations of political manipulation. But in bringing charges, Mr. Nifong discounted evidence of innocence -- including alibi evidence from time-stamped photographs and cellphone records -- and relied almost entirely on the woman's photo identification of the three suspects and on a report by the sexual assault nurse who examined the woman.

The photo lineup procedure was riddled with errors and contradictions and appeared to violate Durham,

state and federal guidelines. The police, instructed by Mr. Nifong, showed the woman pictures only of lacrosse team members, with no filler photographs of people who could not possibly be suspects.

The sexual assault nurse's report of blunt force trauma was undermined by other accounts of her activities as a stripper the weekend before the lacrosse party. There was no other forensic evidence to support her account. And other than the accuser, no one claimed to have witnessed the assault -- including a second dancer hired for the evening and the 20 or so men at the party.

Mr. Cooper succinctly summed up the evidence this way: "No D.N.A. confirms the accuser's story. No other witness confirms her story. Other evidence contradicts her story. She contradicts herself."

One of those contradictions forced Mr. Nifong to drop the rape charges in December. The woman, who had repeatedly said she endured violent penile penetration, suddenly said she could no longer be sure what had penetrated her. This came after it had been revealed that sophisticated DNA tests found no traces from any of the three defendants -- or any other Duke lacrosse player -- on her body or clothes. DNA from other men, however, was found.

Mr. Nifong at first vowed to proceed with the remaining charges of kidnapping and sexual offense. But in January, facing ethics charges and mounting criticism from editorial pages and bloggers, he asked Mr. Cooper to take over the case. Mr. Cooper said he and his staff spent three months reinvestigating the case, interviewing Mr. Nifong, police investigators, defense lawyers, the accuser and other witnesses.

In the end, Mr. Cooper said, it was not even a close call. Their investigation, he emphasized, "shows clearly" that there was insufficient evidence to bring any charges.

On the Duke campus, some students greeted Mr. Cooper's decision as a welcome relief from months of turmoil. "The Duke bashing got old really quickly," said Tucker Page, a junior from Portland, Ore. "To pigeonhole all students as racist and sexist -- it felt like the media was personally attacking us."

After the accusations surfaced, Mr. Brodhead, the university president, canceled the lacrosse season and accepted the coach's resignation. He also appointed panels to examine the team's behavior and the university's handling of the case. He invited Mr. Finnerty and Mr. Seligmann back to school after the rape charges were dropped, but they declined. Mr. Evans had graduated the day before he was charged.

Today, Mr. Evans is working, while Mr. Finnerty and Mr. Seligmann said they were looking forward to continuing their educations. All three said the searing experience of being falsely accused before their fellow students and an entire nation had drawn them closer to their families. "To hell and back," is how Mr. Evans described the past year.

Duke officials said the furor had not hurt their admissions or fund-raising efforts. The university had 19,170 applicants this year -- including record numbers of African-Americans (2,190), Asians or Asian-Americans (5,173) and Latinos (1,303). The men's lacrosse team, ranked third in the nation just before the accusations, was recently ranked fourth by Lacrosse Magazine.

Mr. Nifong aside, the most lasting damage may be to the credibility of North Carolina's criminal justice system. Mr. Cooper, who said he would issue a report next week detailing all the evidentiary weaknesses in the Duke case, said the prosecution had indeed raised broader questions about the state's criminal justice system.

"This case," he said, "shows the enormous consequences of overreaching by a prosecutor."

EXHIBIT 2

# washingtonpost.com

## Senators Chastise Gonzales at Hearing

Members of His Own Party Pile On as Attorney General Defends Firings

By Dan Eggen and Paul Kane
Washington Post Staff Writers
Friday, April 20, 2007; A01

Attorney General Alberto R. Gonzales came under withering attack from members of his own party yesterday over the dismissals of eight U.S. attorneys, facing the first resignation demand from a Republican member of the Senate Judiciary Committee and doubts from others about his candor and his ability to lead the Justice Department.


Advertisement

Gonzales appeared frustrated, weary and at times combative during a five-hour Senate panel hearing that was widely considered crucial to his bid to hold on to his job. He sought to present a careful defense of the firings, apologizing for the way they were handled but defending them as the "right decision."

"While the process that led to the resignations was flawed, I firmly believe that nothing improper occurred," Gonzales said. "It would be improper to remove a U.S. attorney to interfere with or influence a particular prosecution for partisan political gain. I did not do that. I would never do that."

Yet the attorney general, who spent the past three weeks preparing for his testimony, struggled to recall key details of his involvement in the firings, including a pivotal conversation with President Bush.

Gonzales conceded that he never looked at the prosecutors' performance reviews and did not know why two of them were being removed until after they were fired. He also said he did not remember a final high-level meeting in his office suite in November to discuss the firings, nor did he remember when he decided to carry out the dismissals.

"I recall making the decision," Gonzales said at one point. "I don't recall when the decision was made."

The numerous uncertainties irritated many of the Republican committee members, who criticized Gonzales for bungling the dismissals and their aftermath, and questioned his apparent disconnection from the process. Sen. Tom Coburn (R-Okla.), the panel's most conservative member, joined Sen. Charles E. Schumer (N.Y.) and other committee Democrats in calling on Gonzales to resign.

