**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RECEIVED

DEC 2 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ANGEL RUIZ RIVERA

Petitioner

v.

ALBERTO R. GONZALES, Et Al.,                    07-0019 (~~EGS~~)(RBW)

Respondents

---

## MOTION TO RE-SUBMIT MOTION FOR NEW TRIAL OR TO ALTER OR AMEND JUDGMENT WITH ERRATA AMENDED

TO THE HONORABLE U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA (HUSDCDC):

Comes now the Petitioner, Angel Ruiz Rivera (ARR), appearing here Pro Se Ipso, and respectfully states, alleges and prays as follows:

1. That on December 24, 2007 at 8:47 P.M., I timely filed a MOTION FOR NEW TRIAL OR TO ALTER OR AMEND JUDGMENT in the instant case, pursuant to Federal Rule of Civil Procedure (FRCP) 59, which was simultaneously served to the appearing counsel for the Respondents. See Proof of Service, Exhibit1.

2. Same Motion was sent by error to the wrong address, namely 333 Connecticut Ave., instead of Constitution. For this reason it is probable that it may not reach this court.

3. In any event, same Motion was sent without its Exhibits, due to an inadvertent error on our part sue to the difficulties in sending these documents on a Christmas eve.

4. For all the above reasons, we respectfully pray that this court substitutes the

1

enclosed motion for the previous one, that is in case it receives the previous one

sent to the wrong address. In the alternative, we pray that you file the one

enclosed as a substitute of the one timely filed and served.

So we state, allege and pray. Respectfully submitted, today December 26, 2007.

Angel Ruiz Rivera
Pro Se Ipso
P.O. Box 191209,
San Juan, P.R. 00919-1209.
787-435-3512
aruizrivera@aol.com

**CERTIFICATE OF SERVICE**

I, Angel Ruiz Rivera, appearing here Pro Se ipso, hereby certify that I have sent a copy of this writing today by priority mail of the USPS to the appearing counsel for the Respondents, Mr. Blanche L. Bruce, AUSA, 555 Fourth St., NW.-Room E4905, Washington, D.C. 20530. (202) 514-7250.

EXHIBIT 1

1. Proof of Filing and Service.

EXHIBIT 1

1. Proof of Filing and Service.

WELCOME TO
SAN JUAN MPO
585 AVE FD ROOSEVELT
SAN JUAN, PR 00936-9312
12/24/07 08:47PM

Transaction Number:              120
USPS® #                     438466-9550


1. Priority Mail® FR Env        5.25
    Destination:      20001
    Weight:         0 lb. 4.00 oz.
    Total Cost:            5.25
    Base Rate:            4.60
    Label #:
    0487 3013 9730 0406 3206
            SERVICES
    Delivery
    Confirmation™ service    .65
2. Priority Mail® FR Env        5.25
    Destination:      20530
    Weight:         0 lb  4.00 oz.
    Total Cost:            5.25
    Base Rate            4.60
    Label #:
    0487 3013 9730 0403 3213
            SERVICES
    Delivery
    Confirmation™ service    .65

Subtotal                      10.50
Total Charged                 10.50

VISA                          10.50

        <23-901900035-99>
VISA
ACCT NUMBER        TRANS #    AUTH
XXXX XXXX XXXX 6907    259    450763

To check on the delivery status of
your Delivery Confirmation™ article,
visit our Track & Confirm website at
www.usps.com, use this Automated
Postal Center™ (or any Automated
Postal Center™ at other Postal
locations) or call 1-800-222-1811.

            Thanks
    It's a pleasure to serve you

ALL SALES FINAL ON STAMPS AND POSTAGE.
REFUNDS FOR GUARANTEED SERVICES ONLY.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *
*                                           *
*    Your opinion matters to us.            *
*           Please visit                    *
*                                           *
*      http://gx.gallup.com/apc             *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *



**UNITED STATES POSTAL SERVICE**

Home | Help

Track & Confirm

# Track & Confirm

Track & Confirm

Label/Receipt Number: **0487 3013 9730 0408 3206**
Status: **Acceptance**

The U.S. Postal Service has received electronic notification from our
Automated Postal Center (APC) in SAN JUAN, PR 00936 on December
24, 2007 to expect your shipment for mailing.

Enter Label/Receipt Number.

Track & Confirm by email

Get current event information or updates for your item sent to you or others by email.

Site Map    Contact Us    Forms    Gov't Services    Jobs    Privacy Policy    Terms of Use    National & Premier Accounts

Copyright © 1999-2007 USPS. All Rights Reserved.

USPS - Track & Confirm


**UNITED STATES POSTAL SERVICE**

Track & Confirm

# Track & Confirm

Search Results

Label/Receipt Number: **0487 3013 9730 0408 3213**
Status: **Acceptance**

The U.S. Postal Service has received electronic notification from our
Automated Postal Center (APC) in SAN JUAN, PR 00936 on December
24, 2007 to expect your shipment for mailing.

Enter Label/Receipt Number.

Track & Confirm by email

Get current event information or updates for your item sent to you or others by email.

Copyright © 1999-2007 USPS. All Rights Reserved.

12/26/2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANGEL RUIZ RIVERA

Petitioner

v.

ALBERTO R. GONZALES, Et Al.,                    07-0019 (EGS)(RBW)

Respondents

---

## MOTION FOR NEW TRIAL OR TO ALTER OR AMEND JUDGMENT

TO THE HONORABLE U.S. DISTRICT COURT FOR THE DISTRICT OF
COLUMBIA (HUSDCDC):

     Comes now the Petitioner, Angel Ruiz Rivera (ARR), appearing here Pro Se Ipso,

and respectfully states, alleges and prays as follows:

     I. PROCEDURAL STATUS

1.     This HUSDCDC recently issued a presumably final Order in the instant

    Petition/Complaint. Since it was unbeknownst by us, we had in the

    interim filed what in good faith we intended to be a Motion To

    Facilitate A Ruling, that chronologically crisscrossed with same Order.

    In view of this, we are respectfully filing this Motion For A New Trial

    Or To Alter Or Amend Judgment, pursuant to Federal Rule of Civil

    Procedure (FRCP) 59. We also pray that the Motion To Facilitate A

    Ruling, considered moot under the above circumstances, is reconsidered

    and taken as an Appendix to this Motion, since it includes the smoking

    gun, and beyond doubt evidence that should persuade this or any other

    court for that matter, of the *ad nauseam* merits justifying this Petition.

II.    SUBSTANTIVE ISSUES JUSTIFYING FRCP 59 MOTION – THE ISSUE OF STANDING

2.    Very respectfully, this HUSDCDC, apparently confused this Petitioner with the run-of-the-mill third party who pretends to have standing upon controversies where he/she/or they, does/do not have an injury-in-fact or a personal bearing in the cause of action. This is clearly not our case.

3.    First, as a result of the malicious prosecution by various of the U.S. Department of Education (USDE) legal counsels which evolved into a vindictive prosecution by some of the U.S. Attorney's Office (USAO) Attorneys, timely complained about to the U.S. Department of Justice (USDJ), Office of Professional Responsibility (OPR), and which was covered up or ignored, ergo, provoking this Petition, this Petitioner suffered personally the illegal and wrongful imputation of Trust Fund Liabilities (TFL) by the U.S. Department of the Treasury (USDT), Internal Revenue Service (IRS). See Exhibit 1 of the Mandamus Petition and Exhibit 3 of our timely filed Memorandum In Support Of Petitioner's Motion In Response To Respondent's Motion To Dismiss.

4.    For these TFL, I am personally liable *ad perpetuam*, simply because they are not dischargeable in any way or manner, (except by payment, of course), not even through a personal bankruptcy. Ergo, they have a preconfiscatory effect upon all of my present and future income and consequently, that of my wife, children and successors. In this sense, the above is not only clearly an injury-in-fact, but it is the worst kind probable that a person can suffer, except of course, that of life or liberty.