"I believe there's consequences for mistakes. . . . And I believe the best way to put this behind us is your resignation," Coburn said.

The sharp criticism from Coburn, Sen. Arlen Specter (Pa.) and other Republicans poses another difficult political challenge for Gonzales, who has been under siege by Democrats for weeks but has heard only a handful of Republicans call for him to step down.

White House spokeswoman Dana Perino said yesterday that Bush "was pleased with the attorney

general's testimony" and that Gonzales "has the full confidence of the president."

"He again showed that nothing improper occurred," Perino said. "He admitted the matter could have been handled much better, and he apologized for the disruption to the lives of the U.S. attorneys involved, as well as for the lack of clarity in his initial responses."

Seven U.S. attorneys were fired on Dec. 7, and another was removed earlier last year, as a result of a suggestion from the White House two years ago. Democrats allege that some prosecutors may have been removed to interfere with political corruption probes, and two of the fired prosecutors have alleged improper pressure from GOP lawmakers.

Much of the uproar, however, has centered on statements by Gonzales and some of his aides about the dismissals that are contradicted by information in e-mails and other documents released by the Justice Department. The conflict has grown to include a showdown between the Bush administration and the Democratic-controlled Congress over access to White House records and employees.

One bit of good news for Gonzales came late in the day, when Specter, the committee's ranking Republican, announced that he will refrain from publicly asking Gonzales to resign. Justice Department officials had said privately that their best hope for yesterday's hearing was to keep key Republicans, particularly Specter, from calling on Gonzales to quit. About half a dozen GOP lawmakers have asked the attorney general to step down.

A Justice Department official said last night that Gonzales's aides consider the lone Republican call for his resignation yesterday a "positive barometer."

"While we realize Senate Republicans are not happy, they are willing to stick with the attorney general," said the official, who spoke about members of Congress on the condition of anonymity.

Specter and Gonzales got off to a rough start, arguing heatedly over the attorney general's preparation for news conferences and hearings. Specter also questioned Gonzales's candor about meetings and conversations on three of the prosecutors that Gonzales had with his staff, White House aides and Bush.

"The reality is that your characterization of your participation is just significantly, if not totally, at variance with the facts," Specter said.

By the close of the hearing, Specter told Gonzales that his "panorama of responses" to questions created a "loss of credibility." He said he will privately offer Bush his opinion about whether Gonzales should remain attorney general.

Another Republican on the committee, Sen. Lindsey O. Graham (S.C.), openly questioned whether Gonzales was telling the truth about the reasons behind the firings.

"Is this really performance-based, or did these people just run afoul of personality conflicts in the office and we were trying to make up reasons to fire them because we wanted to get rid of them?" he asked.

During his opening remarks and subsequent testimony, Gonzales repeatedly said that nothing improper occurred in the firings. He specifically denied that he or other Justice officials removed any prosecutors to influence individual corruption cases.

Committee Democrats argued that standard was overly narrow, and they focused on evidence in

testimony and documents that Gonzales had direct involvement in the firing of three prosecutors before his final approval of the plan: Bud Cummins of Little Rock, David C. Iglesias of New Mexico and Carol S. Lam of San Diego.

Gonzales said he made the final decision to approve the firings but took the recommendations of his assistants without closely reviewing their reasons for dismissing each prosecutor. He said his former chief of staff, D. Kyle Sampson, was in charge of the details and updated him only occasionally on his progress. The attorney general said he made a mistake by not being more closely involved in the process.

Gonzales confirmed statements by Sampson that presidential adviser Karl Rove passed along GOP complaints to Gonzales last fall about the alleged lack of aggressiveness by Iglesias and two other U.S. attorneys in prosecuting voter fraud. Gonzales said he passed on the complaints to Sampson, who at some point in the same time period placed Iglesias on the firing list.

The attorney general said he could not remember a similar conversation on Oct. 11 with Bush, who has publicly confirmed the discussion.

While the panel's Democrats focused primarily on the alleged rationale for the firings, many of the Republicans concentrated on Gonzales's declared lack of involvement and inability to remember significant details. Sen. Jeff Sessions (R-Ala.), a former U.S. attorney, seemed stunned when Gonzales said he could not recall a crucial Nov. 27 meeting at which a final plan for carrying out the firings was discussed.

"I'm concerned about your recollection, really, because it's not that long ago," Sessions said. "It was an important issue. And that's troubling to me, I've got to tell you."

Several senators asked Gonzales how he would fare under the criteria for removal that were applied to the fired U.S. attorneys.

"You said something that struck me, that sometimes it just came down to 'These were not the right people at the right time,' " Graham said, referring to previous remarks by Gonzales. "If I applied that standard to you, what would you say?"

Gonzales responded: "Senator, what I would say is, is that I believe that I continue to be effective as the attorney general of the United States. We've done some great things."

© 2007 The Washington Post Company

**Ads by Google**

**Ann Coulter's Column Free**
Get Ann Coulter's weekly column delivered to you Free via email.
www.HumanEvents.com

**"The War is Lost"**
Sen. Harry Reid's comments go too far and this blogger blasts back.
asmba.typepad.com/veterans/

**Employment Lawyers**
Find Employment Law Specialists In Your Area. Free & Confidential.
www.LegalMatch.com