5.      Ergo, in this vein, the cases used in support by this HUSDCDC, to ""justify", its Order, namely, <u>Public Citizen v. Nat'l Highway Traffic Safety Administration</u> and <u>Lujan v. Defenders of Wildlife,</u> (citations omitted), are clearly non-applicable, with all due respect.

6.      Second, the imputation of the TFL, which were initiated by the USDT-IRS as the result of the malicious-vindictive prosecution timely complained about, and which have unjustly remained as a Damocles spade over our heads all throughout the judicial poltergeist we have had to endure so far for over twelve (12) years, were resumed by the USDT-IRS after appeal 03-1083 was also unjustly decided, as we timely forewarned the Honorable U.S. Court of Appeals for the First Circuit (HUSAC1C). See Appeal Brief and other documents filed within that appeal. Same appeal was of related controversy 99-1012 (CCC)(SEC)(JAG), Angel Ruiz Rivera, Et Al., v. Internal Revenue Service, at the Honorable U.S. District Court for the District of P.R. (HUSDCDPR). The pertinence that this *fait accompli* has to the instant petition is that the USDT-IRS has repeatedly made collection efforts against me personally of these TFL, ergo, the injury-in-fact that once was, has remained not only intact, but has grown with time, due to the customary accrued interests added to the imputed principal. With all due respect, as anyone can easily corroborate, there is nothing conjectural or hypothetical about these collections by the USDT-IRS against me personally, which undoubtedly constitute an injury-in-fact.

In this vein, the case <u>New World Radio, Inc. v. FCC</u>, (citation omitted), used by this HUSDCDC in support of its Order, is clearly not applicable to the circumstances of the instant controversy. This HUSDCDC, cannot, just as the HUSCA1C, could not, even with all your power and authority, legally guarantee that the USDT-IRS is not going to pursue its collection efforts against this Petitioner personally, of the illegally and wrongfully imputed TFL, which has as its most proximate cause or causal nexus, the viciously maintained, retained and sustained claims by the malicious prosecution of the various of the U.S Department of Education (USDE) legal counsels, callously, egregiously and wantonly upheld by the some of the USAO Attorneys vindictive prosecution timely complained about.

7.    Third, consistent with the above, the illegal and wrongful TFL have another worst side to them, and that is, that they can be used at any time at will, by the USAO Attorneys to indict and file criminal charges against me, anytime they decide to exert their infinite discretion in that way, which given the record of my litigation against them and their track record, is more probable than not, absent a court decision resulting in the uncovering of the above and elsewhere timely denounced malicious/vindictive prosecution. For this reason only, without more, the use, not to say abuse, by this HUSDCDC of the <u>Linda R.S v. Richard</u> case, (citation omitted), in support of its Order, is also inapplicable here.

4

8.    The conclusion by this HUSDCDC that "a citizen lacks standing to
contest the policies of a prosecuting authority when he himself is
neither prosecuted nor threatened with prosecution or nonprosecution of
another" because "a private citizen lacks a judicially cognizable interest
in the prosecution ..." is clearly not the case in the instant controversy,
again with all due respect.

9.    Fourth, the Complaint for Professional Misconduct (CPM) in question
which provoked the instant Petition/Complaint, ergo, provoking this
Petition, and which was covered up or ignored altogether by the
Respondents/Defendants, was filed by non other than this Petitioner
himself. In this sense, I respectfully reiterate that I have standing to
request this or any court for that matter, [1] to order the agency to comply
with its ministerial duties and rule upon same CPM accord the law, the
regulations, and their own policies as published by the own USDJ-OPR,
in its publications including the U.S. Attorney Manual. (USAM). See
the pertinent excerpts of the USAM that proves without a doubt that the
USAO Attorneys had the ministerial duty and ethical obligation of
compromising or closing if "he believes that a claim of the United
States is without legal merit". 4.3.120 General Redelegation of the
Attorney General's Authority to Compromise and Close. See Exhibit 4
of the Mandamus Petition.

---

[1] This HUSDCDC was chosen as the forum non coveniens since it is the place where all the Respondents/
Defendants reside and it is less onerous for the Petitioner/Plaintiff to depose all of them there than to move
them to Puerto Rico, where I reside, that is in the event that I am given the modicum of due process that
should be given me, or anyone similarly situated, to so do.

10.    In view of the overwhelming evidence included, particularly in the

Motion To Facilitate A Ruling, it should be more than diaphanously

clear to this HUSDCDC or any court for that matter, that any objective,

ethical, non-vindictive, and non-malicious prosecutor would not had

even dared to endorse the evidently obvious abuse of the legal process,

fraud upon the courts, obstruction of justice, intimidation of witnesses,

suborn perjury and perjury, viciously initiated by the USDE legal

counsels that have provoked all this and related litigation for almost

twelve (12) years now, since there was simply no probable cause.

11.    Fifth, this HUSDCDC, in its Order at p. 5, opines that the investigation

timely solicited respectfully from the USDJ-OPR, statutorily mandated

(without entering into the real gist of the main real issue here which is

whether it was ever conducted or not, and if ever conducted if it was

accord the applicable statute and regulations), would not benefit the

petitioner in any "concrete" or "actual" way. With all due respect,

nothing is further from the truth.

12.    This HUSDCDC continues to accuse us of pursuing some "emotional

satisfaction from a report confirming the petitioner's belief that the

DOE and the Assistant United States Attorneys representing the DOE

acted in an unethical manner..." Order at p.5. To this unjust accusation

we must respectfully react by saying that we honestly  hope that some

day this and/or more than this court for that matter, eventually rule as

it/they should, that it/they, were the ones which were deprived of the

knowledge as to whether a violation of the law has occurred that would be tantamount to recognizing a justifiable interest in the enforcement of the law, and consequently experience an emotional satisfaction of same sort after making sure that Justice is made, since the ones that certainly and undoubtedly have a ministerial, ethical and justifiable interest in same enforcement of the law are definitely you the courts, and not private citizens like myself, who by the way, am not a third party, by no ways or means. In this vein, the use of the case <u>Common Cause v, FEC</u>, (citation omitted), used by this HUSDCDC in support of its conclusion in its improvidently issued Order is also clearly non-applicable to the facts and circumstances of the instant controversy.  The main issue here is if this federal court of law, or any other one for that matter, is going to let the USDJ-OPR officers, get away with total impunity, with the cover up of the evidently obvious malicious/vindictive prosecution, timely denounced in the CPM. That is the question. My general emotional harm, no matter how deeply felt, is not the issue. Actually, the above are definitely no business for this HUSDCDC or whichever ends evaluating this matter, The real issue here is that the injuries-in-fact, that we have suffered for the past twelve (12) years now, can be amended, if not totally corrected, and they should, if this HUSDCDC or any other court for that matter, eventually rules according to what the hard evidence in this controversy mandates: cure a miscarriage and a mismanagement of "Justice" provoked by the government barristers.

### III. THE EVIDENCE

13. The smoking gun and beyond doubt overwhelming, robust, and abundant evidence submitted, quantitatively and qualitatively, do not admit any other possible ruling than one ordering the USDJ-OPR to show cause why the Mandamus Petition should not issue, or *de minimis* to file their answer to the Petition/Complaint as respectfully requested in our Motion To Facilitate A Ruling.

### IV. THE USDJ AND THE OPR MINISTERIAL DUTIES

14. There is an eminent public interest behind the USDJ and OPR presumably serious, ethical and responsible considerations and evaluations of the complaints filed for misconduct by the citizens. If these institutions are going to be allowed to get away with cover ups as the one proven in this Petition, then this HUSDCDC and/or whichever court that may end evaluating this matter is or are making a mockery of a serious process that was designed and legislated to be exactly the opposite- to uncover the instances of misconduct in our legal system.

### V. BIVENS AND FTCA

15. Since this Petition/Complaint was filed by a Pro Se litigant, a layperson non-lawyer, we respectfully invoke the stare decisis of the U.S. Supreme Court, ( See Haines v. Kerner, 404 U.S. 519), in that our pleadings should be liberally construed, and based on it, we pray that the instant Petition/Complaint is also considered to be a Bivens Complaint against the named officers in their personal basis, and that we are allowed to file a Second Amended Complaint and summon them accordingly. We also invoke the Federal Torts Claims Act (FTCA).

VI. REPRISALS AS PROXIMATE CAUSE OF THE MALICIOUS/VINDICTIVE PROSECUTIONS

16. We advance that we support our Proposed Amended Complaint, [2] in the teachings of the U.S. Supreme Court in, Hartman v. Moore, 547 U.S. 250 (4/26/2006) and Wilkie v. Robbins, 127 S.Ct. 2588 (U.S. 06/25/2007). We also respectfully refer this HUSDCDC to the Exhibits 1 and 2 of our timely filed Motion To Publicly Denounce Judicial Corruption, and the Motion For The Disqualification Of The Circuit Court, before the HUSCA1C in related appeals 06-1562 and 07-1547, included as Exhibit 1 and 2, in our timely filed Motion To Request The Court To Issue Orders To Answer And To Show Cause, in the instant case, which were not taken into consideration by this HUSDCDC, at least as far as the Order expressed.

The reprisals taken by the USDE officers against this Petitioner were provoked by my complaint against a Mr. Jack Reynolds, Director of the Institutional Participation Division (IPD), for the imprecision in the timeframe needed by the USDE in processing an application for eligibility of IEU's Caguas branch. See January 1995 Letters between Reynolds and Petitioner. Exhibit 1. As its first reprisal, Reynolds ultra vires ordered the erroneous treatment of IEU's audited financial statements as if it was a profit-making institution when it was a non-profit making institution, recognized as such by the USDT-IRS. Then, as a second reprisal, he ordered that an ultra vires acid test ratio was applied to same audited financial statements against the Higher

---

[2] Since the Respondents/Defendants have not filed their answer to the Petition/Complaint, according to the FRCP, we aver that we do not need leave to amend same. In any event, we do as a matter of deference to this HUSDCC.

Education Act (HEA) express mandates that specifically ordered current ratio. Third, a letter of credit, in lieu of the statutorily allowed payment and performance bond was demanded for an excessive amount. See March and April 1995 Letters from Jack Reynolds, to Petitioner, Exhibit 2. Fourth, further reprisals were taken against Petitioner once Reynolds and other USDE officers knew that Petitioner had raised his concerns to President Clinton himself. See Exhibit 3 and 96-1893 (JAF) Amended Complaint. See also October 15, 1995 Letter from USDE Deputy Secretary David Longanecker apologizing for the treatment Petitioner had received from Reynolds. Exhibit 4. All of the above triggered the USDE officers' reprisals against Petitioner, which initiated the chain of events that have us unnecessarily litigating here.

The reprisals taken against me by the USAO Attorneys, initiated by eternal interim U.S. Attorney Guillermo Gil, Esq, were as a result of our Petition for Certiorari filed before the U.S. Supreme Court and our Complaint For Judicial Misconduct filed before the HUSCA1C Judicial Council, where in it, we included reference about the fact that his sister received a *superavit* of due process by Judge Fuste in <u>Gil De Rebollo v. Miami Heat Associates</u>, 137 F.3d 56 (1st Cir. 03/05/1998), *vis a vis,* the *deficit* of due process given by him to us in <u>Instituto de Educacion Universal v. U.S. Department of Education</u>, Et Al, Et al., 96-1893 (JAF), renamed as <u>Rivera v. Riley</u>, 209 F.3d 24, (1st Cir. 04/12/2000)  In addition, we also filed a cause of action against him personally at the local courts, Angel Ruiz Rivera v. Colegio San Ignacio, KDP02-1014, TPI, San Juan.

ANALOGY TO A CRIMINAL SETTING

19. The malicious/vindictive prosecution timely complained about and denounced here occurred in violation of the principles clearly established in <u>Brady v. Maryland</u>, 373 U.S. 83 and <u>Napue v. Illinois,</u> 360 U.S. 264 and their respective progenies. See also <u>United States v. Basurto</u>, 497 F.2d 781 (9th.Cir. 1974) and <u>Dixon v. District of Columbia</u>, 129 U.S. App.. D.C 341, 394, F. Ed 966 (1968), cited in <u>Colon v. U.S. Attorney for District of P.R.</u>., 576 F. 2d 1 (5/17/1978). If in a criminal setting, the above prosecutorial violations must lead to dismissal, should not same lead to idem results in a civil setting, such as the one here?

CONCLUSION

For all the above stated reasons, very respectfully, this HUSDCDC should reconsider its Order and alter and/or amend it in such a way that it provides this Petitioner with at least the modicum of due process that the facts, the law, the jurisprudence and the circumstances dictate. We reiterate our timely filed requests in our Motion To Request The Court To Issue Orders To Answer And To Show Cause before its Order and the ones made in our Motion To Facilitate A Ruling before having any way of knowing that same had been issued. So we state, allege and pray. Respectfully submitted, today, December 24, 2007.

Angel Ruiz Rivera
Pro Se Ipso
P.O. Box 191209, San Juan, P.R. 00919-1209.
787-435-3512 aruizrivera@aol.com

**CERTIFICATE OF SERVICE**

I, Angel Ruiz Rivera, appearing here Pro Se ipso, hereby certify that I have sent a copy of this writing today by priority mail of the USPS to the appearing counsel for the Respondents, Mr. Blanche L. Bruce, AUSA, 555 Fourth St., NW.-Room E4905, Washington, D.C. 20530. (202) 514-7250.

EXHIBITS

1. January 1995 Letters between Reynolds and Petitioner.

2. See March and April 1995 Letters from Gene Kelly.

3. October 15, 1995 Letter from USDE Deputy Secretary David Longanecker.

4. Letters to the President.

1. January 1995 Letters between Reynolds and Petitioner.



**INSTITUTO
EDUCACION
UNIVERSAL**

January 19, 1995



Mr. Jack Reynolds, Acting Director
US Department of Education
Student Financial Program
Office of Post Secondary Education
Institutional Participation Division

Dear Mr. Reynolds:

Last Tuesday, January 10, 1995, I visited and spoke to you in your office inquiring the status of an application for eligibility for an additional location that our Institution had filed on November 30, 1994.

I expressed to you that on December 14, persons from our staff had visited Rosemary Foltis and were given the impression that this application could be processed before the Christmas Holidays. In our conversation, I pointed out to you that on January 9, I had talked to Ms. Lilliam Thomas from Miami and she had told me she believed our case was in Mr. Kelley's hands. I then asked for an appointment to see him that same afternoon. After traveling to Washington D.C. from Miami to follow up on this, Mr. Kelly who kindly attended me, told me that the case had not been received at his desk and proceeded to introduce me to Ms. Foltis. She then informed me she had not evaluated the application and that she could not give me a tentative time table for the application to be processed.

As a result of this, I visited you on January 10 and personally pointed out that I found unreasonable not being able to get an approximate date or tentative time table for this application to be processed. You indicated that you were going to check on this application status and make sure it was being processed appropriately. On Tuesday, January 17, I called you to follow up on this issue, I was told that you were at a meeting and you would later return my call. Today, Thursday, January 19, I had called again without being able to reach you leaving a message with Caroline. I am, hereby, respectfully requesting from you to give us some insight as to the whereabouts of our application and an approximate date of final processing.

Please return my call as soon as possible. Your cooperation on this matter, will be greatly appreciated.

Thank you very much for your attention.

Ruiz-Rivera







**INSTITUTO
EDUCACION
UNIVERSAL**

December 15, 1994

*Angel A. Ruiz-Rivera*
*President*

## WASHINGTON D.C. VISIT REPORT - TITLE IV FEDERAL PROGRAM PARTICIPATION FOR THE CAGUAS BRANCH

On December 14, 1994, we visited the Department of Education, Institutional Participation Division to investigate the status of our request submitted for the Caguas Branch.

Mr. José Ruiz, Operations Director and Mr. Manuel Fernández, External Consultant, accompanied us in this visit. We presented ourselves to the Office of Institutional Participation Division and requested to meet with the person who attends petitions for Title IV Federal Program Participation. The person who was in charge of our petition, Ms. Rosemary Foltis, attended us in the hallway and informed us that she had not received any kind of document from us. She also indicated to us that she did not attend visitors that did not have a previous appointment. We expressed to her the many times we have tried to reach her by phone to make an appointment and were unsuccessful since she was out of her office. We insisted that the documents were mailed and asked for an opportunity to contact our main offices to verify this information.

We returned to the hotel, called our main offices and requested evidence of documents mailed to the Department of Education. Federal Express confirmed that the documents were received on Monday, December 12, 1994 at 9:03 am by Ms. Carol Williams.

We returned to the Department of Education and requested to see Ms. Rosemary Foltis. Again, we were attended in the hallway. We shared the information that Federal Express had conferred us and she proceeded to search for our documents; finally locating them. She returned to the hallway and informed us that all cases were considered by arrival date. Further, she mentioned to us that she would process our case, before the end of the following week because she was going to leave on vacations. She added that if she was unable to see our case before her vacations, Ms Janet Blunterbart would be allotted to our case.

If you need additional information, please do not hesitate in contacting me.

*Rosa Román-López*
*Executive Director*



UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON, D.C. 20202·

*Exhibit 6a*

Mr. Angel A. Ruiz-Rivera
President
Instituto de Educacion Universal
Avenida Barbosa #425, 2Do Piso
Rio Piedras, Puerto Rico  00923

Dear Mr. Ruiz-Rivera:

I am in receipt of a letter which you faxed to me on January 20, 1995.  I am disturbed by your recantation of events and your insistence on delaying the process for gaining approval of the additional site for which your request was initiated.

I have spoken with the members of my staff who have been dealing with this issue and find your explanation of events less than accurate.  During our brief meeting of January 10, 1995 you claimed that Ms. Rosemary Foltis of my staff had promised to have the matter reviewed and a decision made by the end of December 1994.  In discussions with Ms. Foltis, a thoroughly professional employee of mine in two different divisions for over four years, I found that not only did Ms. Foltis specifically decline to provide an estimated date for completion of the review, but further advised your representatives - correctly - that our policy has always been to never give estimates of completion dates.

Given the myriad complicating issues that arise in such matters, staff in this division have often suffered from ill advised and self serving comments of school officials who complain of our purported failure to meet fabricated promises of specific completion dates despite having knowingly submitted suspect or incomplete documentation.

I also spoke with Ms. Lillian Thomas, yet another employee of mine whom you mentioned in our conversation.  Ms. Thomas, in fact, informed the representative inquiring about your additional site in mid-December that it was unlikely that any decision would be made within that time-frame because a number of staff would be out on Christmas vacation.  Ms. Thomas has worked in the certification area for a number of years and is very familiar with the problems associated with off-the-cuff commitments to final decision dates.

You also told me that Mr. Gene Kelly of my staff informed you - correctly - that he was not in receipt of your request for his part of the additional site analysis.  He was not, and could not have been, in receipt of your request simply because the analysis in the Eligibility and Administrative Analysis Branch was not yet complete.

Page 2 - Mr. Ruiz-Rivera

Given the workload of this division and the relatively limited number of staff performing those functions, the only fair and effective way to handle incoming traffic is on a first-come, first-served basis. You will receive notification of any materials needed to complete our analysis, and prompt notification of our final decision in due course. Calls and letters such as you have made and forwarded only serve to delay the review process.

If we need additional information about your application, we will contact you.

Respectfully yours,

Jack C. Reynolds
Acting Director
Institutional Participation Division

2. See March 1995 Letter from Reynolds.



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF POSTSECONDARY EDUCATION
INSTITUTIONAL PARTICIPATION DIVISION
WASHINGTON, DC 20202-5323

**MAR - 6** 1995

Mr. Angel Ruiz Rivera
President
Instituto de Educacion Universal
404 Avenue Barbosa
Hato Rey, Puerto Rico 00917-4302

Dear Mr. Rivera:

We received and reviewed your institution's Application for Institutional Participation (Application) submitted for approval of an additional location in Caguas to participate in the Title IV, Higher Education Act (HEA) programs.

We have carefully reviewed the Application and the supporting documents to determine whether the institution meets regulatory standards of eligibility, administrative capability, and financial responsibility. However, we are unable to approve this Application until the deficiencies addressed below are resolved; in addition, the institution must post surety to continue to participate in the Title IV, HEA Programs. The original Application and a blank Application with an errata sheet are attached for future use. The items of concern are listed below:

<u>Cover Sheet</u> — If the institution were to re-apply, we would require a copy of the institution's most recent letter, ruling, or other communication from the Internal Revenue Service concerning the institution's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. This document is necessary because our records do not contain a recent ruling.

It appears that the institution previously failed to request approval for a change in the location of the main institution. The institution indicated the main campus on the Cover Sheet as Instituto de Educacion Universal at 404 Avenue Barbosa, Hato Rey, PR, whereas our records indicate that the main campus is at Marginal #9, Bayamon, PR 00619 with the mailing address of Box 1027, Sabana Seca, PR 00749. Also per our records, 404 Avenue Barbosa, Hato Rey, is an additional location. The institution must provide a clear explanation to this office **within thirty days.**

<u>Number of Additional Locations</u> -- Per page 9 of the instructions, the institution must complete the entire application for the main campus, and complete Schedules K, L, Q, and Y for an additional location that offers 100% of an educational program.

However, Schedule D lists a total of four additional locations, whereas Schedules K and L reflect three additional locations, and only one Schedule Q was submitted.

Schedule D lists a total of four additional locations, including Marg. Corujo Carr. No. 2, Km. 16, Hato Tejas 00619. However, our records indicate that this location closed on January 31, 1987. (It used to be the main campus.)

The institution must provide a clear explanation for the inconsistent number of additional locations to this office **within thirty days.** In addition, the institution must provide the specific dates when the location in Hato Tejas provided Title IV funds to students after January 31, 1987.

Also per page 9 of the instructions, the institution must attach a specific description of the relationship between the main campus and each (branch and) additional location that provides 100% of an educational program. This description was not provided.

Schedule A -- The correspondence from ACCSCT dated November 9, 1994 submitted with the Application merely indicates that the Commission would review the application at a November, 1994 conference call meeting. We have since requested and received from ACCSCT a copy of the subsequent approval for the additional location in Caguas.

Due to the inconsistencies in the number and addresses of the additional locations, we require copies of approval documents from ACCSCT reflecting the specific addresses of each location in addition to the location in Caguas.

Schedule B -- Per page 8 of the instructions, the institution must attach copies of the most recent licenses or other legal authorizations issued by an agency of the State. No documentation was submitted which should have reflected approval for the additional location in Caguas.

Due to the inconsistencies in the number and addresses of the additional locations, we require copies of approval documents from the Consejo General de Educacion reflecting the specific addresses of each location in addition to the location in Caguas.

Schedule C -- The institution indicated that it is a corporation. However, no information was provided on part two of Schedule C. If the institution resubmits an Application, it must complete this part or provide an explanation on Schedule Y.

Schedule D -- Our comments concerning the additional locations are addressed above.

Schedule F -- It appears that Schedule F should not have been completed, whereas Schedule C, Part two should have been completed.

Schedule 1 -- This schedule as completed addresses four locations including the main campus. This contradicts Schedule D as described above.

Page 3 -- Mr. Angel Ruiz Rivera

In addition, Schedule I as completed indicates all diploma programs, whereas Schedule H indicates "At least 600 clock hours but less than one academic year" and Associate Degree programs.

Schedule K -- Our comments concerning the number of additional locations are addressed above.

Schedule L -- We are concerned with the excessive student withdrawal rate at the main campus and at one of the additional locations. The withdrawal rates for the main campus and for one of the additional locations are 35.3 percent and 36.4 percent for the award year ending June 30, 1994. If the institution submits another application, it must attach a written description of the actions taken to reduce the withdrawal rate.

Our comments concerning the number of additional locations are addressed above.

Schedule O -- Our comments concerning the number of additional locations are addressed above.

Once again, the institution must provide written explanation to this office concerning the two highlighted items above. The response must be submitted to the following address within thirty days:

> U.S. Department of Education
> Institutional Participation Division
> 600 Independence Avenue, S.W.
> Washington, D.C. 20202-5323
> Attn: Team IV/Rosemary Foltis

Financial Condition -- The Financial Analysis Branch of the Institutional Participation Division (IPD) has completed its review of the Institution's June 30, 1994 financial statements. The analysis indicates that the Institution does not meet the general standards of financial responsibility as defined in the financial responsibility regulations, 34 CFR 668.15 (copy enclosed). Specifically, the Institution exhibited an acid test ratio of 1:1.23. The acceptable acid test ratio standard is 1:1. The Institution is also delinquent in making payments owed to its vendors and suppliers. IPD has reviewed the information that is available to it and noted that the Institution did not meet the financial standards previously. Consequently, the Institution cannot avail itself of one of the exceptions to the general standards, 34 CFR 668.15 (d) (ii). Therefore, the Institution may be considered financially responsible and permitted to continue to participate in the Title IV, student financial assistance programs only if it provides surety, as indicated.

The Institution must post an irrevocable letter of credit in the amount of $8,825,000 within sixty (60) days of the date of this letter. The amount of the letter of credit is set at 50 percent of the total volume of the student financial aid funds delivered or disbursed through the Institution for the most recent award year for which information is available. The letter

Page 4 -- Mr. Angel Ruiz Rivera

of credit must be payable to the Secretary, U.S. Department of Education (Secretary) and must have an expiration date of no earlier than December 1, 1996. The letter of credit assures the Secretary that, in the event the Institution would close or terminate classes at other than the end of an academic period, funds would be available for student refunds, to provide teach-out facilities, or to meet institutional obligations to the Secretary. A blank copy of an irrevocable letter of credit is enclosed. Your lending institution must use this as a form or reproduce it on its letterhead without deviation from the language provided.

In addition, the Institution must submit its June 30, 1995 financial statements to this office for review **no later than 120 days** following the close of the Institution's fiscal year. The financial statements must be prepared on an accrual basis in accordance with generally accepted accounting principles and audited by an independent certified public accountant in accordance with generally accepted auditing standards. If the Institution submits audited consolidated financial statements of its parent corporation for the Secretary to use in determining the Institution's level of financial responsibility, the consolidated financial statements must be supplemented with consolidating schedules showing the consolidation of each of the parent corporation's subsidiaries (each separate institution participating in Title IV, HEA programs must be shown separately), intercompany eliminating entries, and derived consolidated totals. The Secretary may also require the Institution to submit additional substantive information.

In providing the annual financial statements, the Institution is required to specify the manner in which the Institution recognizes any obligations owed to the Secretary as a result of audit or program review findings and to identify the dollar portion of current liabilities that consists of unpaid refunds. If there are such refunds, please identify the portion due to lenders, to the Secretary, and to students, specifying the average period of time between a student's withdrawal and the posting of the liability, and the portion of the unpaid refund liability that is overdue thirty (30) days or longer.

At the appropriate times, the Irrevocable Letter of Credit, the financial statements and the liability information must be mailed to the following address:

> U.S. Department of Education
> Institutional Participation Division
> ATTENTION: Team IV/Mr. Gene Kelly
> 600 Independence Avenue, S.W.
> Washington, D.C. 20202-5232

Please note that if the Institution fails to provide the written explanations, the financial statements, and the Irrevocable Letter of Credit within the specified time frames, the ability of the Institution to administer the Title IV, HEA student financial assistance programs properly will be called into question. As a consequence, we will consider whether it is

Page 5 -- Mr. Angel Ruiz Rivera

necessary to monitor the Institution's receipt of Federal funds more closely. Failure to respond within the time frames required may also result in an adverse action being taken against the institution in accordance with 34 CFR 668, Subpart G.

If you have further questions regarding these matters, you may call Team IV at (202) 205-3720.

Respectfully yours,

Jack C. Reynolds
Acting Director

cc: Mr. Robert McKiernan, Chief, Institutional Review Branch, Region II
    Mr. Keith Kistler, Chief, Institutional Review Branch, IMD

DOW, LOHNES & ALBERTSON

ATTORNEYS AT LAW

1255 TWENTY-THIRD STREET

WASHINGTON, D. C. 20037

TELEPHONE (202) 857-2800

SHERRY MASTROSTEFANO

DIRECT DIAL NO

857-8803

FACSIMILE (202) 857-2900

CABLE "DOWLA"

TELEX 436648

May 11, 1995

<u>VIA FACSIMILE AND HAND DELIVERY</u>

Mr. Gene Kelly
Institutional Participation Division
U.S. Department of Education
Room 3522, R.O.B. 3
7th & D Streets, S.W.
Washington, D.C.  20407

        Re:  <u>Instituto de Educacion Universal, OPEID # 02316400</u>

Dear Mr. Kelly:

        On behalf of Instituto de Educacion Universal ("IEU"),
we submit the following further response to the Institutional
Participation Division's ("IPD") March 6, 1995 letter to Mr.
Angel Ruiz Rivera, President of IEU.[1]  Specifically, this
response addresses IPD's inquiries with regard to IEU's Financial
Statements for the years ending June 30, 1993 and 1994.

        In its March 6 letter, IPD asserts that IEU does not
meet the general standards of financial responsibility as defined
under 34 C.F.R. § 668.15 because:  (1) the institution exhibits
an acid test ratio of 1:1.23; and (2) the institution is
delinquent in making payments owed to its vendors and suppliers.
Moreover, IPD requests the institution to post an irrevocable
letter of credit in the amount of $8,825,000 by May 6, 1995,
which purportedly represents 50 percent of the total volume of
Federal Student Financial Assistance funds delivered or disbursed
through the institution for the most recent award year for which
information is available.

        IEU, with confirmation from its independent auditor,
calculates its acid test ratio as greater than 1:1.  IEU's
calculation includes the following items in cash and cash equivalents:

---

[1]    IEU submitted a response with regard to unrelated issues to
Ms. Rosemary Foltis on April 11, 1995.

Mr. Gene Kelly
May 11, 1995
Page 2

| | |
|---|---|
| Cash | $ 101,441 |
| Accounts receivable from students | $5,358,070 |
| Accounts receivable from bank (in escrow) | $ 350,000 |
| Due from related entities | $ 100,569 |
| Due from plant fund | $ 222,426 |
| Due from other funds | $ 190,551 |
| Total "Acid Test" Assets: | $6,323,057 |

IEU counts as current liabilities all items listed under the Current funds, Restricted and Unrestricted, for a total of $5,847,835. Thus, if IEU includes both restricted and unrestricted accounts, IEU has an acid test ratio of $6,323,057:5,847,835 or 1.08:1.

Certain cash and cash equivalent entries on IEU's June 30, 1994 balance sheet which must be included within the acid test ratio calculation merit explanation. For example, "Accounts receivable from bank (in escrow)" consists of funds held by the Roig Commercial Bank as a withholding credit owed to IEU pending a final claim settlement. On October 28, 1994 Roig Commercial Bank released the $350,000 to IEU. In addition, according to IEU management, "Due from related entities" ($100,569) refers to funds owed to IEU as a result of a short-term loan to its President, which loan is collateralized by a security interest in the President's house. As such, it is to be included as a cash equivalent in accordance with 34 C.F.R. § 668.15(b)(7)(i)(A).

IEU notes that it does not include the revolving line of credit, (drawn at $1,500,000 as described in Note 2) as a current liability in determining the current acid ratio because the debt is not in fact a demand note, as erroneously stated in footnote 2 to the financial statements, but rather a term note reasonably anticipated to be renewed on an annual basis. See Attachment A.

With regard to IEU's "late payments to vendors," IEU cannot respond to the circumstances that IPD references in its March 6 letter because IPD does not specifically identify the "late" payments. Nevertheless, IEU assures IPD that it has a policy of maintaining timely payments with its more than 300 vendors. In fact, IEU submits with this response credit references from its major vendors which clearly attest to IEU's ability to meet its obligations. See Attachment B.

Mr. Gene Kelly
May 11, 1995
Page 3


        Regardless of IPD's determination of IEU's compliance
with the financial responsibility standards, IPD's demand for a
letter of credit is inaccurate because IPD states that 50 percent
of the institution's total annual disbursements of student
financial aid would be $8,825,000.  As shown on the "Statement of
changes in fund balances" for the year ended June 30, 1994,
however, IEU had only $10,536,288 of revenue for the entire award
year of July 1, 1993 through June 30, 1994.  (In accordance with
fund accounting principles, the $9,560,147 listed as "Federal
grants and contracts" under the Current Restricted Fund is a
subset of the $10,536,288, not an addition to that revenue.)
Therefore, 50 percent of the Federal Student Financial Assistance
funds disbursed by IEU during the 1993-1994 award year is
approximately $4,780,073.

        If you have any questions with respect to the above,
please do not hesitate to call me at (202) 857-2803.

        Thank you for your cooperation in this matter.

                            Sincerely,


                            Sherry Mastrostefano

SM:df
Enclosures

3. Letters to the President Clinton.

September 29, 1995


The President
The White House
Washington, DC

Dear Mr. President:

As requested during our conversation on Tuesday, September 26 at the Ritz Carlton, I am writing to follow up on discussion regarding the current treatment of Puerto Rican higher education and postsecondary institutions and their officials by the U.S. Department of Education, specifically the Institutional Participation Division (IPD). I would like to be clear: the problems we are having within the Department are predominantly from career employees, not from political appointees. My concern is based upon the following incidents from my own institution, the Instituto Educación Universal (IEU):

Our ability to access our contact people at the IPD is hindered as we are told that they are "not available." More often than not, our calls are not returned. If we are insistent that our calls be returned, the officials at the IPD threaten our institution with sanctions, stating that our pursuit of information is improper or illegal.( Mr. President, I can thoroughly document this assertion.) Moreover, even the smallest interaction is frustrating for us as one of the staff complained, "these people don't even speak English."

Since December of 1994, IEU has been trying without success to establish eligibility for its Caguas facility. IEU was finally denied its request in March of 1995, which is 90 days after the date of the application. IEU tried to ascertain how much time the process would take; not only were we treated disrespectfully, but we were given conflicting information.

IEU has responded in writing to address these concerns, providing evidence of the Department's prior approval of our additional locations and explaining why IEU meets the required financial responsibility standards. To date, IEU still has not resolved this issue nor reached any agreement with the Institutional Participation Division at the Department of Education. A positive step has been taken, however, as Assistant Secretary David Longanecker and two of his Deputy Assistant Secretaries met with us. They, too, were disturbed by the chain of events.




BAYAMON




CAROLINA



HATO REY



CAGUAS

The President
Page 2

Mr. President, I am disappointed with the interaction with IPD within the Department of Education. The officials there seem not to comprehend that Puerto Rican institutions can offer quality education for significantly less money than parallel institutions on the US mainland. This may be due to a basic lack of understanding of the Puerto Rican economic situation.

As much as I have struggled with the Department, it concerns me deeply to know that my institution is not alone. Apparently there are at least five other higher education institutions in Puerto Rico that have had similar dealings with the Department of Education with the same result.

I know that you must share my concerns. I am appreciative of any intervention on your part to help us resolve this situation. Please do not hesitate to contact me if you should need any further information or documentation.

Thank you for your interest in our case. It was a great honor to meet you and to have had the opportunity to share a moment of your time.

Most Sincerely,

Angel A. Ruiz,
President

vrl

The President
Page 2

If the Institution I represent is not immediately taken out of Reimbursement, we won't have resources to meet our obligations, including payroll, plus monies owed to our students before Christmas. Our teachers, administrators and other employees cannot continue to work without being paid. More importantly, the students we work with will be left without the opportunity of finishing their education during the anticipated time frame. There is no doubt in my that in my mind that in a legal suit for Civil Rights Discrimination against the USDE, we would prevail. Your administration does not warrant what can become a class action suit. The implications will eventually cost the taxpayers millions of dollars, but at this point, there seems no other choice.

Your reputation as a fair and humanitarian visionary precedes you, sir. As such, I respectfully request that you intervene directly in our case. We want this process finished because we know we will prevail in the end, but we must be taken out of reimbursement immediately. This will allow our institution to continue to operate as we respond to the allegations made by the USDE. If we are not taken out of reimbursement before the end of next week, the Instituto de Educación Universal will be history. The alternative, as you know, will be a travesty of justice.

Mr. President, thank you again for your anticipated cooperation. This will allow us to continue our work of educating the economically disadvantaged of Puerto Rico.

Have a Merry Christmas and a Happy New Year in case we do not.

Sincerely,

Angel A. Ruiz, President
Instituto de Educación Universal

# MCI

CLIENTE INSTITUTO EDUCACION

PAGINA 3

## DETALLE LLAMADAS DE LARGA DISTANCIA EXTERIOR

| FECHA | HORA | LUGAR | DESDE TELEFONO | HACIA TELEFONO | MINUTOS | TIPO DE LLAMADA | CANTIDAD |
|---|---|---|---|---|---|---|---|
| 11-04 | 5:03 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 2 | DISCADO DIRECTO | .27 |
| 11-04 | 4:51 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 3 | DISCADO DIRECTO | .71 |
| 11-04 | 4:13 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 10 | DISCADO DIRECTO | 2.39 |
| 12-05 | 1:28 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 2 | DISCADO DIRECTO | .47 |
| 12-05 | 2:00 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 8 | DISCADO DIRECTO | 1.91 |
| 12-05 | 2:09 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 1 | DISCADO DIRECTO | .23 |
| 12-05 | 2:11 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 6 | DISCADO DIRECTO | 1.43 |
| 12-05 | 4:22 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 1 | DISCADO DIRECTO | .23 |
| 12-05 | 4:23 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 7 | DISCADO DIRECTO | 1.67 |
| 12-05 | 5:37 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 3 | DISCADO DIRECTO | .41 |
| 12-05 | 6:11 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 2 | DISCADO DIRECTO | .27 |
| 12-05 | 6:26 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 2 | DISCADO DIRECTO | .27 |
| 12-07 | 2:27 PM | WASHING DC | 809 250-1921 | 202 797-1344 | 2 | DISCADO DIRECTO | .47 |
| 12-07 | 6:26 PM | WASHING DC | 809 250-1921 | 202 797-1433 | 1 | DISCADO DIRECTO | .13 |
| 12-07 | 6:22 PM | WASHING DC | 809 250-1921 | 202 456-7929 | 2 | DISCADO DIRECTO | .27 |
| 12-07 | 10:32 AM | WASHING DC | 809 250-1921 | 202 797-1344 | 2 | DISCADO DIRECTO | .47 |
| 12-07 | 2:57 PM | PHOENIX AZ | 809 250-1921 | 602 253-5758 | 3 | DISCADO DIRECTO | .71 |
| 12-07 | 6:17 PM | WASHING DC | 809 250-1921 | 202 797-1344 | 4 | DISCADO DIRECTO | .55 |
| 12-07 | 3:01 PM | PHOENIX AZ | 809 250-1921 | 602 253-5758 | 1 | DISCADO DIRECTO | .23 |
| 12-07 | 10:37 AM | JACKSON FL | 809 250-1921 | 904 232-3692 | 2 | DISCADO DIRECTO | .47 |
| 12-07 | 12:43 PM | WASHING DC | 809 250-1921 | 202 797-1344 | 2 | DISCADO DIRECTO | .47 |
| 12-07 | 6:33 PM | WASHING DC | 809 250-1921 | 202 797-1344 | 3 | DISCADO DIRECTO | .41 |
| 12-08 | 11:31 AM | WASHING DC | 809 250-1921 | 202 224-0868 | 2 | DISCADO DIRECTO | .47 |
| 12 | 1:03 PM | WASHING DC | 809 250-1921 | 202 225-2154 | 2 | DISCADO DIRECTO | .47 |
| 12 | 1:05 PM | WASHING DC | 809 250-1921 | 202 225-2154 | 1 | DISCADO DIRECTO | .23 |
| 12-08 | 11:14 AM | WASHING DC | 809 250-1921 | 202 401-2731 | 1 | DISCADO DIRECTO | .23 |
| 12-08 | 11:16 AM | WASHING DC | 809 250-1921 | 202 401-2731 | 1 | DISCADO DIRECTO | .23 |
| 12-08 | 4:08 PM | WASHING DC | 809 250-1921 | 202 708-9700 | 1 | DISCADO DIRECTO | .23 |
| 12-08 | 10:39 AM | WASHING DC | 809 250-1921 | 202 797-1344 | 2 | DISCADO DIRECTO | .47 |
| 12-08 | 4:10 PM | WASHING DC | 809 250-1921 | 202 797-1344 | 1 | DISCADO DIRECTO | .23 |
| 12-08 | 4:58 PM | WASHING DC | 809 250-1921 | 202 797-1344 | 3 | DISCADO DIRECTO | .61 |
| 12-08 | 11:58 AM | WASHING DC | 809 250-1921 | 202 857-2900 | 1 | DISCADO DIRECTO | .23 |
| 12-08 | 12:05 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 2 | DISCADO DIRECTO | .47 |
| 12-08 | 4:55 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 2 | DISCADO DIRECTO | .47 |
| 12-11 | 6:28 PM | WASHING DC | 809 250-1921 | 202 479-4353 | 5 | DISCADO DIRECTO | .69 |
| 12-11 | 7:16 PM | WASHING DC | 809 250-1921 | 202 479-4353 | 2 | DISCADO DIRECTO | .27 |
| 12-11 | 12:02 PM | WASHING DC | 809 250-1921 | 202 708-9046 | 2 | DISCADO DIRECTO | .47 |
| 12-11 | 12:06 PM | WASHING DC | 809 250-1921 | 202 797-1344 | 2 | DISCADO DIRECTO | .47 |
| 12-11 | 4:28 PM | WASHING DC | 809 250-1921 | 202 797-1344 | 5 | DISCADO DIRECTO | 1.19 |
| 12-11 | 6:09 PM | WASHING DC | 809 250-1921 | 202 797-1344 | 5 | DISCADO DIRECTO | .69 |
| 12-11 | 11:45 AM | WASHING DC | 809 250-1921 | 202 857-2900 | 1 | DISCADO DIRECTO | .23 |
| 12-11 | 11:47 AM | WASHING DC | 809 250-1921 | 202 857-2900 | 1 | DISCADO DIRECTO | .23 |
| 12-11 | 11:48 AM | WASHING DC | 809 250-1921 | 202 857-2900 | 3 | DISCADO DIRECTO | .71 |
| 12-11 | 2:37 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 3 | DISCADO DIRECTO | .71 |
| 12-11 | 2:41 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 1 | DISCADO DIRECTO | .23 |
| 12-11 | 5:13 PM | WASHING DC | 809 250-1921 | 202 857-2900 | 4 | DISCADO DIRECTO | .55 |
| 12-12 | 9:56 AM | WASHING DC | 809 250-1921 | 202 401-0596 | 4 | DISCADO DIRECTO | .95 |
| 12-12 | 7:38 PM | WASHING DC | 809 250-1921 | 202 479-4353 | 2 | DISCADO DIRECTO | .27 |
| 12-12 | 1:17 PM | WASHING DC | 809 250-1921 | 202 479-4353 | 2 | DISCADO DIRECTO | .47 |
| 12-12 | 5:17 PM | WASHING DC | 809 250-1921 | 202 479-4353 | 1 | DISCADO DIRECTO | .13 |
| 12-12 | 8:23 AM | WASHING DC | 809 250-1921 | 202 479-4353 | 4 | DISCADO DIRECTO | .95 |
| 12-12 | 10:07 AM | WASHING DC | 809 250-1921 | 202 479-4353 | 2 | DISCADO DIRECTO | .47 |
| 12-12 | 10:25 AM | WASHING DC | 809 250-1921 | 202 479-4353 | 2 | DISCADO DIRECTO | .47 |
| 12-12 | 10:59 AM | WASHING DC | 809 250-1921 | 202 479-4353 | 10 | DISCADO DIRECTO | 2.39 |
| 12-12 | 12:55 PM | WASHING DC | 809 250-1921 | 202 479-4353 | 1 | DISCADO DIRECTO | .23 |
| 12-12 | 12:59 PM | WASHING DC | 809 250-1921 | 202 479-4353 | 6 | DISCADO DIRECTO | 1.43 |
| 12-12 | 1:13 PM | WASHING DC | 809 250-1921 | 202 479-4353 | 2 | DISCADO DIRECTO | .47 |
| 12 | 5:19 PM | WASHING DC | 809 250-1921 | 202 479-4353 | 1 | DISCADO DIRECTO | .13 |
| 12 | 11:56 AM | WASHING DC | 809 250-1921 | 202 479-4353 | 1 | DISCADO DIRECTO | .23 |

4. October 15, 1995 Letter from USDE Deputy Secretary David Longanecker.

UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

OCT 1 3 1995

Mr. Angel A. Ruiz-Rivera
President
Instituto de Educacion Universal
404 Avenue Barbosa
Hato Rey, Puerto Rico  00917-4302

| OPTIONAL FORM 99 (7-90) | | |
|---|---|---|
| **FAX TRANSMITTAL** | | # of pages ▶ 5 |
| To Mr. Angel A. Ruiz-Rivera | From Marianne R Phelps | |
| Dept./Agency President of IEU | Phone # (202) 708-6040 | |
| Fax # 250-1921 FAX (809) 766-2443 Phone | Fax # (202) 358-4200 | |
| NSN 7540-01-317 7368       5099-101 | GENERAL SERVICES ADMINISTRATION | |

Dear Mr. Ruiz-Rivera:

   We have reviewed all available information concerning the various matters at issue between the Instituto de Educacion Universal (IEU) and the Department of Education, including that information forwarded to us most recently. This letter sets forth a chronology of all these matters, beginning with the school's request for approval of an additional location in Caguas.

   The Department received a request from the Instituto de Educacion Universal for approval of an additional location on <u>December 12, 1994</u>. We understand that officials of any institution requesting changes to the conditions of participation in Title IV programs are quite naturally anxious for the Department to complete review of their application, and we apologize for the treatment you received from the previous Acting Director of the Institutional Participation Division when you attempted to expedite review of your request. However, the process requires in-depth review of the institution's financial situation and its capability to administer Title IV programs consistent with the regulations governing the programs. When problems, either in the area of financial responsibility or administrative capability, are identified, the time to complete review can be considerable, and it is very difficult to provide information concerning when we might be able to take action. In the case of the Instituto de Educacion Universal, our Institutional Participation Division (IPD) identified serious problems in both areas.

   In a letter dated <u>March 6, 1995</u>, IPD notified you of several deficiencies in the application that had been submitted by IEU. Since this letter is lengthy, I have enclosed a copy of that letter for your easy reference rather than attempting to summarize the contents. Several of the deficiencies identified in the March letter have been subsequently resolved. The <u>April 11, 1995</u> letter we received from Sherry Mastrostefano of Dow, Lohnes, and Albertson satisfactorily addressed the question of the address of the main campus and the two additional locations of IEU approved by the Department. Exhibits attached to her letter addressed other deficiencies relating to information concerning licensing and accreditation issues.

   The most serious deficiency identified in the March 6 letter, the institution's failure to meet financial responsibility standards, has yet to be resolved. The <u>May 11, 1995</u> letter from Sherry Mastrostefano responded to this finding. In brief, her letter asserted that:

400 MARYLAND AVE., S.W.  WASHINGTON, D.C. 20202

Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.

Page 2

(1) the institution met the acid test ratio by virtue of including certain assets which it considered as being eligible for inclusion in the acid ratio formula;

(2) the IEU auditor had erroneously classified a $1.5 million commercial loan as a "Demand Note" obligation;

(3) IEU has a policy of maintaining timely payments to vendors; and

(4) the Department's surety assessment was too high.

A member of our Financial Analysis Branch reviewed the points made in Ms. Mastrostefano's letter and concluded that the information provided did not negate our finding that the institution failed to meet financial responsibility standards. In subsequent conversations with Ms. Mastrostefano, the staff member indicated that we would need confirmation from the auditor if we were to accept the school's assertion that the $1.5 million loan was erroneously classified on the school's audited financial statement.

The auditor did provide a statement to the effect that the liability was incorrectly classified, and recently the bank also provided a letter concerning that liability. However, the documentation provided by the auditor does not change the Department's position with respect to the institution's failure to demonstrate financial responsibility, in that Generally Accepted Auditing Standards require that a material error be corrected through the reissuance of financial statements, with appropriate modification and footnote disclosure. In order for the Department to give further consideration to the classification of the $1.5 million liability, at a minimum, the auditor would need to make available the reissued financial statement, the work papers relating to the specific liability, and a copy of the actual note as executed with the financial institution.

Concerning the matter of the letter of credit, it appears that there has been some confusion. Based on his conversation with Ms. Mastrostefano, the IPD staff member concluded that school officials were in the process of obtaining a letter of credit from one of the major lending institutions in Puerto Rico, even though the question of the amount required was still at issue. Subsequently, IPD had no further communications from IEU or its Counsel concerning the posting of surety until you raised the issue with Deputy Assistant Secretary Hicks and me on September 15. In the meantime, the Department has reviewed the amount the institution is required to post and decreased the requirement from $8,825,000 to $4,700,000.

If the matter of compliance with financial responsibility standards were the only issue, IEU could come into compliance with those financial responsibility standards under the condition outlined later in this letter. However, there are now other areas of concern to the Department, namely those relating to the program review findings and the audit performed by the Office of Inspector General (OIG). These are discussed below.

Page 3

The program review at the institution, which was conducted by New York Regional staff from April 18 - 22, 1995, was initiated because of the questions concerning the institution's administrative capability raised in the course of reviewing its request for approval of an additional location. The review disclosed several major findings. Most notably, the review found that IEU made late refunds to the Federal Pell Grant program during the 1992-93 and 1993-94 award years; that Federal Pell Grant refunds were not paid; and that there had been disbursement of Federal student assistance to students enrolled in a location not recognized by the school's accrediting body. A variety of other problems also were discovered.

The regional office staff has now completed a draft of its program review report, and it is anticipated that this report will be sent to you within the next two weeks. As we are completing the report, we understand that the school may have begun to address at least some of the findings identified in the report. For instance, a school official has indicated that the Federal Pell Grant refunds have since been paid. In addition, the accrediting agency has now provided written confirmation that the location in question is considered part of the main campus.

On the other hand, there almost surely will be actions required of and liabilities assessed against the institution. If the findings in the report are sufficiently serious in the judgment of the regional staff, they also could refer the institution to the Compliance and Enforcement Division (CED) for administrative action. (Depending upon the circumstances, administrative action can include, but is not limited to, terminating an institution's participation in the Federal programs authorized under Title IV of the Higher Education Act.)

However, since the report is not yet completed, this is only an indication of what the possible conclusions might be. Once the report is issued, the school will have a full opportunity to respond to it and provide information relevant to the findings prior to the issuance of a program review determination letter that would contain the actions required and any liabilities that might be assessed as a result of the review.

Finally, the Department of Education's Office of Inspector General (OIG) conducted an audit of IEU's student financial assistance programs for the award years 1991-92 through 1993-94. Our Compliance and Enforcement Division recently received the final audit report from OIG. This report, dated September 1995, includes two very serious findings:

(1) overstated clock hours of instruction resulted in Pell Grant overawards of $3,854,700; and

(2) unrelated to the first finding, the use of excess Federal student aid funds to pay for the institution's general operating expenses (primarily to meet payroll costs).

.ge 4

As a result of these findings, the OIG has recommended: (1) that the Department place the school on the reimbursement system for receiving Federal funds, and (2) that appropriate administrative action be taken to protect the integrity to the Federal student aid programs.

Given the seriousness of these findings, CED has now placed IEU on the reimbursement system for receiving Federal funds. CED is preparing a letter formally notifying IEU of this action, which will be mailed to the school in the immediate future along with specific information concerning policies and procedures for claiming funds under the reimbursement system. Beyond this action, CED will be considering whether administrative action is required and will notify you of the Department's course of action in the very near future as soon as they complete their analysis.

As mentioned above, we have found that IEU does not meet our standards of financial responsibility. Institutions must meet our standards in order to continue to participate in Title IV programs. Aside from the issue of the program review and OIG audit findings, IEU could come into compliance with our financial responsibility standards under the following condition:

> The institution could come into compliance with the financial responsibility standards by posting surety in the form of an irrevocable letter of credit equal to 50 percent of the Title IV funds received by the institution during the last complete award year for which figures are available. Based on our re-calculation, we have determined that surety of $4,700,000 would be required to insure the institution's continued participation in the Title IV student assistance programs. The assessment is consistent with the institution's estimated Title IV liability as cited by its legal counsel, Dow, Lohnes and Albertson, in their letter dated May 11, 1995. Surety would have to be provided in the form of an irrevocable letter of credit.

In some limited instances, we have allowed schools to continue participation by posting a lower percentage of surety. However, this option is not available in IEU's case because of other outstanding compliance problems.

If the institution fails to post surety, the Institutional Participation Division will be required to forward IEU to our Compliance and Enforcement Division for administrative action. Since we are already considering administrative action on the basis of the OIG report and could possibly also do so on the basis of the findings from the program review, this could be a moot point, but naturally is one that IEU may wish to consider.

To return now to the matter of an additional location, the attached March 6 letter provides notice, albeit not as clearly as it might, that IPD had denied the request. Earlier in this letter, I indicated that Ms. Mastrostephano's letter of May 11 clarified many of the deficiencies detailed in our March 6 letter. However, there has been no change in our finding that IEU does not meet financial responsibility standards. In addition, the findings of the

age 5

program review and now the OIG in its recent audit report cast serious doubt on IEU's administrative capability. As a result, at this point it is important to reiterate that the request has been denied and could not be reconsidered unless all matters concerning financial responsibility and administrative capacity were to be resolved. As a result, students in attendance at the Caguas location are not eligible to receive Federal student financial assistance.

I realize that this letter provides an extremely pessimistic picture for IEU's eligibility to participate in Title IV programs in the future. I do sincerely hope that I have been able to clarify the chronology and status of the various reviews undertaken by offices within the Department of Education. If you have questions or wish to discuss any of the matters contained in this letter, please feel free to contact Dr. Marianne Phelps, Director of the Institutional Participation and Oversight Service. Dr. Phelps can be reached at 202/708-6040.

Sincerely

David A. Longanecker
Assistant Secretary for Postsecondary
Education

cc.    Ms. Sherry Mastrostefano
       Dow, Lohnes, and Albertson

Enclosure